222 DELAWARE AVENUE, SUITE 900
P.O. BOX 25130
WILMINGTON, DE 19899
ZIP CODE FOR DELIVERIES 19801

# THE BAYARD FIRM
A   T   T   O   R   N   E   Y   S

Ⅲ MERITAS LAW FIRMS WORLDWIDE
www.bayardfirm.com
302-655-5000
(FAX) 302-658-6395
WRITER'S DIRECT ACCESS

FILED ELECTRONICALLY
ORIGINAL BY HAND

(302) 429-4208
rkirk@bayardfirm.com

May 4, 2007

The Honorable Sue L. Robinson
Chief Judge
United States District Court
844 North King Street
Wilmington, DE  19801

RE:     *Sepracor Inc. v. Dey, L.P. and Dey, Inc.,*
        C.A. Nos. 06-113-*** & 06-604-*** (Consolidated Cases)

Dear Chief Judge Robinson:

I write on behalf of Sepracor Inc. ("Sepracor") in response to the letter of May 1, 2007 sent to you by defendants Dey, L.P. and Dey, Inc. (collectively, "Dey") in connection with these consolidated cases.  These cases involve Sepracor's innovative XOPENEX® (levalbuterol hydrochloride) inhalation solutions, which Sepracor developed in the 1990s, and Dey's attempt to copy and market these products before Sepracor's patents expire.

At the outset, Sepracor wishes to make clear that it is anxious to move this case forward on a timely and efficient schedule so as to remove the cloud Dey has placed on Sepracor's patents when Dey served its questionable Paragraph IV certifications on Sepracor.  It also wishes to make clear that it has been Dey who has repeatedly refused to cooperate in a reasonable manner to resolve disputes without involving the Court so that discovery could be completed in a reasonable time.  Finally, Sepracor wishes to express its astonishment that Dey would attempt to undermine Magistrate Judge Thynge's authority to manage the discovery phase of this case by approaching your Honor directly in this matter, particularly since the very issue of eventual transfer of the case to a sitting Judge in the District of Delaware has already been discussed with Magistrate Judge Thynge and both parties have been informed of the manner in which the Court has chosen to handle cases, including Hatch-Waxman cases, on Judge Jordan's docket.  (*See* D.I. 115, at 8, attached as Exhibit 1.)

In fact, Dey has asked that this case be assigned to a sitting judge in the District of Delaware "to avoid the risk of further delay" without fully informing your Honor of the discovery conference with the Magistrate that had been scheduled for **today** in these cases.  The parties had a 75 minute discovery conference with Magistrate Judge Thynge and have scheduled an additional conference in ten days.  The primary issue dealt with in that conference was the

659101-1

THE BAYARD FIRM

parties' inability to negotiate a reasonable schedule and mechanism for carrying out electronic discovery in this case.  Because of the delay in electronic discovery, the Magistrate Judge will also need to address Sepracor's request for an adjustment of the case and trial schedule.

Contrary to the impression it tries to portray in its letter to the Court, Dey is not a small generic drug company whose only attempt to enter the market is being thwarted by Sepracor.  Dey "develops, manufactures and markets innovative . . . medications."  Moreover, Dey is an affiliate of Merck KGaA, a German company that claims to be the oldest chemical and pharmaceutical company in the world.  (*See* Exhibit 2.)  Like other innovator companies in the pharmaceutical arena, Dey regularly seeks patent protection to secure market advantages.  Dey also lists its patents in the Orange Book and asserts them against its competitors to maintain the very market advantages of which it claims to be deprived somehow by Sepracor and the schedule put in place by this Court for these consolidated cases. (*See* Exhibit 2.)

In its letter, Dey criticizes Sepracor's earlier efforts to have this Court set a proposed discovery plan in the initial case (C.A. No. 06-113, hereinafter "Dey I") that would have corresponded to the schedule of a case involving the same patents-in-suit pending in the District Court of Massachusetts. (*See* D.I. 24, attached as Exhibit 3.)  The defendant in the Massachusetts case is the first "generic" drug company to challenge the patents-in-suit at issue in this case.  Dey neglects to mention that with respect to the three levalbuterol inhalation solution products at issue in Dey I, Dey cannot, without a drastic forfeiture event[1] by the "first filer," enter the market with these products until 180 days after the ANDA of that "first filer" had been approved and the "first filer" had entered the market.  Dey also fails to mention that Judge Jordan found the "aggressive" discovery plan proposed by Dey to be similarly inappropriate for this case. (*See* D.I. 27, at 8, attached as Exhibit 4.)

Dey also fails to mention that the revised Scheduling Order entered by Judge Jordan in December 2006 resulted from a second ANDA by Dey directed to a fourth levalbuterol inhalation solution product that was filed with the FDA some seven months after Dey filed its initial ANDA that was directed to the first three levalbuterol inhalation solution products. (*See* D.I. 70, at 4, attached as Exhibit 5.)

A review of the transcript of the discovery conference of November 1, 2006 shows that Judge Jordan's admonitions were directed at both parties to this case. (*See* D.I. 65, at 14-17, attached as Exhibit 5.)  For instance, with respect to e-discovery, Judge Jordan informed Dey to "[j]ust get it done." (*See* D.I. 65, at 14-17, attached as Exhibit 6.)  As mentioned aboved, e-discovery is still not done and this is a direct result of Dey's own behavior and litigation delays.

As mentioned previously, Magistrate Judge Thynge has already advised the parties of the process the Court has undertaken with respect to the vacancy created by Judge Jordan's new appointment. (*See* D.I. 115, at 8, attached as Exhibit 1.)  As a result, Sepracor understands that Hatch-Waxman litigations with trial dates originally set sometime in 2008 may be reassigned to a sitting District Court Judge, if the vacant position was not filled by some date that the Court

---

[1]  These very limited and complex forfeiture events are set forth in the Medicare Prescription Drug, Improvement, and Modernization Act of 2003.  *See* 21 U.S.C. § 355(j)(5)(D)(i).

THE BAYARD FIRM

will determine.  However, the Magistrate Judge will be considering Sepracor's request for an adjustment of the trial schedule.  Meanwhile, Dey should not be allowed to impugn Sepracor before Your Honor, jump ahead of other cases on the Court's crowded docket, or avoid having Sepracor's discovery disputes resolved by Magistrate Judge Thynge in a timely fashion.

Respectfully submitted,

Richard D. Kirk (rk0922)

cc:    The Honorable Mary Pat Thynge
       Clerk of Court, by hand
       All counsel of record as shown on attached service list

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on May 4, 2007, he electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send automatic notification of the filing to the following:

Steven J. Balick, Esquire
John G. Day, Esquire
Tiffany Geyer Lydon, Esquire
Ashby & Geddes
500 Delaware Avenue, 8th Floor
PO Box 1150
Wilmington, Delaware 19899

The undersigned counsel further certifies that, on May 4, 2007, copies of the foregoing document were sent by email and hand to the above local counsel and by email and first class mail to the following non-registered participant:

Edgar H. Haug, Esquire
Kimberly J. McGraw, Esquire
Frommer, Lawrence & Haug L.L.P.
745 Fifth Avenue
New York, NY  10151

Elizabeth A. Leff, Esquire
Frommer, Lawrence & Haug L.L.P.
1667 K. Street, N.W.
Washington, D.C. 20006

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk

629446-1

# EXHIBIT 1

SHEET 1

1

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

      SEPRACOR, INC.,
4                                    :     CIVIL ACTION
               Plaintiff,           :
5                                    :
          v                          :
6                                    :
      DEY, L.P. and DEY, INC.,       :
7                                    :
                                     :     NO. 06-113 (***)
8              Defendants.
                                 - - -
9
                     Wilmington, Delaware
10          Wednesday, February 28, 2007 at 3:02 p.m.
                    TELEPHONE CONFERENCE
11
                          - - -
12
      BEFORE:   HONORABLE MARY PAT THYNGE, U.S. MAGISTRATE JUDGE
13
                          - - -
14    APPEARANCES:

15
              THE BAYARD FIRM
16            BY:  RICHARD D. KIRK, ESQ.

17                and

18            BUCHANAN INGERSOLL & ROONEY, PC
              BY:  WILLIAM E. DAVIS, ESQ.
19                 (Miami, Florida)

20                and

21            BUCHANAN INGERSOLL & ROONEY, PC
              BY:  SUSAN M. DADIO, ESQ., and
22                 BARBARA WEBB WALKER, Ph.D., ESQ.
                   (Alexandria, Virginia)
23
                  and
24

25                      Brian P. Gaffigan
                        Registered Merit Reporter

SHEET 2

**2**

1    APPEARANCES: (Continued)

2

3              BUCHANAN INGERSOLL & ROONEY, PC
              BY:   JAYSON R  WOLFGANG, ESQ.
4                  (Harrisburg, Pennsylvania)

5                   Counsel for Plaintiff

6

7              ASHBY & GEDDES
              BY:   JOHN G  DAY, ESQ
8
                   and
9
        FROMMER LAWRENCE & HAUG L.L.P
10             BY:   JOHN S. GOETZ, ESQ.
                  (New York, New York)
11
                   and
12
        FROMMER LAWRENCE & HAUG L.L.P
13             BY:   ELIZABETH A  LEFF, ESQ.
                  (Washington, District of Columbia)
14
                   Counsel for Defendants
15

16

17

18

19

20

21

22                     - oOo -

23            P R O C E E D I N G S

24        (REPORTER'S NOTE:  The following telephone

25   conference was held in chambers, beginning at 3:02 p.m.)

---

**3**

1         THE COURT:  Good afternoon, this is Judge
2    Thynge.
3         (The attorneys respond, "Good afternoon, Your
4    Honor ")
5         THE COURT:  Okay.  Let me just try to find
6    out -- I heard Dick's voice.  Dick, who is on the line with
7    you for Sepracor?
8         MR. KIRK:  Your Honor, this is Dick Kirk from
9    The Bayard Firm.  And with me on the line from Buchanan
10   Ingersoll & Rooney are Susan Dadio, Barbara Walker, Bill
11   Davis and Jayson Wolfgang.
12        THE COURT:  Okay.  Thank you.  And who is on the
13   line on behalf of Dey?
14        MR. DAY:  Good afternoon, Your Honor.  You have
15   John Day for Dey; and with me on the line are Elizabeth Leff
16   and John Goetz from Frommer Lawrence & Haug.
17        THE COURT:  All right.  Thank you very much.
18        We have a couple issues to discuss, at least
19   according to the order that was reviewed.  First of all,
20   what are the parties' position concerning consenting to my
21   jurisdiction?
22        MR. DAVIS:  Your Honor, this is William Davis on
23   behalf of Sepracor.  We've conferred with our client and
24   they do not wish to consent to Magistrate Court jurisdiction
25   for dispositive matters in the case.

---

**4**

1         THE COURT:  Well, that eliminates that.  Okay.
2    Then the next issue, we've got scheduling issues and
3    discovery disputes.  Maybe we should address the scheduling
4    issues first.
5         MR. DAVIS:  And, Your Honor, we do have some
6    agreements on the discovery disputes that we just hammered
7    out so we may be able to shortcut that as well.
8         THE COURT:  Which do you think I ought to
9    tackle first, the discovery disputes or the scheduling
10   issue?
11        MR. DAVIS:  I guess we could go to scheduling
12   issues.
13        THE COURT:  In light of that, looking over Judge
14   Jordan's schedule in this case, the real question I guess is
15   whether -- I think you've got an outstanding motion right
16   now, do you not, filed in this case?
17        MS. LEFF:  Yes, we do, Your Honor.  This is
18   Elizabeth Leff from Dey.  We have a motion to dismiss one of
19   the claims for --
20        THE COURT:  Willfulness?
21        MS. LEFF:  -- willfulness.
22        THE COURT:  Yes, okay.  And in light of the fact
23   that the parties -- this, I can't remember.  Do we actually
24   have a date set for mediation in this case?
25        MS. LEFF:  Yes, Your Honor.  Elizabeth Leff

---

**5**

1    again.  We do.  We had a mediation to commence on May 7th.
2         THE COURT:  Are we still going to be going
3    forward with that, counsel?
4         MR. DAVIS:  Your Honor, from Sepracor's
5    standpoint, we believe that mediation at that time would
6    be premature in light of the discovery that we are going
7    to need to conduct and the difficulty in trying to resolve
8    these cases anyway.
9         THE COURT:  I understand your concerns expressed
10   as far as the difficulty in settling such cases.  I don't
11   mind attempting to try to do it, but your other concern is
12   prematurity as far as what you are going to have committed
13   concerning discovery?
14        MR. DAVIS:  Yes, Your Honor.
15        THE COURT:  All right.  We'll address that, too,
16   as well  Let's talk about the schedule
17        It kind of seems, at least to me; unless the
18   parties feel differently, why don't you tell me; have you
19   discussed the scheduling order at all about discovery
20   cutoff, any of the other matters?  It doesn't sound to me
21   like we need an interim status report on May 3rd and May
22   10th.  We can probably push that back.  Personally, I don't
23   think you need to file case dispositives when this is going
24   to be a bench trial.
25        The tutorial, obviously, unless the parties wish

SHEET 3

**6**

1   for me to have a minitutorial so I understand the issues
2   more when it comes to discovery disputes, I don't mind doing
3   that. All these dates, I just don't know how wedded you are
4   to these dates in light of the fact that we're approaching
5   March and we don't have a District Court Judge unless local
6   counsel on the phone are more informed than I am, I haven't
7   heard anything at all about what is going on in that regard
8   about our prospects of having a District Court Judge any
9   time soon, such as this year.
10          MR. KIRK:  I have no idea, Your Honor.
11          MR. DAY:  Nor do I.
12          THE COURT:  I literally have heard nothing.
13          MR. KIRK:  Nor have I.
14          THE COURT:  I think they're more concerned about
15  what is going on in Iraq rather than what is happening in
16  the United States.  So let's talk about it.  Do you think it
17  makes any sense to keep the schedule in as it presently
18  exists or haven't you really thought about it?
19          MS. LEFF:  Your Honor, this is Elizabeth Leff on
20  behalf of Dey.  We would like to keep the schedule as it is.
21  The schedule has been pushed back once due to the addition
22  of another ANDA product and we would like to get this case
23  resolved.  It's been around since the beginning of 2006 and
24  we think it should be resolved by the beginning of 2008 when
25  it's scheduled to be resolved.

**7**

1          MR. DAVIS:  Your Honor, on behalf of Sepracor,
2   William Davis.  I guess we could leave it as it is for now,
3   but it seems like that unless a judge is appointed, some of
4   these dates will become meaningless.
5          THE COURT:  Oh, I think that is probably true.
6   But the dates, for example, in which you submit your claim
7   construction briefs I don't consider necessarily meaningless
8   because that means that your case could be set up.  I, quite
9   frankly, am not of the same belief as Judge Jordan is about
10  giving counsel the opportunity to file briefs on case
11  dispositive motions when it's a bench trial.  But it also
12  is clear to me that once you get your claim construction
13  briefing done, I'm not certain that you will end up having a
14  hearing on November 20th, 2007.
15          But I certainly think that to the extent counsel
16  can get the case teed up for the next judge to take it on,
17  it makes some sense to have a schedule in at least up to,
18  and including, those dates, the dates where there is more
19  responsibility on the part of counsel than there is on the
20  court.  And I have no problem leaving the dates as is.
21  Probably what we should do is set up another teleconference
22  in the future and find out the status of the case maybe
23  even before you start filing your case dispositive motions.
24  You are going to have to still do the claim construction
25  material in any event.

**8**

1          Yes?
2          MR. DAY:  Your Honor, it's John Day.  Just a
3   quick question, if I may.
4          THE COURT:  Sure.
5          MR. DAY:  I'm aware in some other ANDA cases
6   that some of the other District Court Judges were willing
7   to take them on so they wouldn't be left in limbo.
8          THE COURT:  Yes.
9          MR. DAY:  I'm wondering if we might have a shot
10  here.
11          THE COURT:  Oh, I think you do.  I think you do
12  I definitely think you do, John.  I think the reason your
13  case wasn't picked up is because your trial date was in
14  2008.  If you noticed, the other trial dates in the other
15  cases were picked up because it was in 2007.
16          MR. DAY:  Okay.
17          THE COURT:  But I do think you have a decent
18  chance of that, depending upon how backlogged this court
19  ends up getting on other matters.
20          MR. DAY:  Thank you, Your Honor.
21          THE COURT:  No, the ANDA cases they pay more
22  attention to as far as that is concerned.  I will tell you
23  that Chief Judge Robinson, who is one of the judges that
24  picks it up, she is of the same belief I am about case
25  dispositive motions in bench trials and I think we have been

**9**

1   working on Judge Sleet long enough, he may be of the same
2   opinion as well.  At least, this was the discussion in the
3   judges meetings.  He was kind of flabbergasted to find out
4   the two of us don't let them be filed.
5          Do you want me to get any background at all on
6   this technology or do you think it would not be particularly
7   helpful to me for the purposes of discovery issues?  I throw
8   that out to you because that request was made in another
9   case and that is the only reason why I'm asking you if you
10  think it would necessarily be helpful to me.
11          (Pause.)
12          THE COURT:  Boy, there is an absolute silence on
13  that point.
14          MR. DAVIS:  This is William Davis, Your Honor.
15  I'm just sitting here thinking of what the discovery issues
16  could conceivably be.  We've worked several things out and
17  I think until we maybe have a clearer picture as to what
18  the real issues are that would be teed up for some sort of
19  discovery hearing, maybe we can't answer that quite yet.
20          THE COURT:  All right.  I made a suggestion
21  that it might not be a bad idea for us to have a status
22  conference in the September time frame.  And I think that, I
23  personally think that is a decent suggestion, either August
24  or September, because by that time you will have moved along
25  and we will now be hitting dates in which you will actually

SHEET 4

**10**

1  have to start doing some briefing. So why don't we look at
2  early September just to remind me. Before I set a date and
3  time, are we dealing with multiple time zones on this call?
4  MS. LEFF: No, Your Honor, we're not.
5  THE COURT: That's interesting. Okay. How
6  about September 11th, if that is doable on everybody's
7  calendar, at either 8:00, 8:30 or 9:00 o'clock in the
8  morning?
9  MS. LEFF: Your Honor, Elizabeth Leff on behalf
10  of Dey. 8:30 or 9:00 on is fine with me.
11  MR. DAVIS: Same with me, Your Honor. William
12  Davis on behalf of Sepracor.
13  THE COURT: Then we'll schedule it for 8:30.
14  And do you want to do any submission to me before that or
15  don't bother? You don't have to.
16  MS. LEFF: Your Honor, this is Elizabeth Leff
17  on behalf of Dey. It might be a good idea so both sides
18  know and Your Honor knows which issues may need to be
19  resolved during that conference.
20  MR. DAVIS: I would agree with that, Your Honor.
21  THE COURT: Well, the Monday before that --
22  normally, it is done a week beforehand -- no, it is a
23  Tuesday. Excuse me. And I don't know if you want to do it
24  on September 4th, so why don't we make it by Friday, August
25  31st.

**11**

1  MS. LEFF: 5:00 p.m., Your Honor?
2  THE COURT: By 5:00 p.m. As a cautionary note,
3  counsel, if there is anything that you submit to me that is
4  under seal, the problem is obviously when you put it on the
5  e-filing, of course, the under seal portion doesn't get to
6  me via that. And it would be helpful if, along with the
7  e-filing, I don't necessarily care to have a whole bunch of
8  separate stuff but at least give me the materials that are
9  under seal. Do you understand what I'm saying? Because I
10  don't get them until the next day.
11  MR. DAVIS: We will do that, Your Honor.
12  THE COURT: Thank you. All right. So we're
13  keeping the schedule in and we'll see how it goes forward as
14  it presently exists and we'll see what happens then in
15  September.
16  MS. LEFF: Your Honor?
17  THE COURT: Yes.
18  MS. LEFF: This is Elizabeth Leff on behalf of
19  Dey. When I was going through the schedule, I noticed that
20  we didn't have a date for supplemental expert reports which
21  generally goes to secondary consideration. I was wondering
22  if we could add that to the schedule?
23  THE COURT: What paragraph are expert reports
24  found in, Elizabeth?
25  MS. LEFF: 3e.

**12**

1  THE COURT: You're talking about having another
2  date like 30 days before the completion of discovery?
3  MS. LEFF: Yes.
4  THE COURT: Is that what you are thinking? All
5  right. And have you discussed that with plaintiff's side?
6  MS. LEFF: Your Honor, I haven't because I just
7  was looking at it.
8  THE COURT: All right.
9  MR. DAVIS: I think we could discuss that and
10  work that out.
11  THE COURT: Why don't you do that and to the
12  extent you want to modify the scheduling order, do so. Send
13  me an amendment to it. If you can't work it out, then just
14  tell me.
15  MS. LEFF: Thank you, Your Honor.
16  THE COURT: Let's get to the issues, the
17  discovery issues then, counsel. What is left out of the
18  materials that were sent to me which still needs to be
19  resolved?
20  MS. LEFF: Your Honor, I believe that we have
21  managed to agree on everything. However, I just wanted to
22  go over, for the record, our agreement with respect to
23  backup tapes so I'm sure that we're on the same page.
24  THE COURT: That is fine, Elizabeth. And if it
25  turns out by some major miracle, you all have agreed to it,

**13**

1  I'll be very pleased.
2  MS. LEFF: Okay.
3  THE COURT: Go ahead.
4  MS. LEFF: Here goes.
5  We have been informed there are no backup tapes
6  from between 1989 to 1995.
7  In November 2002, the system was backed up and
8  there are between 100 to 116 backup tapes that were made.
9  There were also one set of the last backup tapes from the
10  first class e-mail system.
11  Between 1995, there was a litigation hold put
12  on in September-October '05. That the backup tapes were
13  destroyed every 30 days pursuant to their policy. There
14  are currently approximately 2,000 backup tapes from
15  September-October '05 to the present. So what we've agreed
16  to at this point is that we would like to obtain the logs
17  for the 100 to the 116 backup tapes from November 2, 2002 to
18  determine if and which tapes we might want. They estimate,
19  Sepracor's counsel estimates it will take them two-to-three
20  weeks to obtain the log and so we will wait for those. And
21  that includes the log on the first class e-mail.
22  THE COURT: Okay.
23  MS. LEFF: We're also asking Sepracor to pull
24  the tapes from the 100 to 116 backup tapes now so we don't
25  have to wait an additional two-to-three weeks if we want to

SHEET 5

14

1   inspect them.
2           We've agreed that the set of backup tapes from
3   first class which is identified at page three and any logs
4   of those tapes, if possible, will be produced within
5   two-to-three weeks.
6           THE COURT:  As I to understand, Elizabeth, on
7   the first tape issue, the 100 to the 116, that Sepracor has
8   agreed to pull the tapes now?
9           MS. LEFF:  Yes.
10          THE COURT:  Okay.
11          MS. LEFF:  But we are not going to inspect them
12  right away.
13          THE COURT:  I understand that.  I understand.
14          MS. LEFF:  Okay.  And then, finally, they
15  reserve the right to obtain the logs for and to inspect the
16  2,000 plus backup tapes which have been retained since
17  September to October '05 because of the litigation hold.  We
18  are not going to inspect either the logs or the tapes now
19  but we reserve our right to do so later in the litigation,
20  if necessary.
21          THE COURT:  All right.  So far, are you in
22  agreement, Bill, concerning this?
23          MR. DAVIS:  Yes, Your Honor.  I just would
24  like to point out, and I have explained it to counsel, using
25  of the term "log," what that will include is a document

15

1   which reflects the date range of the tapes and probably a
2   description of the systems which were backed up on the
3   tapes.  I don't want to suggest that there is any more
4   information than that at this point and the agreement is to
5   look at them and see where we are.
6           THE COURT:  All right.  And you're in agreement
7   with that understanding, Elizabeth?
8           MS. LEFF:  Yes, I am, Your Honor.
9           THE COURT:  All right.
10          MR. DAVIS:  There was one other matter, Your
11  Honor, that we had raised but counsel for Dey has agreed
12  to provide us with a definitive response to our various
13  correspondence regarding discovery issues by March the 9th.
14          THE COURT:  All right.  I think that dealt with
15  your letter of -- let me double-check.
16          MR. DAVIS:  There was a letter of February 22nd,
17  which was the follow-up letter to a number of letters, but
18  counsel has agreed with us that they will provide us
19  definitive response to the issues we've raised in those
20  letters.
21          THE COURT:  And those various letters are
22  Exhibits A through D?
23          MR. DAVIS:  That is correct, Your Honor.
24          THE COURT:  All right.  Fine.  Is there anything
25  else, counsel, that we need to discuss or put on the record

16

1   at this point or is counsel comfortable with the understand-
2   ing of how they have resolved their discovery disputes so
3   far?
4           MR. DAVIS:  We are comfortable, Your Honor.
5           MS. LEFF:  Your Honor, Elizabeth Leff on behalf
6   of Dey.  We're comfortable at this time.
7           THE COURT:  All right.  And the only other thing
8   that is left is that you will send over to me, and I hope it
9   can be done in short order, about modifying paragraph 3e of
10  the scheduling order for the consolidated cases that I think
11  Judge Jordan entered on December 6th.
12          MS. LEFF:  Your Honor, we should be able to
13  resolve that fairly quickly.
14          MR. DAVIS:  We can do that.
15          THE COURT:  I would hope so.
16          Dick, I've got you on the line right now?
17          MR. KIRK:  Yes, Your Honor.
18          (Brief discussion held off the record )
19          MR. KIRK:  Thank you, Your Honor.
20          THE COURT:  Thank you very much, counsel.
21          (The attorneys respond, "Thank you, Your
22  Honor.")
23          THE COURT:  Take care.  Good-bye.
24          (Telephone conference ends at 3:24 p.m.)
25

**'**

'05 [3] - 13:12, 13:15, 14:17

**0**

06-113 [1] - 1:7

**1**

100 [4] - 13:8, 13:17, 13:24, 14:7
10th [1] - 5:22
116 [4] - 13:8. 13:17, 13:24, 14:7
11th [1] - 10:6
1989 [1] - 13:6
1995 [2] - 13:6, 13:11

**2**

2 [1] - 13:17
2,000 [2] - 13:14, 14:16
2002 [2] - 13:7, 13:17
2006 [1] - 6:23
2007 [3] - 1:10, 7:14, 8:15
2008 [2] - 6:24, 8:14
20th [1] - 7:14
22nd [1] - 15:16
28 [1] - 1:10

**3**

30 [2] - 12:2, 13:13
31st [1] - 10:25
3:02 [2] - 1:10, 2:25
3:24 [1] - 16:24
3e [2] - 11:25, 16:9
3rd [1] - 5:21

**4**

4th [1] - 10:24

**5**

5:00 [2] - 11:1, 11:2

**6**

6th [1] - 16:11

**7**

7th [1] - 5:1

**8**

8:00 [1] - 10:7
8:30 [3] - 10:7, 10:10, 10:13

**9**

9:00 [2] - 10:7, 10:10
9th [1] - 15:13

**A**

able [2] - 4:7. 16:12
absolute [1] - 9:12
according [1] - 3:19
ACTION [1] - 1:4
add [1] - 11:22
addition [1] - 6:21
additional [1] - 13:25
address [2] - 4:3, 5:15
afternoon [3] - 3:1. 3:3, 3:14
agree [1] - 10:20. 12:21
agreed [6] - 12:25, 13:15. 14:2, 14:8, 15:11, 15:18
agreement [4] - 12:22, 14:22, 15:4, 15:6
agreements [1] - 4:6
ahead [1] - 13:3
Alexandria [1] - 1:22
amendment [1] - 12:13
AND [1] - 1:2
ANDA [3] - 6:22, 8:5, 8:21
answer [1] - 9:19
anyway [1] - 5:8
APPEARANCES [2] - 1:14, 2:1
appointed [1] - 7:3
approaching [1] - 6:4
ASHBY [1] - 2:7
attempting [1] - 5:11
attention [1] - 8:22
attorneys [2] - 3:3, 16:21
August [2] - 9:23. 10:24
aware [1] - 8:5

**B**

backed [2] - 13:7. 15:2
background [1] - 9:5
backlogged [1] - 8:18
backup [10] - 12:23. 13:5, 13:8, 13:9, 13:12, 13:14. 13:17. 13:24, 14:2, 14:16
bad [1] - 9:21
Barbara [1] - 3:10
BARBARA [1] - 1:22
Bayard [1] - 3:9
BAYARD [1] - 1:15
become [1] - 7:4
BEFORE [1] - 1:12
beforehand [1] - 10:22
beginning [3] - 2:25, 6:23, 6:24
behalf [9] - 3:13, 3:23. 6:20, 7:1, 10:9, 10:12, 10:17, 11:18, 16:5
belief [2] - 7:9, 8:24
bench [2] - 5:24, 7:11, 8:25
between [2] - 13:6. 13:8
Between [1] - 13:11
Bill [2] - 3:10, 14:22
bother [1] - 10:15
Boy [1] - 9:12
Brian [1] - 1:25
Brief [1] - 16:18
briefing [2] - 7:13, 10:1
briefs [2] - 7:7. 7:10
Buchanan [1] - 3:9
BUCHANAN [3] - 1:18. 1.21, 2:3
bunch [1] - 11:7
BY [7] - 1:16. 1:18, 1:21, 2:3, 2:7, 2:10, 2:13
bye [1] - 16:23

**C**

calendar [1] - 10:7
care [2] - 11:7, 16:23
case [14] - 3:25, 4:14, 4:16, 4:24, 5:23. 6:22, 7:8, 7:10, 7:16, 7:22, 7:23. 8:13. 8:24, 9:9
cases [6] - 5:8. 5:10. 8:5, 8:15, 8:21,

16:10
cautionary [1] - 11:2
certain [1] - 7:13
certainly [1] - 7:15
chambers [1] - 2:25
chance [1] - 8:18
check [1] - 15:15
Chief [1] - 8:23
CIVIL [1] - 1:4
claim [3] - 7:6. 7:12. 7:24
claims [1] - 4:19
class [3] - 13:10. 13:21, 14:3
clear [1] - 7:12
clearer [1] - 9:17
client [1] - 3:23
Columbia [1] - 2:13
comfortable [3] - 16:1, 16:4. 16:6
commence [1] - 5:1
committed [1] - 5:12
completion [1] - 12:2
conceivably [1] - 9:16
concern [1] - 5:11
concerned [2] - 6:14, 8:22
concerning [3] - 3:20. 5:13, 14:22
concerns [1] - 5:9
conduct [1] - 5:7
conference [4] - 2:25, 9:22, 10:19, 16:24
CONFERENCE [1] - 1:10
conferred [1] - 3:23
consent [1] - 3:24
consenting [1] - 3:20
consider [1] - 7:7
consideration [1] - 11:21
consolidated [1] - 16:10
construction [3] - 7:7, 7:12, 7:24
Continued [2] - 2:1
correct [1] - 15:23
correspondence [1] - 15:13
counsel [14] - 5:3, 6:6, 7:10, 7:15, 7:19. 11:3, 12:17, 13:19. 14:24, 15:11, 15:18, 15:25, 16:1, 16:20
Counsel [2] - 2:5. 2:14
couple [1] - 3:18
course [1] - 11:5
COURT [51] - 1:1, 3:1, 3:5. 3:12, 3:17, 4:1,

4:8, 4:13, 4:20, 4:22, 5:2. 5:9, 5:15, 6:12, 6:14, 7:5, 8:4. 8:8, 8:11. 8:17, 8:21, 9:12, 9:20, 10:5, 10:13. 10:21, 11:2. 11:12, 11:17, 11:23, 12:1, 12:4, 12:8, 12:11, 12:16, 12:24. 13:3, 13:22, 14:6, 14:10, 14:13, 14:21, 15:6. 15:9, 15:14. 15:21, 15:24, 16:7, 16:15. 16:20. 16:23
Court [4] - 3:24. 6:5. 6:8, 8:6
court [2] - 7:20, 8:18
cutoff [1] - 5:20

**D**

DADIO [1] - 1:21
Dadio [1] - 3:10
date [6] - 4:24. 8:13, 10:2, 11:20, 12:2, 15:1
dates [9] - 6:3, 6:4, 7:4, 7:6, 7:18, 7:20. 8:14, 9:25
DAVIS [18] - 1:18, 3:22, 4:5, 4:11, 5:4, 5:14, 7:1, 9:14, 10:11. 10:20, 11:11. 12:9, 14:23, 15:10, 15:16, 15:23, 16:4, 16:14
Davis [5] - 3:11, 3:22. 7:2, 9:14, 10:12
DAY [8] - 2:7. 3:14. 6:11, 8:2, 8:5, 8:9, 8:16, 8:20
days [2] - 12:2, 13:13
dealing [1] - 10:3
dealt [1] - 15:14
December [1] - 16:11
decent [2] - 8:17, 9:23
Defendants [2] - 1:8, 2:14
definitely [1] - 8:12
definitive [2] - 15:12. 15:19
DELAWARE [1] - 1:2
Delaware [1] - 1:9
description [1] - 15:2
destroyed [1] - 13:13
determine [1] - 13:18
Dey [9] - 3:13, 3:15, 4:18. 6:20, 10:10. 10:17, 11:19, 15:11,

16:6
DEY [2] - 1:6
Dick [3] - 3:6, 3:8, 16:16
Dick's [1] - 3:6
differently [1] - 5:18
difficulty [2] - 5:7, 5:10
discovery [14] - 4:3, 4:6, 4:9, 5:6, 5:13, 5:19, 6:2, 9:7, 9:15, 9:19, 12:2, 12:17, 15:13, 16:2
discuss [3] - 3:18, 12:9, 15:25
discussed [2] - 5:19, 12:5
discussion [2] - 9:2, 16:18
dismiss [1] - 4:18
dispositive [4] - 3:25, 7:11, 7:23, 8:25
dispositives [1] - 5:23
disputes [5] - 4:3, 4:6, 4:9, 6:2, 16:2
DISTRICT [2] - 1:1, 1:2
District [4] - 2:13, 6:5, 6:8, 8:6
doable [1] - 10:6
document [1] - 14:25
done [3] - 7:13, 10:22, 16:9
double [1] - 15:15
double-check [1] - 15:15
due [1] - 6:21
during [1] - 10:19

E

e-filing [2] - 11:5, 11:7
e-mail [2] - 13:10, 13:21
early [1] - 10:2
either [3] - 9:23, 10:7, 14:18
eliminates [1] - 4:1
ELIZABETH [1] - 2:13
Elizabeth [12] - 3:15, 4:18, 4:25, 6:19, 10:9, 10:16, 11:18, 11:24, 12:24, 14:6, 15:7, 16:5
end [1] - 7:13
ends [2] - 8:19, 16:24
entered [1] - 16:11
ESQ [8] - 1:16, 1:18, 1:21, 1:22, 2:3, 2:7, 2:10, 2:13

estimate [1] - 13:18
estimates [1] - 13:19
event [1] - 7:25
example [1] - 7:6
Excuse [1] - 10:23
Exhibits [1] - 15:22
exists [2] - 6:18, 11:14
expert [2] - 11:20, 11:23
explained [1] - 14:24
expressed [1] - 5:9
extent [2] - 7:15, 12:12

F

fact [2] - 4:22, 6:4
fairly [1] - 16:13
far [5] - 5:10, 5:12, 8:22, 14:21, 16:3
February [2] - 1:10, 15:16
file [2] - 5:23, 7:10
filed [2] - 4:16, 9:4
filing [3] - 7:23, 11:5, 11:7
finally [1] - 14:14
fine [2] - 10:10, 12:24
Fine [1] - 15:24
FIRM [1] - 1:15
Firm [1] - 3:9
First [1] - 3:19
first [6] - 4:4, 4:9, 13:10, 13:21, 14:3, 14:7
flabbergasted [1] - 9:3
Florida [1] - 1:19
follow [1] - 15:17
follow-up [1] - 15:17
following [1] - 2:24
FOR [1] - 1:2
forward [2] - 5:3, 11:13
frame [1] - 9:22
frankly [1] - 7:9
Friday [1] - 10:24
FROMMER [2] - 2:9, 2:12
Frommer [1] - 3:16
future [1] - 7:22

G

Gaffigan [1] - 1:25
GEDDES [1] - 2:7
generally [1] - 11:21
GOETZ [1] - 2:10

Goetz [1] - 3:16
Good-bye [1] - 16:23
guess [3] - 4:11, 4:14, 7:2

H

hammered [1] - 4:6
Harrisburg [1] - 2:4
Haug [1] - 3:16
HAUG [2] - 2:9, 2:12
heard [3] - 3:6, 6:7, 6:12
hearing [2] - 7:14, 9:19
held [2] - 2:25, 16:18
helpful [3] - 9:7, 9:10, 11:6
hitting [1] - 9:25
hold [2] - 13:11, 14:17
Honor [37] - 3:4, 3:8, 3:14, 3:22, 4:5, 4:17, 4:25, 5:4, 5:14, 6:10, 6:19, 7:1, 8:2, 8:20, 9:14, 10:4, 10:9, 10:11, 10:16, 10:18, 10:20, 11:1, 11:11, 11:16, 12:6, 12:15, 12:20, 14:23, 15:8, 15:11, 15:23, 16:4, 16:5, 16:12, 16:17, 16:19, 16:22
HONORABLE [1] - 1:12
hope [2] - 16:8, 16:15

I

idea [3] - 6:10, 9:21, 10:17
identified [1] - 14:3
IN [2] - 1:1, 1:2
INC [2] - 1:3, 1:6
include [1] - 14:25
includes [1] - 13:21
including [1] - 7:18
information [1] - 15:4
informed [2] - 6:6, 13:5
ing [1] - 16:2
Ingersoll [1] - 3:10
INGERSOLL [3] - 1:18, 1:21, 2:3
inspect [4] - 14:1, 14:11, 14:15, 14:18
interesting [1] - 10:5
interim [1] - 5:21
Iraq [1] - 6:15

issue [3] - 4:2, 4:10, 14:7
issues [13] - 3:18, 4:2, 4:4, 4:12, 6:1, 9:7, 9:15, 9:18, 10:18, 12:16, 12:17, 15:13, 15:19

J

JAYSON [1] - 2:3
Jayson [1] - 3:11
JOHN [2] - 2:7, 2:10
John [4] - 3:15, 3:16, 8:2, 8:12
Jordan [2] - 7:9, 16:11
Jordan's [1] - 4:14
JUDGE [1] - 1:12
Judge [8] - 3:1, 4:13, 6:5, 6:8, 7:9, 8:23, 9:1, 16:11
judge [2] - 7:3, 7:16
judges [2] - 8:23, 9:3
Judges [1] - 8:6
jurisdiction [2] - 3:21, 3:24

K

keep [2] - 6:17, 6:20
keeping [1] - 11:13
kind [2] - 5:17, 9:3
KIRK [6] - 1:16, 3:8, 6:10, 6:13, 6:17, 16:19
Kirk [1] - 3:8
knows [1] - 10:18

L

L.L.P [2] - 2:9, 2:12
L.P [1] - 1:6
last [1] - 13:9
Lawrence [1] - 3:16
LAWRENCE [2] - 2:9, 2:12
least [3] - 3:18, 5:17, 7:17, 9:2, 11:8
leave [1] - 7:2
leaving [1] - 7:20
Leff [8] - 3:15, 4:18, 4:25, 6:19, 10:9, 10:16, 11:18, 16:5
LEFF [25] - 2:13, 4:17, 4:21, 4:25, 6:19, 10:4, 10:9, 10:16, 11:1, 11:16, 11:18, 11:25, 12:3, 12:6,

12:15, 12:20, 13:2, 13:4, 13:23, 14:9, 14:11, 14:14, 15:8, 16:5, 16:12
left [3] - 8:7, 12:17, 16:8
letter [3] - 15:15, 15:16, 15:17
letters [3] - 15:17, 15:20, 15:21
light [4] - 4:13, 4:22, 5:6, 6:4
limbo [1] - 8:7
line [5] - 3:6, 3:9, 3:13, 3:15, 16:16
literally [1] - 6:12
litigation [3] - 13:11, 14:17, 14:19
local [1] - 6:5
log [3] - 13:20, 13:21, 14:25
logs [4] - 13:16, 14:3, 14:15, 14:18
look [2] - 10:1, 15:5
looking [2] - 4:13, 12:7

M

MAGISTRATE [1] - 1:12
Magistrate [1] - 3:24
mail [2] - 13:10, 13:21
major [1] - 12:25
managed [1] - 12:21
March [2] - 6:5, 15:13
MARY [1] - 1:12
material [1] - 7:25
materials [2] - 11:8, 12:18
matter [1] - 15:10
matters [3] - 3:25, 5:20, 8:19
meaningless [2] - 7:4, 7:7
means [1] - 7:8
mediation [4] - 4:24, 5:1, 5:5
meetings [1] - 9:3
Merit [1] - 1:25
Miami [1] - 1:19
might [4] - 8:9, 9:21, 10:17, 13:18
mind [2] - 5:11, 6:2
minitutorial [1] - 6:1
miracle [1] - 12:25
modify [1] - 12:12
modifying [1] - 16:9
Monday [1] - 10:21

morning [1] - 10:8
motion [2] - 4:15, 4:18
motions [3] - 7:11,
  7:23, 8:25
moved [1] - 9:24
MR [29] - 3:8, 3:14,
  3:22, 4:5, 4:11, 5:4,
  5:14, 6:10, 6:11,
  6:13, 7:1, 8:2, 8:5,
  8:9, 8:16, 8:20, 9:14,
  10:11, 10:20, 11:11,
  12:9, 14:23, 15:10,
  15:16, 15:23, 16:4,
  16:14, 16:17, 16:19
MS [24] - 4:17, 4:21,
  4:25, 6:19, 10:4,
  10:9, 10:16, 11:1
  11:16, 11:18, 11:25,
  12:3, 12:6, 12:15,
  12:20, 13:2, 13:4,
  13:23, 14:9, 14:11,
  14:14, 15:8, 16:5,
  16:12
multiple [1] - 10:3

### N

necessarily [3] - 7:7,
  9:10, 11:7
necessary [1] - 14:20
need [5] - 5:7, 5:21,
  5:23, 10:18, 15:25
needs [1] - 12:18
New [2] - 2:10
next [3] - 4:2, 7:16,
  11:10
NO [1] - 1:7
normally [1] - 10:22
NOTE [1] - 2:24
note [1] - 11:2
nothing [1] - 6:12
noticed [2] - 8:14,
  11:19
November [3] - 7:14,
  13:7, 13:17
number [1] - 15:17

### O

o'clock [1] - 10:7
obtain [3] - 13:16,
  13:20, 14:15
obviously [2] - 5:25,
  11:4
October [3] - 13:12,
  13:15, 14:17
OF [1] - 1:2
once [2] - 6:21, 7:12
one [4] - 4:18, 8:23,

13:9, 15:10
oOo [1] - 2:22
opinion [1] - 9:2
opportunity [1] - 7:10
order [5] - 3:19, 5:19,
  12:12, 16:9, 16:10
ought [1] - 4:8
outstanding [1] - 4:15

### P

p.m [5] - 1:10, 2:25,
  11:1, 11:2, 16:24
page [2] - 12:23, 14:3
paragraph [2] - 11:23,
  16:9
part [1] - 7:19
particularly [1] - 9:6
parties [3] - 4:23,
  5:18, 5:25
parties' [1] - 3:20
PAT [1] - 1:12
Pause [1] - 9:11
pay [1] - 8:21
PC [3] - 1:18, 1:21, 2:3
Pennsylvania [1] - 2:4
Personally [1] - 5:22
personally [1] - 9:23
Ph D [1] - 1:22
phone [1] - 6:6
picked [2] - 8:13, 8:15
picks [1] - 8:24
picture [1] - 9:17
Plaintiff [2] - 1:4, 2:5
plaintiff's [1] - 12:5
pleased [1] - 13:1
plus [1] - 14:16
point [3] - 9:13, 13:16,
  14:24, 15:4, 16:1
policy [1] - 13:13
portion [1] - 11:5
position [1] - 3:20
possible [1] - 14:4
premature [1] - 5:6
prematurity [1] - 5:12
present [1] - 13:15
presently [2] - 6:17,
  11:14
problem [2] - 7:20,
  11:4
produced [1] - 14:4
product [1] - 6:22
prospects [1] - 6:8
provide [2] - 15:12,
  15:18
pull [2] - 13:23, 14:8
purposes [1] - 9:7
pursuant [1] - 13:13
push [1] - 5:22

pushed [1] - 6:21
put [3] - 11:4, 13:11,
  15:25

### Q

quick [1] - 8:3
quickly [1] - 16:13
quite [2] - 7:8, 9:19

### R

raised [2] - 15:11,
  15:19
range [1] - 15:1
rather [1] - 6:15
real [2] - 4:14, 9:18
really [1] - 6:18
reason [2] - 8:12, 9:9
record [3] - 12:22,
  15:25, 16:18
reflects [1] - 15:1
regard [1] - 6:7
regarding [1] - 15:13
Registered [1] - 1:25
remember [1] - 4:23
remind [1] - 10:2
report [1] - 5:21
Reporter [1] - 1:25
REPORTER'S [1] -
  2:24
reports [2] - 11:20,
  11:23
request [1] - 9:8
reserve [2] - 14:15,
  14:19
resolve [2] - 5:7, 16:13
resolved [6] - 6:23,
  6:24, 6:25, 10:19,
  12:19, 16:2
respect [1] - 12:22
respond [2] - 3:3,
  16:21
response [2] - 15:12,
  15:19
responsibility [1] -
  7:19
retained [1] - 14:16
reviewed [1] - 3:19
RICHARD [1] - 1:16
Robinson [1] - 8:23
Rooney [1] - 3:10
ROONEY [3] - 1:18,
  1:21, 2:3

### S

schedule [10] - 4:14,

5:16, 6:17, 6:20,
  6:21, 7:17, 10:13,
  11:13, 11:19, 11:22
scheduled [1] - 6:25
scheduling [7] - 4:2,
  4:3, 4:9, 4:11, 5:19,
  12:12, 16:10
seal [3] - 11:4, 11:5,
  11:9
secondary [1] - 11:21
see [3] - 11:13, 11:14,
  15:5
send [1] - 16:8
Send [1] - 16:8
sense [2] - 6:17, 7:17
sent [1] - 12:18
separate [1] - 11:8
Sepracor [6] - 3:7,
  3:23, 7:1, 10:12,
  13:23, 14:7
SEPRACOR [1] - 1:3
Sepracor's [2] - 5:4,
  13:19
September [9] - 9:22,
  9:24, 10:2, 10:6,
  10:24, 11:15, 13:12,
  13:15, 14:17
September-October
  [2] - 13:12, 13:15
set [6] - 4:24, 7:8,
  7:21, 10:2, 13:9,
  14:2
settling [1] - 5:10
several [1] - 9:16
short [1] - 16:9
shortcut [1] - 4:7
shot [1] - 8:9
side [1] - 12:5
sides [1] - 10:17
silence [1] - 9:12
sitting [1] - 9:15
Sleet [1] - 9:1
soon [1] - 6:9
sort [1] - 9:18
sound [1] - 5:20
standpoint [1] - 5:5
start [2] - 7:23, 10:1
States [1] - 6:16
STATES [1] - 1:1
status [3] - 5:21, 7:22,
  9:21
still [3] - 5:2, 7:24,
  12:18
stuff [1] - 11:8
submission [1] -
  10:14
submit [2] - 7:6, 11:3
suggest [1] - 15:3
suggestion [2] - 9:20,
  9:23

supplemental [1] -
  11:20
Susan [1] - 3:10
SUSAN [1] - 1:21
system [2] - 13:7,
  13:10
systems [1] - 15:2

### T

tackle [1] - 4:9
tape [1] - 14:7
tapes [17] - 12:23,
  13:5, 13:8, 13:9,
  13:12, 13:14, 13:17,
  13:18, 13:24, 14:2,
  14:4, 14:8, 14:16,
  14:18, 15:1, 15:3
technology [1] - 9:6
teed [2] - 7:16, 9:18
teleconference [1] -
  7:21
Telephone [1] - 16:24
TELEPHONE [1] -
  1:10
telephone [1] - 2:24
term [1] - 14:25
THE [53] - 1:1, 1:2,
  1:15, 3:1, 3:5, 3:12,
  3:17, 4:1, 4:8, 4:13,
  4:20, 4:22, 5:2, 5:9,
  5:15, 6:12, 6:14. 7:5,
  8:4, 8:8, 8:11, 8:17,
  8:21, 9:12, 9:20,
  10:5, 10:13, 10:21,
  11:2, 11:12, 11:17,
  11:23, 12:1, 12:4,
  12:8, 12:11, 12:16,
  12:24, 13:3, 13:22,
  14:6, 14:10, 14:13,
  14:21, 15:6, 15:9,
  15:14, 15:21, 15:24,
  16:7, 16:15, 16:20,
  16:23
thinking [2] - 9:15,
  12:4
three [3] - 13:19,
  13:25, 14:3, 14:5
throw [1] - 9:7
Thynge [1] - 3:2
THYNGE [1] - 1:12
trial [4] - 5:24, 7:11,
  8:13, 8:14
trials [1] - 8:25
true [1] - 7:5
try [2] - 3:5, 5:11
trying [1] - 5:7
Tuesday [1] - 10:23
turns [1] - 12:25

tutorial [1] - 5:25
two [4] - 9:4, 13:19,
  13:25, 14:5
two-to-three [3] -
  13:19, 13:25, 14:5

## U

U.S [1] - 1:12
under [3] - 11:4, 11:5,
  11:9
United [1] - 6:16
UNITED [1] - 1:1
unless [4] - 5:17, 5:25,
  6:5, 7:3
up [13] - 7:8, 7:13,
  7:16, 7:17, 7:21,
  8:13, 8:15, 8:19,
  8:24, 9:18, 13:7,
  15:2, 15:17

## V

various [2] - 15:12,
  15:21
via [1] - 11:6
Virginia [1] - 1:22
voice [1] - 3:6

## W

wait [2] - 13:20, 13:25
WALKER [1] - 1:22
Walker [1] - 3:10
Washington [1] - 2:13
WEBB [1] - 1:22
wedded [1] - 6:3
Wednesday [1] - 1:10
week [1] - 10:22
weeks [3] - 13:20,
  13:25, 14:5
whole [1] - 11:7
Willfulness [1] - 4:20
willfulness [1] - 4:21
WILLIAM [1] - 1:18
William [4] - 3:22, 7:2,
  9:14, 10:11
willing [1] - 8:6
Wilmington [1] - 1:9
wish [2] - 3:24, 5:25
WOLFGANG [1] - 2:3
Wolfgang [1] - 3:11
wondering [2] - 8:9,
  11:21

## Y

year [1] - 6:9
York [2] - 2:10

## Z

zones [1] - 10:3

# EXHIBIT 2

Home    Deutsch    Español    Français    Locations Worldwide    Contacts    Imprint    Search

**Corporate    Pharmaceuticals    Chemicals    Investors    Media    Career**

- ⌁ Corporate
- ⌁ Corporate Profile
- ⌁ Areas of Business
- ⌁ Corporate Structure
- ⌁ Management
- ⌁ Facts & Figures
- **The Name "Merck"**
- ⌁ History

### Merck is not the same as Merck

The two are confused again and again – and yet the direct association between Merck´KGaA in Darmstadt and the U.S. pharmaceutical company Merck & Co., Whitehouse Station, New Jersey, ended a long time ago. Merck in Darmstadt is the oldest pharmaceutical and chemical company in the world – and still operates successfully today in both the pharmaceutical and chemical sectors. Merck & Co. became an independent company after World War I.

Our historical roots lie in Darmstadt, where Friedrich Jacob Merck acquired the Engel-Apotheke ("Angel Pharmacy") in 1668. In 1827, Heinrich Emanuel Merck began the industrial-scale production of alkaloids, plant extracts and other chemicals. The successful export business in the United States led in 1887 to the establishment of a subsidiary in New York. Under Georg Merck, a grandson of Heinrich Emanuel Merck, Merck & Co. was formed in 1891. Following the confiscation of properties that took place as a result of World War I, Merck & Co. became an independent American company.



Heinrich Emanuel Merck 1794-1855

The two companies are no longer linked to one another today – the only thing they still have in common is the name Merck. Merck & Co. holds the rights to the name within North America; outside this region the U.S. company operates as Merck Sharp and Dohme (MSD) or MSD Sharp & Dohme. Merck KGaA, in turn, holds the rights elsewhere in the world and operates in North America under the umbrella brand EMD, formed from the initials of Emanuel Merck, Darmstadt.

Last update 29 03 2005, © Merck KGaA, Darmstadt, Germany

Home    Deutsch    Español    Français    Locations Worldwide    Contacts    Imprint    Search

Corporate    **Pharmaceuticals**    Chemicals    Investors    Media    **Career**

**Pharmaceuticals**
- Merck Serono
- Consumer Health Care
- Generics
- Clinical Trial Information
- Sitemap

# Drugs improve patients' quality of life



Our activities in the Pharmaceuticals business sector comprise three areas:

- Prescription drugs (Merck Serono)
- Generics (off-patent drugs – Generics division)
- Self-medication products (Consumer Health Care division)

■ **Merck Serono | Prescription drugs to treat major widespread diseases ▶▶**

Additional Information:
  Oncology
  CardioMetabolic Care
  Women's Health

■ **Generics | Ensuring basic, low-cost treatment**
Against the background of ever more cost-cutting measures in the healthcare sector, generics - drugs containing off-patent active ingredients - play an important role. The Generics division is one of the leading ten global suppliers of generics and focuses on the rapid marketing approval and launch of successful active ingredients. With these generics, low-price but high-quality standard drugs are made available to doctors and patients. The Generics division also includes our subsidiary Dey which offers innovative treatments against respiratory disorders.

■ **Consumer Health Care | The growing significance of self-medication**
Self-responsible measures for treatment of disturbances of well-being and for prevention are an obvious or for the well-informed patient. The trust in well-known brands is of particular importance in this context. Amo its prescription-free vitamin and mineral preparations, the Consumer Health Care division offers such international brands as Cebion , Multibionta , Omnibionta, Femibion, Sangiobion and Diabion, as well as th first probiotic multivitamin preparation BION 3. Popular brands for cold remedies are Nasivin , Ilvico , Sedalmerck and Ergix. Herbal and natural supplements are available under the strong umbrella brands of Seven Seas and Médiflor.

Last update 11.04 2007, © Merck KGaA, Darmstadt, Germany



HOME    CAREERS    BUSINESS DEVELOPMENT    PRODUCT    CORPORATE PROFILE    PRODUCT DEVELOPMENT    PRESS ROOM



An Affiliate of
Merck KGaA

SEARCH FOR

_____    GO

_____

BUSINESS
DEVELOPMENT CONTACT

# Business Overview

DEY® develops, manufactures and markets innovative airway and allergy medications.



Founded in 1978 and based in Napa, California, DEY has a long history of providing high-quality generic drug products, and has enjoyed significant growth in sales, manufacturing capacity and personnel. Over time, DEY has expanded its product portfolio to include branded products, such as DuoNeb, EpiPen® and AccuNeb®, which now account for the majority of total company sales.

DEY markets its products in the United States through its dedicated sales force that sells to office-based physicians, hospitals and distribution chain organizations. DEY markets its products outside the United States through a network of distributors, some of which are affiliates.

DEY is an affiliate of Merck KGaA, Darmstadt, Germany.

## DEY Core Competencies

- Leadership in the respiratory nebulized market
- Demonstrated ability to successfully market branded products
- Proven ability to understand market needs
- Specialty focused experienced sales force
- Quality reputation
- Ability to develop combination formulations and intellectual property
- State of the art unit-dose manufacturing
- Seasoned management team

## Growth

DEY has grown rapidly in the past decade. Annual net sales and the employee base have tripled since 1993. The company's manufacturing facilities in Napa have been enlarged from 30,000 square feet to more than 300,000 square feet.

# **EXHIBIT 3**

# THE BAYARD FIRM
### A T T O R N E Y S

222 DELAWARE AVENUE, SUITE 900
P.O. BOX 25130
WILMINGTON, DE 19899
ZIP CODE FOR DELIVERIES 19801

MERITAS LAW FIRMS WORLDWIDE
www.bayardfirm.com

302-655-5000
(FAX) 302-658-6395

WRITER'S DIRECT ACCESS

FILED ELECTRONICALLY
ORIGINAL BY HAND

(302) 429-4208
rkirk@bayardfirm.com

July 17, 2006

The Honorable Kent A. Jordan
United States District Court for the District of Delaware
844 King Street, Lockbox 10
Wilmington, DE 19801

     RE:    Sepracor Inc. v. Dey, L.P. and Dey, Inc.,
                C.A. No. 06-113 (KAJ)

Dear Judge Jordan:

     In response to the Court's June 22, 2006 Order (D.I. 15), the parties submitted their Joint Proposed Discovery Plan (D.I. 22) on July 14, 2006. Counsel for Plaintiff Sepracor Inc. ("Sepracor") and counsel for Defendants Dey, L.P. and Dey, Inc. (collectively "Dey") conferred on several occasions after receiving the Court's June 22 Order. While some progress was made, Sepracor and Dey continue to differ on how they expect this case to proceed. Thus, where agreement could not be reached, the parties presented each side's proposed calendar and sequence of events in the Joint Proposed Discovery Plan. I respectfully submit this letter to explain why Sepracor's proposed calendar and sequence of events differ from Dey's views.

     This patent infringement action is the *second* Paragraph IV Hatch-Waxman Act litigation brought by Sepracor against a generic pharmaceutical company attempting to copy Sepracor's XOPENEX® (levalbuterol hydrochloride) inhalation solutions.[1] The first litigation, against a generic pharmaceutical company called Breath Limited, is currently pending in the District of Massachusetts. *Sepracor Inc. v. Breath Ltd.*, No. 06-10043-DPW (D. Mass.) (hereinafter, the "Massachusetts action"). The Massachusetts action involves all six of Sepracor's patents listed in FDA's Orange Book in connection with Sepracor's XOPENEX® (levalbuterol hydrochloride) inhalation solutions. This case against Dey involves five of the same six Sepracor patents.

     Sepracor's view is that the dates and sequence of events in this case against Dey should be no sooner or different than those in the Massachusetts action. A copy of Judge Woodlock's Scheduling Order in the Massachusetts action is attached hereto as Appendix A. For this reason, Sepracor proposed a discovery plan in D.I. 22 that tracks the Massachusetts action. Dey, on the

---

[1] The timing for filing suit by the innovator company, in this case Sepracor, is dependent upon notice by the generic company that it filed an Abbreviated New Drug Application ("ANDA") with a Paragraph IV certification. 21 U.S.C. § 355(j)(5)(B)(iii) (indicating that FDA approval shall be made unless a patent infringement action is brought "before the expiration of 45 days after the date on which notice . . . is received[.]")

THE BAYARD FIRM

other hand, has proposed a discovery plan in D.I. 22 that would have most events occur sooner than they will occur in the Massachusetts action.

It is noted that this case against Dey was filed months after the Massachusetts action. Thus, when viewed in terms of overall pendency of the lawsuit, Sepracor's proposed discovery plan in this case moves to resolution more rapidly than the Massachusetts action. Nevertheless, Sepracor is very sensitive to this Court's calendar. By having concurrent and consistent discovery schedules between the two cases (both in timing and format), resources can be conserved by, for example, consolidating document production and witness depositions. This would not only reduce the burden on various party witnesses, but also reduce the burden on likely third party witnesses that would be deposed in both cases. Concurrent scheduling and consistent sequence of events (*e.g.*, keying the date for submission of summary judgment motions and briefs off of the date of a ruling on claim construction), with the Massachusetts action would also reduce the risk of potentially inconsistent claim construction determinations and duplicative summary judgment briefings. Therefore, such a schedule would conserve this Court's resources as well.

Moreover, Sepracor is fully cognizant of the parties statutory duty to "reasonably cooperate in expediting this action." 21 U.S.C. § 355(j)(5)(B)(iii). It is Sepracor's position that its proposal to track the schedule in the Massachusetts action fully complies with its statutory obligation in this case. As Judge Woodlock indicated with respect to the Scheduling Order in the Massachusetts action, "[t]his Order . . . insur[es] the effective, speedy and fair disposition of cases, either by settlement or trial." *See* Appendix A.

Additionally, Dey would not be prejudiced by Sepracor's proposed discovery plan. These Paragraph IV Hatch-Waxman Act litigations are unique because it is the submission of an ANDA with a Paragraph IV certification that constitutes the act of infringement. 35 U.S.C. § 271(e)(2)(A). Once a patent infringement action is brought, the generic company's ANDA can not be approved by FDA for a period of time that is dictated by 21 U.S.C. § 355(j)(5)(B). Since Dey is not the first generic company to submit an ANDA for Sepracor's XOPENEX® (levalbuterol hydrochloride) inhalation solutions with FDA that contains a Paragraph IV certification, the key period of time is 180 days after the first commercial marketing of the drug by the first applicant. 21 U.S.C. § 355(j)(5)(B)(iv). Commercial marketing by the first applicant in this instance is dependent on resolution of its patent infringement action. 21 U.S.C. § 355(j)(5)(B)(iii). Here, Dey can not obtain FDA approval or engage in commercial marketing of the drug until after resolution of the Massachusetts action.

Therefore, there is no sound basis for moving this case ahead in schedule before the Massachusetts action. Instead, in the interest of judicial economy, this case against Dey should not proceed faster than the Massachusetts action.

THE BAYARD FIRM

The Honorable Kent A. Jordan
July 17, 2006
Page 3 of 3

We look forward to discussing the parties' views with the Court during the Rule 16 teleconference on Wednesday, July 19, 2006.  In the meantime, if the Court has any questions I know that Dey's counsel and Sepracor's counsel would be pleased to respond.

Respectfully submitted,

/s/ Richard D. Kirk (rk0922)

RDK/ABS
Enclosure
cc:    Clerk of Court, by hand
       All counsel of record as shown on attached service list

# APPENDIX A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SEPRACOR, INC
           Plaintiff

                                    CIVIL ACTION NO. 06-10043-DPW

v.

BREATH LIMITED
           Defendant

<u>SCHEDULING ORDER</u>

WOODLOCK, D.J.

      This Order is intended primarily to aid and assist counsel in scheduling and planning the preparation and presentation of cases, thereby insuring the effective, speedy and fair disposition of cases, either by settlement or trial.

      The above-entitled action having been heard on March 30, 2006, it is hereby ORDERED pursuant to Rule 16(b) of the Federal Rules of Civil Procedure and Local Rule 16.1(F), that:

(1)    all trial experts are to be designated and disclosure of information contemplated by FRCP, Rule 26 provided by the parting bearing the burden of proof no later than **MAY 25, 2007**, disclosure of rebuttal experts no later than **JULY 13, 2007**, and any supplement expert reports by **AUGUST 10, 2007**. Depositions of expert witnesses shall be completed by **OCTOBER 31, 2007.**

(2)    discovery is to be completed by **MARCH 23, 2007**, unless shortened or enlarged by Order of this Court;

(3)    **MARKMAN BRIEFS:**   Briefs on claim constructions due by **DECEMBER 15, 2007.**  Responsive briefs due by **JANUARY 19, 2008.**  A MARKMAN Hearing is set for **FEBRUARY 21, 2008 AND FEBRUARY 22, 2008 from 9:00 am to 5:00 pm** in Courtroom 1 on the 3rd floor before Hon. Douglas P. Woodlock, U.S.D.J.

(4)    <u>**ELECTRONIC FILING**</u>: All future submissions in this case are subject to electronic filing and all counsel who choose to appear must make arrangements to register for participation in electronic case filing, if they have not already done so. In

addition to electronically filing any pleading, counsel shall also file all submissions relating to dispositive matters with the Court in hard copy, clearly marked **"Courtesy Copy - Do Not Scan"** on the cover page of <u>each</u> pleading/submission. Notices, orders and memoranda of the Court will only be filed and served electronically.

All provisions and deadlines contained in this order having been established with the participation of the parties to this case, any requests for modification must be presented to the judge or magistrate judge, if referred for case management proceedings. Any requests for extension will be granted only for good cause shown supported by affidavits, other evidentiary materials, or reference to pertinent portions of the record. The request shall be made by motion and shall contain the reasons for the request, a summary of the discovery which remains to be taken, and a date certain when the requesting party will complete the additional discovery, join other parties, amend the pleadings or file motions. The Court may then enter a final scheduling order, if necessary.

Counsel are encouraged to seek an early resolution of this matter. Additional case management conferences may be scheduled by the court or upon the request of counsel, if the Court can be of assistance in resolving preliminary issues or in settlement.

By the Court,

/s/ Michelle Rynne
Deputy Clerk

DATED:   May 3, 2006

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on July 17, 2006, he electronically filed

the foregoing document with the Clerk of the Court using CM/ECF, which will send

automatic notification of the filing to the following:

Steven J. Balick, Esquire
John G. Day, Esquire
Tiffany Geyer Lydon, Esquire
Ashby & Geddes
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899


The undersigned counsel further certifies that, on July 17, 2006, copies of the

foregoing document were sent by email and hand to the above local counsel and by email

and first class mail to the following non-registered participant:

Edgar H. Haug, Esquire
Kimberly J. McGraw, Esquire
Frommer, Lawrence & Haug, LLP
745 Fifth Avenue
New York, NY  10151


                    /s/ Richard D. Kirk (rk0922)
                       Richard D. Kirk

574867v1

# EXHIBIT 4

SHEET 1

1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   IN AND FOR THE DISTRICT OF DELAWARE
 2
                             - - -
 3    SEPRACOR,INC.,
                                   :      CIVIL ACTION
 4            Plaintiff,           :
                                   :
 5         v                       :
                                   :
 6    DEY, L.P. and DEY, INC.,     :
                                   :
 7                                 :     NO. 06-113 (KAJ)
              Defendant.
 8                           - - -

 9                    Wilmington, Delaware
              Wednesday, July 19, 2006 at 9:31 a.m.
10                    TELEPHONE CONFERENCE

11                           - - -

12    BEFORE:        HONORABLE KENT A. JORDAN, U.S.D.C.J.

13                           - - -
      APPEARANCES:
14

15            THE BAYARD FIRM
              BY:  RICHARD D. KIRK, ESQ.
16
                   and
17
              BUCHANAN INGERSOLL & ROONEY, PC
18            BY:  SUSAN M. DADIO, ESQ.
                   (Alexandria, Virginia)
19
                   and
20
              BUCHANAN INGERSOLL & ROONEY, PC
21            BY:  JACK M. STOVER, ESQ., and
                   JAYSON R. WOLFGANG, ESQ.
22                 (Harrisburg, Pennsylvania)

23                    Counsel for Plaintiff

24
                         Brian P. Gaffigan
25                       Registered Merit Reporter
```

SHEET 2

**2**

1  APPEARANCES:

2

3      ASHBY & GEDDES
       BY:  JOHN G DAY, ESQ.

4          and

5      FROMMER LAWRENCE & HAUG L.L.P.
       BY:  EDGAR H. HAUG, ESQ , and

6          KIMBERLY J  MCGRAW, ESQ.
           (New York, New York)

7          and

8

9      FROMMER LAWRENCE & HAUG L.L P
       BY:  ELIZABETH A  LEFF, ESQ.
           (Washington, District of Columbia)

10         and

11

12     DEY L.P, DEY INC
       BY:  JOHN KLING, ESQ.

13     Senior Vice President - Legal
       (Napa, California)

14             Counsel for Defendants

15

16

17

18

19

20

21

22

23

24

25

---

**3**

1              - oOo -

2          P R O C E E D I N G S

3          (REPORTER'S NOTE:  The following telephone

4  conference was held in chambers, beginning at 9:31 a m )

5          THE COURT:  Hi, this is Judge Jordan  Who do I

6  have on the line?

7          MR. KIRK:  Good morning, Your Honor  This is

8  Richard Kirk from The Bayard Firm here in Wilmington.  With

9  me on the line are my co-counsel, Susan Dadio, Jack Stover

10 and Jayson Wolfgang from Buchanan Ingersoll  Susan is in

11 the Northern Virginia office.  Jack and Jayson are in the

12 Harrisburg office

13         THE COURT:  All right  Thanks

14         Who do I have on for the defense?

15         MR. DAY:  Good morning, Your Honor  For the

16 defendant, Dey L P. and Dey Inc , and that is spelled D-E-Y,

17 you have John Day, spelled D-A-Y, from Ashby & Geddes, local

18 counsel, and my lead counsel Ed Haug and Kimberly McGraw

19 from Frommer Lawrence & Haug in New York  And Elizabeth

20 Leff from Frommer Lawrence & Haug's Washington office

21         THE COURT:  All right.  Thank you

22         Now, is there anybody else on the line?

23         MR. KLING:  Yes, this is John Kling  I'm Senior

24 Vice President of Legal for Dey Inc  and Dey L P  and that's

25 in California

---

**4**

1          THE COURT:  All right  Thank you

2          Well, I have the letter that was sent over to me

3  on July 14th by Mr  Kirk and --

4          (Background noises )

5          THE COURT:  I think we're getting a little more

6  atmosphere from California than we anticipated  So you may

7  need to find a quieter place

8          MR. KIRK:  I can assure you, Your Honor, that

9  did not originate in my office.

10         (Unidentified Speaker):  It wasn't in mine

11         THE COURT:  Yes, I think we're picking up, I'm

12 guessing that is California  Am I right?

13         MR. HAUG:  Judge Jordan, this is Ed Haug  I'm

14 sorry to say it's New York City

15         THE COURT:  It's New York City

16         MR. HAUG:  I think they're gone for the moment

17         THE COURT:  All right.  My apologies to the

18 California contingent

19         MR. KLING:  Nobody is up out here  We'll let it

20 go this time

21         THE COURT:  So anyway, I've noticed that we've

22 got a real dispute here, separation on the timing  I'll

23 give you your chance to make your pitch for your respective

24 positions but I'll tell you up front, I've got some ideas of

25 my own  Let me hear what you have to say on this

---

**5**

1          Mr  Kirk, who is speaking on this from the

2  plaintiff?

3          MR. KIRK:  From the plaintiff, Your Honor, I'll

4  introduced Susan Dadio from Buchanan Ingersoll

5          THE COURT:  Ms Dadio, why don't you explain to

6  me the basis for your position on the timing

7          MS DADIO:  Thank you, Your Honor  We attempted

8  to articulate our basis in a letter that Mr. Kirk had

9  presented to the Court on July 17th  But to capsulize that

10 which was said in that particular letter, the crux of our

11 position is the nature of this particular case with respect

12 to Dey as a second generic filer where nothing that Dey

13 can do in this case will permit Dey to go on the market in

14 the event which Massachusetts will allow.  Therefore, we

15 strongly believe the course of action that was adopted in

16 Massachusetts should be followed and tracked similarly here

17 That would certainly assist in resources being conserved as

18 far as consolidating discovery and pretrial purposes from

19 both the parties' side, witnesses' side as well as from the

20 judicial side of potential duplication in various claim

21 construction issues as well as summary judgment.

22         THE COURT:  All right  Who is speaking on

23 behalf of the Dey entities?

24         MR HAUG:  Good morning, Your Honor  This is Ed

25 Haug from Frommer Lawrence & Haug in New York.

---

SHEET 3

6

1    The schedule that we proposed, Dey is proposing
2  is what we consider to be, based on our experience, is
3  in accord with most of the schedules we are familiar with in
4  the Delaware court, more than enough time to deal with the
5  issues in this case.  I also want to point out that while
6  there are five patents in this case, I don't know if Your
7  Honor has had an opportunity to really look at them yet, but
8  they are all identical in the sense that they're the
9  identical specification which is quite short, compared to
10  most patents anyway, about one and-a-half columns long.
11  Only the claims differ among these five patents and they
12  don't differ by very much.  So while it is a five patent
13  case, it's really a one patent case that issued through
14  multiple patents on their claims.
15    That being said, there is no connection between
16  our client Dey and the defendant in the Boston action.  The
17  products are completely different.  Well, we don't know what
18  their product is.  They don't know what our product is.
19  The patent issues are different, significantly different
20  because they have a sixth patent in the Boston case which is
21  not identical to the other five.  It's different inventors,
22  different approach.  It's all kinds of different things.
23    So we think as a patent case goes, this is a
24  relatively straightforward, uncomplicated patent case and
25  that's it.  We certainly don't believe that Dey should be

7

1  in any way held to a schedule that is not within its control
2  at all in a case that we're not in.
3    THE COURT:  Well, Mr. Haug, I need you to
4  respond, if you would, to the specific claim Ms. Dadio has
5  made, which is there is no way your client can get ahead of
6  the Massachusetts defendant so it shouldn't matter to you
7  that you're on the same schedule.
8    MR. HAUG:  Well, we don't agree with that.
9  There are forfeiture provisions in the Medicare
10  Modernization Act.  Those forfeiture provisions have to do
11  with the first-to-file company not being able to get an
12  approval within a certain amount of time.  The defendant, I
13  don't know what they could do in their case.  It is not at
14  all uncommon, as Your Honor is probably aware, that many of
15  these cases get settled right before trial or at some point
16  in time way down the road.  I don't know what the nature of
17  that settlement could be but it certainly may well not be
18  in Dey's interest at all.  And in the meantime, we've been
19  not able to prosecute the case, if you will, or move forward
20  with the case expeditiously which we're all obligated to do
21  under the Hatch-Waxman act.  So I don't at all agree that
22  we can never, Dey can never get the market until after the
23  Massachusetts action is concluded.  I think there are a lot
24  of contingencies and things that could happen.
25    THE COURT:  All right.  Well, I'm going to set

8

1  this for a schedule that I believe accords with what is a
2  fair and reasonable time frame for an ANDA case to proceed,
3  and it is not going to be tied to the Massachusetts case
4  because I think the claims for economy are somewhat
5  illusory.  In any event, if you are moving a little quicker
6  here, it can only be a help, I would imagine, to putting
7  things together and making things more efficient in the
8  Massachusetts action.  So I don't think you lose economies
9  by being on an appropriate schedule according to our usual
10  time frames here.  That's not meant in any form or fashion
11  as a comment on the schedule that was entered in
12  Massachusetts, which I'm sure is fair and appropriate under
13  the standards and the practices and the particular facts of
14  that case.
15    Nor, however, am I going to enter an order that
16  is as aggressive as the one that the Dey entities seek here
17  because I don't think that is warranted.  So I'm just going
18  to go through and tell you what the dates are going to be.
19  Since you folks were unable to come to agreement on them,
20  I've selected some that I think are appropriate.
21    Looking at paragraph 1, that five-day limit is
22  fine.
23    Paragraph 2, the agreed September 7th date is
24  fine.
25    We'll come back to paragraph 3a in a moment.

9

1    Looking at 3c, the discovery cutoff will be
2  July 2, 2007.  And you folks will manage your expert
3  discovery in a fashion that is in accordance with my
4  standard order under 3d so that there is a 60 and 90 day
5  exchange.  And your local counsel will undoubtedly be able
6  to share with you what my standard language in that regard
7  is.
8    Looking at paragraph 6, I will refer this to the
9  magistrate judge for settlement.  I'll ask you to strike the
10  second sentence of paragraph 6.  Although I have used that
11  as a standard in the past, I have recently decided it's not
12  appropriate to try to dictate that to the magistrate judge,
13  given other scheduling demands.  So you will hear from her
14  when her schedule permits.  My hope is that you folks will
15  be open to settlement discussions with her assistance.
16    Paragraph 7.  The interim status report will be
17  due on May 3, 2007.
18    Paragraph 8.  The status teleconference will
19  take place on May 10, 2007 at 4:30 p.m.
20    Paragraph 9.  If the parties wish an in-person
21  tutorial, that will take place February 9, 2007 at 9:30 a.m.
22    Paragraph 10.  Case dispositive motions, we'll
23  have those due on August 1, 2007.
24    Paragraph 11.  Claim construction, issue
25  identification, that is going to be due June 15, 2007.

SHEET 4

**10**

1  Paragraph 12. Claim construction briefing,
2  that's going to be the same as the case dispositives so
3  there will be opening round on that is due August 1, 2007.
4  Now, give me just a moment.
5  (Pause.)
6  THE COURT: Your claim construction chart can
7  come in that same day, if you wish, or you can have it
8  earlier, as you choose. I'm not concerned about that issue
9  as long as it comes in no later than August 1, 2007 with the
10  claim construction opening round of briefs.
11  Paragraph 13. Claim construction hearing will
12  be October 5, 2007 at 9:30 a.m. And, of course, that will
13  also be our time for argument on summary judgment motions.
14  Paragraph 15. I'm going to set the pretrial
15  conferences in this matter January 16, 2008 at 4:30
16  p.m.; which means I will need your final form of pretrial
17  order no later than December 17, 2007.
18  All right. Finally, let's look at paragraph 18
19  here. This is a bench trial, obviously. How many days do
20  you think it will take to make this thing move all the way?
21  You know what? I'm seeing here there is a demand for a jury
22  trial from the Dey entities. Why don't you tell me about
23  that.
24  MR. HAUG: Yes, Your Honor. Ed Haug again.
25  There is a demand for a jury trial by the

**11**

1  defendants. The question of whether there is a jury
2  entitlement in the Hatch-Waxman case, fairly stated, still
3  hasn't been clearly decided by the Federal Circuit,
4  although there is a lot of authority going against that.
5  Our position, Dey's position I believe is that
6  we would like a trial date as early as possible. And if
7  dropping the jury demand would give us an earlier date,
8  make it more efficient for the Court, Dey would be happy
9  to do that.
10  THE COURT: Well, you are getting an earlier
11  date than they asked for, so I need for you to tell me
12  straight up. Are you dropping your demand or not?
13  MR. HAUG: I believe we would; Mr. Kling, if I
14  can just say, is here on the phone as general counsel for
15  Dey; I think as long as there is no objection.
16  MR. KLING: No, that's fine with Dey.
17  THE COURT: All right.
18  MR. HAUG: Okay.
19  THE COURT: Then that moots the motion to
20  strike the jury demand. That will be then denied. That
21  motion will be denied as moot. The jury demand is dropped.
22  We'll set this for a bench trial and the
23  question I've got are the parties agreed that this thing
24  will take -- well, let me just ask, Ms. Dadio, how many days
25  do you think this will take?

**12**

1  MS. DADIO: Your Honor, we had a proposed in the
2  joint, 40 hours for our side.
3  THE COURT: Yes, and I'm asking you to try to
4  justify that because that is roughly twice the amount of
5  time I would typically give a case like this. If this
6  were -- I think your local counsel probably shared with you
7  the sort of a rule of thumb is a couple of weeks for a
8  patent case. I found that sometimes I can get them in less
9  than that and on very rare occasions I've given some more
10  time than that. But I found that two weeks typically works
11  and that works out to be about 22 hours a side.
12  MS. DADIO: I think, Your Honor, we could work
13  with that schedule.
14  THE COURT: All right.
15  MR. HAUG: For Dey, that would be perfectly fine
16  and more than enough time.
17  THE COURT: Then we'll set this for 10 days of
18  trial time, two weeks. And hold on just a moment while I
19  give you some dates.
20  (Pause.)
21  THE COURT: I'm going to set this to start on
22  February 19, 2008. That's the day after President's Day.
23  And we'll run it for actually nine days, but because it's a
24  bench trial, we'll still be able to get the 22 hours in. We
25  have the flexibility to run a little longer than we do with

**13**

1  the jury, so we'll have 22 hours per side. We'll run it
2  February 19th through 29, okay?
3  MS. DADIO: Excuse me, Your Honor. This is
4  Susan Dadio from Sepracor.
5  THE COURT: Yes.
6  MS. DADIO: If I might, Judge Woodlock in the
7  Massachusetts action has his Markman Hearing scheduled for
8  January 21 and 22 of '08.
9  THE COURT: How is that for a coincidence?
10  Hold on just a second. Let me see what I can do
11  for you.
12  (Pause.)
13  THE COURT: You did said February 21st and 22nd?
14  MS. DADIO: Yes, Your Honor.
15  THE COURT: All right. I just want to make sure
16  I'm clear because the court reporter has you down as having
17  said January 21 and 22. You're telling me it's February 21
18  and 22 and you are supposed to be in front of the District
19  Judge in Massachusetts; right?
20  MS. DADIO: That's correct, Your Honor. That is
21  in the scheduling order that was attached to the July 17th
22  letter.
23  THE COURT: All right.
24  MS. DADIO: Responsive briefs were due in
25  January of '08.

SHEET 5

**14**

1    THE COURT: Then we're going to start you on the
2 25th of February and we'll run it through the 7th of March.
3 February 25 through March 7.
4    All right. Now let's go back to the dispute you
5 all have in paragraph 3a and see if we can't work that out.
6    Why don't you -- is there a dispute here? Have
7 you talked about this? What is the story on Sepracor's
8 position, Ms Dadio?
9    MS. DADIO: Sepracor's position with respect to
10 the hours of deposition is twofold: First, to not include
11 records deposition in the 140 hours, and second of all is
12 that use in this case of depositions from, for instance, the
13 Massachusetts action or any other paragraph four generic
14 filing actions that might later be filed should count
15 against the party's deposition. The basis is such that if
16 the party is entitled to utilize, for instance, against the
17 inventors the depositions from the Massachusetts action and
18 then take a full day of deposition in their case, they will
19 essentially have been able to double the amount of hours of
20 depositions that they can take whereas we obviously would be
21 limited with respect to their witnesses to a more limited
22 number of hours
23    THE COURT: Well, help me out. When you say
24 they get to double their number of hours If they're not
25 taking the deposition, how have they doubled their hours?

**15**

1    MS. DADIO: Because, Your Honor, they utilize
2 those depositions against us, Sepracor, for any reason.
3    THE COURT: Right. But that that is an effect
4 of the rules, but . All right. I've got your position
5    Tell me about the records deposition. Why do
6 you take the position that records depositions don't count?
7    MS. DADIO: Because, Your Honor, in most
8 instances, record depositions may or may not be necessary
9 and it may be used as a resource to extend or impede with
10 our overall hours of discovery deposition by sort of having
11 to utilize them just to depose the witness. Certainly if
12 we're structured with hours as opposed to days, it's a
13 little bit more accommodatable But if we are going to
14 stick with a day, it's very harmful that we could have a
15 full deposition for a record deposition which may only take
16 a half hour. So with Your Honor's assistance with respect
17 to how we would actually count the hours of a particular
18 deposition, that may be able to be ameliorated
19    THE COURT: Well, we'll count hours the way you
20 count hours. The depositions starts at a time and it ends
21 at a time. And we're not doing days, we're doing hours
22 here We'll do it by hours and not by days.
23    All right Mr. Haug, your position on these
24 issues, please.
25    MR. HAUG: We think 140 hours should be more

**16**

1 than enough. We certainly don't think we should be involved
2 or counting hours that maybe some other attorneys are taking
3 in a different case. Once again, the issues are very
4 different. There are different patents in those cases. And
5 I think while, as a matter of evidence, we may well want to
6 get production of certain deposition transcripts, we're
7 going to have to get into issues of redacting that is not
8 relevant to anything in this case, so on and so forth. And
9 I think we get into a very complicated situation if we tried
10 to somehow count hours taken in a case that we're not in and
11 apply it here.
12    I think that as far as Ms. Dadio is concerned
13 about inventors being deposed twice, the rules are what they
14 are. I think we're limited to seven hours. I have no idea
15 when or if those inventors will be taken in the other case,
16 but I think 140 hours is more than enough.
17    I'll also point out that we've already produced
18 a lot of information about the products here. I don't think
19 the depositions will be all that extensive, certainly not of
20 the defendant.
21    And on the records deposition, I don't really
22 think that is much of an issue. We will be very, very
23 accommodating in terms of authenticity and dealing with
24 business records. I don't think that is where this case is
25 going to get bogged down.

**17**

1    THE COURT: All right. Well, good enough.
2 Listen. We'll go with the straight 140 hours. I am not
3 going to make either side count against their hours what
4 other lawyers do in a different case. And I take Mr. Haug
5 at his word that the record depositions are not going to be
6 a source of gamesmanship here and so I don't think that is
7 going to be a problem. So that will be a straight 140 hour
8 limitation on taking fact testimony by oral deposition.
9    Is there any other matter that we need to
10 address while we're all on the line together, Ms. Dadio?
11    MS. DADIO: Yes, Your Honor. We would like to
12 make the Court aware of the fact that Sepracor is seriously
13 contemplating a motion for transfer or, in the alternative,
14 a motion for stay in this particular case. And we would
15 expect at this point the possibility of taking discovery.
16 We would attempt to do so on an expedited basis for that
17 particular issue.
18    THE COURT: Let me make sure I understand.
19 You guys filed the suit here and you want it transferred
20 someplace else?
21    MS. DADIO: In sum, correct, Your Honor. The
22 transfer we would be seeking would be to Massachusetts
23    THE COURT: Didn't you file the Massachusetts
24 case first?
25    MS. DADIO: Correct, Your Honor.

SHEET 6

18

1      THE COURT: Well, that's interesting  Okay.  I
2  guess we'll deal with what we deal with when we need to deal
3  with it
4      Mr. Haug.
5      MR. HAUG:  We certainly would oppose any
6  transfer.  And this is the first I'm hearing of the intent
7  of Sepracor to file such a motion
8      The question of whether we, Dey, wanted to
9  consent to move the case to Boston, had been raised a few
10  months ago actually and we said no.  And so now, of course,
11  coming up in this phone call for the first time, to my
12  knowledge, we will oppose it
13      MS. DADIO:  If I might just add --
14      MR. HAUG:  The discovery is already started.
15  We've already served discovery requests so we're off and
16  running
17      THE COURT:  All right   Yes, Ms. Dadio.  One
18  other thing, you said?
19      MS. DADIO:  Just for Mr  Haug's clarification,
20  I'm sure it's simply a matter of him not being present but
21  in our Rule 26 conference, we had provided counsel with a
22  proposal as to yet another idea for their consent to
23  transfer, so that question remains unanswered from Dey's
24  side
25      THE COURT:  All right.  Well, you know, like I

19

1  said, we'll deal with whatever motions that come up when
2  they come up.
3      Mr. Kirk, would you be good enough to make the
4  changes we've described here in this call to the form of
5  order and run it past opposing counsel to make sure it
6  reflects accurately what we discussed on the phone today and
7  send it over for my signature?
8      MR. KIRK:  I'll be happy to do that, Your Honor.
9      THE COURT:  I believe I asked Ms  Dadio if there
10  was anything from her perspective  Mr  Haug, I'm not sure I
11  asked if there is anything from the defense side.
12      MR. HAUG:  Nothing at all, Your Honor.  Thank
13  UT.
14      THE COURT:  All right   Thanks for your time.
15  Good-bye.
16      (The attorneys respond, "Thank you, Your
17  Honor.")
18      (Telephone conference ends at 10:00 a m )
19
20
21
22
23
24
25

'08 [2] - 13:8, 13:25

**0**

06-113 [1] - 1:7

**1**

1 [4] - 8:21, 9:23, 10:3, 10:9
10 [3] - 9:19, 9:22, 12:17
10:00 [1] - 19:18
11 [1] - 9:24
12 [1] - 10:1
13 [1] - 10:11
140 [5] - 14:11, 15:25, 16:16, 17:2, 17:7
14th [1] - 4:3
15 [2] - 9:25, 10:14
16 [1] - 10:15
17 [1] - 10:17
17th [2] - 5:9, 13:21
18 [1] - 10:18
19 [2] - 1:9, 12:22
19th [1] - 13:2

**2**

2 [2] - 8:23, 9:2
2006 [1] - 1:9
2007 [10] - 9:2, 9:17, 9:19, 9:21, 9:23, 9:25, 10:3, 10:9, 10:12, 10:17
2008 [2] - 10:15, 12:22
21 [3] - 13:8, 13:17
21st [1] - 13:13
22 [6] - 12:11, 12:24, 13:1, 13:8, 13:17, 13:18
22nd [1] - 13:13
25 [1] - 14:3
25th [1] - 14:2
26 [1] - 18:21
29 [1] - 13:2

**3**

3 [1] - 9:17
3a [2] - 8:25, 14:5
3c [1] - 9:1
3d [1] - 9:4

**4**

40 [1] - 12:2
4:30 [2] - 9:19, 10:15

**5**

5 [1] - 10:12

**6**

6 [2] - 9:8, 9:10
60 [1] - 9:4

**7**

7 [2] - 9:16, 14:3
7th [2] - 8:23, 14:2

**8**

8 [1] - 9:18

**9**

9 [2] - 9:20, 9:21
90 [1] - 9:4
9:30 [2] - 9:21, 10:12
9:31 [2] - 1:9, 3:4

**A**

a.m [5] - 1:9, 3:4, 9:21, 10:12, 19:18
able [6] - 7:11, 7:19, 9:5, 12:24, 14:19, 15:18
accommodatable [1] - 15:13
accommodating [1] - 16:23
accord [1] - 6:3
accordance [1] - 9:3
according [1] - 8:9
accords [1] - 8:1
accurately [1] - 19:6
Act [1] - 7:10
act [1] - 7:21
action [7] - 5:15, 6:16, 7:23, 8:8, 13:7, 14:13, 14:17
ACTION [1] - 1:3
actions [1] - 14:14
add [1] - 18:13
address [1] - 17:10

adopted [1] - 5:15
aggressive [1] - 8:16
ago [1] - 18:10
agree [2] - 7:8, 7:21
agreed [2] - 8:23, 11:23
agreement [1] - 8:19
ahead [1] - 7:5
Alexandria [1] - 1:18
allow [1] - 5:14
alternative [1] - 17:13
ameliorated [1] - 15:18
amount [3] - 7:12, 12:4, 14:19
AND [1] - 1:1
and-a-half [1] - 6:10
ANDA [1] - 8:2
anticipated [1] - 4:6
anyway [2] - 4:21, 6:10
apologies [1] - 4:17
APPEARANCES [2] - 1:13, 2:1
apply [1] - 16:11
approach [1] - 6:22
appropriate [4] - 8:9, 8:12, 8:20, 9:12
approval [1] - 7:12
argument [1] - 10:13
articulate [1] - 5:8
ASHBY [1] - 2:2
Ashby [1] - 3:17
assist [1] - 5:17
assistance [2] - 9:15, 15:16
assure [1] - 4:8
atmosphere [1] - 4:8
attached [1] - 13:21
attempt [1] - 17:16
attempted [1] - 5:7
attorneys [2] - 16:2, 19:16
August [3] - 9:23, 10:3, 10:9
authenticity [1] - 16:23
authority [1] - 11:4
aware [2] - 7:14, 17:12

**B**

Background [1] - 4:4
based [1] - 6:2
basis [4] - 5:6, 5:8, 14:15, 17:16
Bayard [1] - 3:8
BAYARD [1] - 1:15
BEFORE [1] - 1:12

beginning [1] - 3:4
behalf [1] - 5:23
bench [2] - 10:19, 11:22, 12:24
between [1] - 6:15
bit [1] - 15:13
bogged [1] - 16:25
Boston [5] - 6:16, 6:20, 18:9
Brian [1] - 1:24
briefing [1] - 10:1
briefs [2] - 10:10, 13:24
BUCHANAN [2] - 1:17, 1:20
Buchanan [2] - 3:10, 5:4
business [1] - 16:24
BY [7] - 1:15, 1:18, 1:21, 2:3, 2:5, 2:9, 2:12
bye [1] - 19:15

**C**

California [5] - 2:13, 3:25, 4:6, 4:12, 4:18
capsulize [1] - 5:9
Case [1] - 9:22
case [31] - 5:11, 5:13, 6:5, 6:6, 6:13, 6:20, 6:23, 6:24, 7:2, 7:13, 7:19, 7:20, 8:2, 8:3, 8:14, 10:2, 11:12, 12:5, 12:8, 14:12, 14:18, 16:3, 16:8, 16:10, 16:15, 16:24, 17:4, 17:14, 17:24, 18:9
cases [2] - 7:15, 16:4
certain [2] - 7:12, 16:6
Certainly [1] - 15:11
certainly [6] - 5:17, 6:25, 7:17, 16:1, 16:19, 18:5
chambers [1] - 3:4
chance [1] - 4:23
changes [1] - 19:4
chart [1] - 10:6
choose [1] - 10:8
Circuit [1] - 11:3
City [2] - 4:14, 4:15
CIVIL [1] - 1:3
claim [4] - 5:20, 7:4, 10:6, 10:10
Claim [3] - 9:24, 10:1, 10:11
claims [3] - 6:11, 6:14, 8:4

clarification [1] - 18:19
clear [1] - 13:16
clearly [1] - 11:3
client [2] - 6:16, 7:5
co [1] - 3:9
co-counsel [1] - 3:9
coincidence [1] - 13:9
Columbia [1] - 2:9
columns [1] - 6:10
coming [1] - 18:11
comment [1] - 8:11
company [1] - 7:11
compared [1] - 6:9
completely [1] - 6:17
complicated [1] - 16:9
concerned [2] - 10:8, 16:12
concluded [1] - 7:23
CONFERENCE [1] - 1:10
conference [3] - 3:4, 18:21, 19:18
conferences [1] - 10:15
connection [1] - 6:15
consent [2] - 18:9, 18:22
conserved [1] - 5:17
consider [1] - 6:2
consolidating [1] - 5:18
construction [6] - 5:21, 9:24, 10:1, 10:6, 10:10, 10:11
contemplating [1] - 17:13
contingencies [1] - 7:24
contingent [1] - 4:18
control [1] - 7:1
correct [2] - 13:20, 17:21
Correct [1] - 17:25
Counsel [2] - 1:23, 2:14
counsel [8] - 3:9, 3:18, 9:5, 11:14, 12:6, 18:21, 19:5
count [7] - 14:14, 15:6, 15:17, 15:19, 15:20, 16:10, 17:3
counting [1] - 16:2
couple [1] - 12:7
course [5] - 5:15, 10:12, 18:10
Court [3] - 5:9, 11:8, 17:12
COURT [39] - 1:1, 3:5, 3:13, 3:21, 4:1, 4:5,

4:11, 4:15, 4:17,
  4:21, 5:5, 5:22, 7:3,
  7:25, 10:6, 11:10,
  11:17, 11:19, 12:3,
  12:14, 12:17, 12:21,
  13:5, 13:9, 13:13,
  13:15, 13:23, 14:1,
  14:23, 15:3, 15:19,
  17:1, 17:18, 17:23,
  18:1, 18:17, 18:25,
  19:9, 19:14
court [2] - 6:4, 13:16
crux [1] - 5:10
cutoff [1] - 9:1

**D**

Dadio [11] - 3:9, 5:4,
  5:5, 7:4, 11:24, 13:4,
  14:8, 16:12, 17:10,
  18:17, 19:9
DADIO [17] - 1:18, 5:7,
  12:1, 12:12, 13:3,
  13:6, 13:14, 13:20,
  13:24, 14:9, 15:1,
  15:7, 17:11, 17:21,
  17:25, 18:13, 18:19
date [4] - 8:23, 11:6,
  11:7, 11:11
dates [2] - 8:18, 12:19
DAY [3] - 2:3, 3:15,
  3:17
days [7] - 10:19,
  11:24, 12:17, 12:23,
  15:12, 15:21, 15:22
deal [5] - 6:4, 18:2,
  19:1
dealing [1] - 16:23
December [1] - 10:17
decided [2] - 9:11,
  11:3
Defendant [1] - 1:7
defendant [5] - 3:16,
  6:16, 7:6, 7:12,
  16:20
defendants [1] - 11:1
Defendants [1] - 2:14
defense [2] - 3:14,
  19:11
DELAWARE [1] - 1:1
Delaware [2] - 1:9, 6:4
demand [6] - 10:21,
  10:25, 11:7, 11:12,
  11:20, 11:21
demands [1] - 9:13
denied [2] - 11:20,
  11:21
depose [1] - 15:11
deposed [1] - 16:13

deposition [13] -
  14:10, 14:11, 14:15,
  14:18, 14:25, 15:5,
  15:10, 15:15, 15:18,
  16:6, 16:21, 17:8
depositions [9] -
  14:12, 14:17, 14:20,
  15:2, 15:6, 15:8,
  15:20, 16:19, 17:5
described [1] - 19:4
DEY [5] - 1:6, 2:11,
  3:16
Dey [19] - 3:16, 3:24,
  5:12, 5:13, 5:23, 6:1,
  6:16, 6:25, 7:22,
  8:16, 10:22, 11:8,
  11:15, 11:16, 12:15,
  18:8
Dey's [3] - 7:18, 11:5,
  18:23
dictate [1] - 9:12
differ [2] - 6:11, 6:12
different [10] - 6:17,
  6:19, 6:21, 6:22,
  16:3, 16:4, 17:4
discovery [5] - 5:18,
  9:1, 9:3, 15:10,
  17:15, 18:14, 18:15
discussed [1] - 19:6
discussions [1] - 7:2
dispositive [1] - 9:22
dispositives [1] - 10:2
dispute [3] - 4:22,
  14:4, 14:6
District [2] - 2:9, 13:18
DISTRICT [2] - 1:1, 1:1
double [2] - 14:19,
  14:24
doubled [1] - 14:25
down [3] - 7:16, 13:16,
  16:25
dropped [1] - 11:21
dropping [2] - 11:7,
  11:12
due [5] - 9:17, 9:23,
  9:25, 10:3, 13:24
duplication [1] - 5:20

**E**

early [1] - 11:6
economies [1] - 8:8
economy [1] - 8:4
Ed [4] - 3:18, 4:13,
  5:24, 10:24
EDGAR [1] - 2:5
effect [1] - 15:3
efficient [2] - 8:7, 11:8
either [1] - 17:3

Elizabeth [1] - 3:19
ELIZABETH [1] - 2:9
ends [2] - 15:20, 19:18
enter [1] - 8:15
entered [1] - 8:11
entitles [3] - 5:23,
  8:16, 10:22
entitled [1] - 14:16
entitlement [1] - 11:2
ESQ [9] - 1:15, 1:18,
  1:21, 1:21, 2:3, 2:5,
  2:6, 2:9, 2:12
essentially [1] - 14:19
event [2] - 5:14, 8:5
evidence [1] - 16:5
exchange [1] - 9:5
Excuse [1] - 13:3
expect [1] - 17:15
expedited [1] - 17:3
expeditiously [1] -
  7:20
experience [1] - 6:2
expert [1] - 9:2
explain [1] - 5:5
extend [1] - 15:9
extensive [1] - 16:19

**F**

fact [2] - 17:8, 17:12
facts [1] - 8:13
fair [2] - 8:2, 8:12
fairly [1] - 11:2
familiar [1] - 6:3
far [2] - 5:18, 16:12
fashion [2] - 8:10, 9:3
February [7] - 9:21,
  12:22, 13:2, 13:13,
  13:17, 14:2, 14:3
Federal [1] - 11:3
few [1] - 18:9
file [3] - 7:11, 17:23,
  18:7
filed [2] - 14:14, 17:19
filer [1] - 5:12
filing [1] - 14:14
final [1] - 10:16
Finally [1] - 10:18
fine [4] - 8:22, 8:24,
  11:16, 12:15
FIRM [1] - 1:15
Firm [1] - 3:8
first [4] - 7:11, 17:24,
  18:6, 18:11
First [1] - 14:10
first-to-file [1] - 7:11
five [5] - 6:6, 6:11,
  6:12, 6:21, 8:21
five-day [1] - 8:21

flexibility [1] - 12:25
folks [3] - 8:19, 9:2,
  9:14
followed [1] - 5:16
following [1] - 3:3
FOR [1] - 1:1
forfeiture [2] - 7:9,
  7:10
form [3] - 8:10, 10:16,
  19:4
forth [1] - 16:8
forward [1] - 7:19
four [1] - 14:13
frame [1] - 8:2
frames [1] - 8:10
Frommer [3] - 3:19,
  3:20, 5:25
FROMMER [2] - 2:5,
  2:8
front [2] - 4:24, 13:18
full [2] - 14:18, 15:15

**G**

Gaffigan [1] - 1:24
gamesmanship [1] -
  17:6
GEDDES [1] - 2:2
Geddes [1] - 3:17
general [1] - 11:14
generic [2] - 5:12,
  14:13
given [2] - 9:13, 12:9
Good-bye [1] - 19:15
guess [1] - 18:2
guessing [1] - 4:12
guys [1] - 17:19

**H**

half [2] - 6:10, 15:16
happy [2] - 11:8, 19:8
harmful [1] - 15:14
Harrisburg [2] - 1:22,
  3:12
Hatch [2] - 7:21, 11:2
Hatch-Waxman [2] -
  7:21, 11:2
HAUG [15] - 2:5, 2:5,
  2:8, 4:13, 4:16, 5:24,
  7:8, 10:24, 11:13,
  11:18, 12:15, 15:25,
  18:5, 18:14, 19:12
Haug [11] - 3:18, 3:19,
  4:13, 5:25, 7:3,
  10:24, 15:23, 17:4,
  18:4, 19:10
Haug's [2] - 3:20,

18:19
hear [2] - 4:25, 9:13
Hearing [1] - 13:7
hearing [2] - 10:11,
  18:6
held [2] - 3:4, 7:1
help [2] - 8:6, 14:23
HI [1] - 3:5
hold [1] - 12:18
Hold [1] - 13:10
Honor [22] - 3:7, 3:15,
  4:8, 5:3, 5:7, 5:24,
  6:7, 7:14, 10:24,
  12:1, 12:12, 13:3,
  13:14, 13:20, 15:1,
  15:7, 17:11, 17:21,
  17:25, 19:8, 19:12,
  19:17
Honor's [1] - 15:16
HONORABLE [1] -
  1:12
hope [1] - 9:14
hour [2] - 15:16, 17:7
hours [24] - 12:2,
  12:11, 12:24, 13:1,
  14:10, 14:11, 14:19,
  14:22, 14:24, 14:25,
  15:10, 15:12, 15:17,
  15:19, 15:20, 15:21,
  15:22, 15:25, 16:2,
  16:10, 16:14, 16:16,
  17:2, 17:3

**I**

idea [2] - 16:14, 18:22
ideas [1] - 4:24
identical [3] - 6:8, 6:9,
  6:21
identification [1] -
  9:25
illusory [1] - 8:5
imagine [1] - 8:6
impede [1] - 15:9
IN [2] - 1:1, 1:1
in-person [1] - 9:20
Inc [2] - 3:16, 3:24
INC [2] - 1:6, 2:11
include [1] - 14:10
information [1] -
  16:18
Ingersoll [2] - 3:10,
  5:4
INGERSOLL [2] -
  1:17, 1:20
instance [2] - 14:12,
  14:16
instances [1] - 15:8
intent [1] - 18:6

interest [1] - 7:18
interesting [1] - 18:1
interim [1] - 9:16
introduced [1] - 5:4
inventors [4] - 6:21, 14:17, 16:13, 16:15
involved [1] - 16:1
issue [4] - 9:24, 10:8, 16:22, 17:17
issued [1] - 6:13
issues [6] - 5:21, 6:5, 6:19, 15:24, 16:3, 16:7

**J**

JACK [1] - 1:21
Jack [2] - 3:9, 3:11
January [4] - 10:15, 13:8, 13:17, 13:25
JAYSON [1] - 1:21
Jayson [2] - 3:10, 3:11
JOHN [2] - 2:3, 2:12
John [2] - 3:17, 3:23
joint [1] - 12:2
JORDAN [1] - 1:12
Jordan [2] - 3:5, 4:13
judge [2] - 9:9, 9:12
Judge [4] - 3:5, 4:13, 13:6, 13:19
judgment [2] - 5:21, 10:13
judicial [1] - 5:20
July [6] - 1:9, 4:3, 5:9, 9:2, 13:21
June [1] - 9:25
jury [7] - 10:21, 10:25, 11:1, 11:7, 11:20, 11:21, 13:1
justify [1] - 12:4

**K**

KAJ [1] - 1:7
KENT [1] - 1:12
Kimberly [1] - 3:18
KIMBERLY [1] - 2:6
kinds [1] - 6:22
KIRK [5] - 1:15, 3:7, 4:8, 5:3, 19:8
Kirk [5] - 3:8, 4:3, 5:1, 5:8, 19:3
Kling [2] - 3:23, 11:13
KLING [4] - 2:12, 3:23, 4:19, 11:16
knowledge [1] - 18:12

**L**

L.L.P [2] - 2:5, 2:8
L.P [4] - 1:6, 2:11, 3:16, 3:24
language [1] - 9:6
Lawrence [3] - 3:19, 3:20, 5:25
LAWRENCE [2] - 2:5, 2:8
lawyers [1] - 17:4
lead [1] - 3:18
LEFF [1] - 2:9
Leff [2] - 2:12, 3:24
Legal [2] - 2:12, 3:24
less [1] - 12:8
letter [4] - 4:2, 5:8, 5:10, 13:22
limit [1] - 8:21
limitation [1] - 17:8
limited [3] - 14:21, 16:14
line [4] - 3:6, 3:9, 3:22, 17:10
Listen [1] - 17:2
local [3] - 3:17, 9:5, 12:6
look [2] - 6:7, 10:18
Looking [3] - 8:21, 9:1, 9:8
lose [1] - 8:8

**M**

magistrate [2] - 9:9, 9:12
manage [1] - 9:2
March [2] - 14:2, 14:3
market [2] - 5:13, 7:22
Markman [1] - 13:7
Massachusetts [13] - 5:14, 5:16, 7:6, 7:23, 8:3, 8:8, 8:12, 13:7, 13:19, 14:13, 14:17, 17:22, 17:23
matter [5] - 7:6, 10:15, 16:5, 17:9, 18:20
McGraw [2] - 2:6, 3:18
means [1] - 10:16
meant [1] - 8:10
meantime [1] - 7:18
Medicare [1] - 7:9
Merit [1] - 1:25
might [3] - 13:6, 14:14, 18:13
mine [1] - 4:10
Modernization [1] - 7:10

moment [4] - 4:16, 8:25, 10:4, 12:18
months [1] - 18:10
moot [1] - 11:21
moots [1] - 11:19
morning [3] - 3:7, 3:15, 5:24
most [3] - 6:3, 6:10, 15:7
motion [5] - 11:19, 11:21, 17:13, 17:14, 18:7
motions [3] - 9:22, 10:13, 19:1
move [3] - 7:19, 10:20, 18:9
moving [1] - 8:5
MR [20] - 3:7, 3:15, 3:23, 4:8, 4:13, 4:16, 4:19, 5:3, 5:24, 7:8, 10:24, 11:13, 11:16, 11:18, 12:15, 15:25, 18:5, 18:14, 19:8, 19:12
MS [16] - 5:7, 12:1, 12:12, 13:3, 13:6, 13:14, 13:20, 13:24, 14:9, 15:1, 15:7, 17:11, 17:21, 17:25, 18:13, 18:19
multiple [1] - 6:14

**N**

Napa [1] - 2:13
nature [2] - 5:11, 7:16
necessary [1] - 15:8
need [4] - 4:7, 7:3, 10:16, 11:11, 17:9, 18:2
never [2] - 7:22
New [6] - 2:6, 3:19, 4:14, 4:15, 5:25
nine [1] - 12:23
NO [1] - 1:7
Nobody [1] - 4:19
noises [1] - 4:4
Northern [1] - 3:11
NOTE [1] - 3:3
nothing [1] - 5:12
Nothing [1] - 19:12
noticed [1] - 4:21
number [2] - 14:22, 14:24

**O**

objection [1] - 11:15

obligated [1] - 7:20
obviously [2] - 10:19, 14:20
occasions [1] - 12:9
October [1] - 10:12
OF [1] - 1:1
office [4] - 3:11, 3:12, 3:20, 4:9
Once [1] - 16:3
one [3] - 6:10, 6:13, 8:16
One [1] - 18:17
oOo [1] - 3:1
open [1] - 9:15
opening [1] - 10:3, 10:10
opportunity [1] - 6:7
oppose [2] - 18:5, 18:12
opposed [1] - 15:12
opposing [1] - 19:5
oral [1] - 17:8
order [5] - 8:15, 9:4, 10:17, 13:21, 19:5
originate [1] - 4:9
overall [1] - 15:10
own [1] - 4:25

**P**

p.m [2] - 9:19, 10:16
paragraph [7] - 8:21, 8:25, 9:8, 9:10, 10:18, 14:5, 14:13
Paragraph [9] - 8:23, 9:16, 9:18, 9:20, 9:22, 9:24, 10:1, 10:11, 10:14
particular [6] - 5:10, 5:11, 8:13, 15:17, 17:14, 17:17
parties [2] - 9:20, 11:23
parties' [1] - 5:19
party [1] - 14:16
party's [1] - 14:15
past [2] - 9:11, 19:5
patent [7] - 6:12, 6:13, 6:19, 6:20, 6:23, 6:24, 12:8
patents [5] - 6:6, 6:10, 6:11, 6:14, 16:4
Pause [3] - 10:5, 12:20, 13:12
PC [2] - 1:17, 1:20
Pennsylvania [1] - 1:22
per [1] - 13:1
perfectly [1] - 12:15

permit [1] - 5:13
permits [1] - 9:14
person [1] - 9:20
perspective [1] - 19:10
phone [2] - 11:14, 18:11, 19:6
picking [1] - 4:11
pitch [1] - 4:23
place [3] - 4:7, 9:19, 9:21
Plaintiff [2] - 1:4, 1:23
plaintiff [2] - 5:2, 5:3
point [4] - 6:5, 7:15, 16:17, 17:15
position [9] - 5:6, 5:11, 11:5, 14:8, 14:9, 15:4, 15:6, 15:23
positions [1] - 4:24
possibility [1] - 17:15
possible [1] - 11:6
potential [1] - 5:20
practices [1] - 8:13
present [1] - 18:20
presented [1] - 5:9
President [2] - 2:12, 3:24
President's [1] - 12:22
pretrial [1] - 5:18, 10:14, 10:16
problem [1] - 17:7
proceed [1] - 8:2
produced [1] - 16:17
product [2] - 6:18
production [1] - 16:6
products [2] - 6:17, 16:18
proposal [1] - 18:22
proposed [2] - 6:1, 12:1
proposing [1] - 6:1
prosecute [1] - 7:19
provided [1] - 18:21
provisions [2] - 7:9, 7:10
purposes [1] - 5:18
putting [1] - 8:6

**Q**

quicker [1] - 8:5
quieter [1] - 4:7
quite [1] - 6:9

**R**

raised [1] - 18:9

4

rare [1] - 12:9
real [1] - 4:22
really [3] - 6:7, 6:13, 16:21
reason [1] - 15:2
reasonable [1] - 8:2
recently [1] - 9:11
record [3] - 15:8, 15:15, 17:5
records [5] - 14:11, 15:5, 15:6, 16:21, 16:24
redacting [1] - 16:7
refer [1] - 9:8
reflects [1] - 19:6
regard [1] - 9:6
Registered [1] - 1:25
relatively [1] - 6:24
relevant [1] - 16:8
remains [1] - 18:23
report [1] - 9:16
reporter [1] - 13:16
Reporter [1] - 1:25
REPORTER'S [1] - 3:3
requests [1] - 18:15
resource [1] - 15:9
resources [1] - 5:17
respect [4] - 5:11, 14:9, 14:21, 15:16
respective [1] - 4:23
respond [2] - 7:4, 19:16
Responsive [1] - 13:24
Richard [1] - 3:8
RICHARD [1] - 1:15
road [1] - 7:16
ROONEY [2] - 1:17, 1:20
roughly [1] - 12:4
round [2] - 10:3, 10:10
Rule [1] - 18:21
rule [1] - 12:7
rules [2] - 15:4, 16:13
run [5] - 12:23, 12:25, 13:1, 14:2, 19:5
running [1] - 18:16

**S**

schedule [8] - 6:1, 7:1, 7:7, 8:1, 8:9, 8:11, 9:14, 12:13
scheduled [1] - 13:7
schedules [1] - 6:3
scheduling [2] - 9:13, 13:21
second [4] - 5:12, 9:10, 13:10, 14:11

see [2] - 13:10, 14:5
seeing [1] - 10:21
seek [1] - 8:16
seeking [1] - 17:22
selected [1] - 8:20
send [1] - 19:7
Senior [2] - 2:12, 3:23
sense [1] - 6:8
sent [1] - 4:2
sentence [1] - 9:10
separation [1] - 4:22
Sepracor [4] - 13:4, 15:2, 17:12, 18:7
Sepracor's [2] - 14:7, 14:9
SEPRACOR,INC [1] - 1:3
September [1] - 8:23
seriously [1] - 17:12
served [1] - 18:15
set [5] - 7:25, 10:14, 11:22, 12:17, 12:21
settled [1] - 7:15
settlement [3] - 7:17, 9:9, 9:15
seven [1] - 16:14
share [1] - 9:6
shared [1] - 12:6
short [1] - 6:9
side [8] - 5:19, 5:20, 12:2, 12:11, 13:1, 17:3, 18:24, 19:11
signature [1] - 19:7
significantly [1] - 6:19
similarly [1] - 5:16
simply [1] - 18:20
situation [1] - 16:9
sixth [1] - 6:20
someplace [1] - 17:20
sometimes [1] - 12:8
somewhat [1] - 8:4
sorry [1] - 4:14
sort [2] - 12:7, 15:10
source [1] - 17:6
Speaker [1] - 4:10
speaking [2] - 5:1, 5:22
specific [1] - 7:4
specification [1] - 6:9
spelled [2] - 3:16, 3:17
standard [3] - 9:4, 9:6, 9:11
standards [1] - 8:13
start [2] - 12:21, 14:1
started [1] - 18:14
starts [1] - 15:20
STATES [1] - 1:1
status [2] - 9:16, 9:18
stay [1] - 17:14

stick [1] - 15:14
still [2] - 11:2, 12:24
story [1] - 14:7
Stover [1] - 3:9
STOVER [1] - 1:21
straight [3] - 11:12, 17:2, 17:7
straightforward [1] - 6:24
strike [2] - 9:9, 11:20
strongly [1] - 5:15
structured [1] - 15:12
suit [1] - 17:19
sum [1] - 17:21
summary [2] - 5:21, 10:13
supposed [1] - 13:18
Susan [4] - 3:9, 3:10, 5:4, 13:4
SUSAN [1] - 1:18

**T**

teleconference [1] - 9:18
Telephone [1] - 19:18
telephone [1] - 3:3
TELEPHONE [1] - 1:10
terms [1] - 16:23
testimony [1] - 17:8
THE [41] - 1:1, 1:1, 1:15, 3:5, 3:13, 3:21, 4:1, 4:5, 4:11, 4:15, 4:17, 4:21, 5:5, 5:22, 7:3, 7:25, 10:6, 11:10, 11:17, 11:19, 12:3, 12:14, 12:17, 12:21, 13:5, 13:9, 13:13, 13:15, 13:23, 14:1, 14:23, 15:3, 15:19, 17:1, 17:18, 17:23, 18:1, 18:17, 18:25, 19:9, 19:14
Therefore [1] - 5:14
thumb [1] - 12:7
tied [1] - 8:3
timing [2] - 4:22, 5:6
today [1] - 19:6
together [2] - 8:7, 17:10
tracked [1] - 5:16
transcripts [1] - 16:6
transfer [4] - 17:13, 17:22, 18:6, 18:23
transferred [1] - 17:19
trial [6] - 7:15, 10:19, 10:22, 10:25, 11:6, 11:22, 12:18, 12:24

tried [1] - 16:9
try [2] - 9:12, 12:3
tutorial [1] - 9:21
twice [2] - 12:4, 16:13
two [2] - 12:10, 12:18
twofold [1] - 14:10
typically [2] - 12:5, 12:10

**U**

U.S.D.C.J [1] - 1:12
unable [1] - 8:19
unanswered [1] - 18:23
uncommon [1] - 7:14
uncomplicated [1] - 6:24
under [3] - 7:21, 8:12, 9:4
undoubtedly [1] - 9:5
Unidentified [1] - 4:10
UNITED [1] - 1:1
up [7] - 4:11, 4:19, 4:24, 11:12, 18:11, 19:1, 19:2
usual [1] - 8:9
UT [1] - 19:13
utilize [3] - 14:16, 15:1, 15:11

**V**

various [1] - 5:20
Vice [2] - 2:12, 3:24
Virginia [2] - 1:18, 3:11

**W**

warranted [1] - 8:17
Washington [2] - 2:9, 3:20
Waxman [2] - 7:21, 11:2
Wednesday [1] - 1:9
weeks [3] - 12:7, 12:10, 12:18
whereas [1] - 14:20
Wilmington [2] - 1:9, 3:8
wish [2] - 9:20, 10:7
witness [1] - 15:11
witnesses [1] - 14:21
witnesses' [1] - 5:19
Wolfgang [1] - 3:10
WOLFGANG [1] - 1:21
Woodlock [1] - 13:6

word [1] - 17:5
works [2] - 12:10, 12:11

**Y**

York [6] - 2:6, 3:19, 4:14, 4:15, 5:25

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SEPRACOR INC., <br><br>     Plaintiff, <br><br>   v. <br><br> DEY, L.P. and DEY, INC., <br><br>      Defendants. | C.A. No. 06-113-KAJ |

| | |
|---|---|
| SEPRACOR INC., <br><br>     Plaintiff, <br><br>   v. <br><br> DEY, L.P. and DEY, INC., <br><br>      Defendants. | C.A. No. 06-604-KAJ |

**PLAINTIFF SEPRACOR INC.'S ANSWERING BRIEF
IN OPPOSITION TO MOTION OF DEFENDANTS DEY, L.P.
AND DEY, INC. TO CONSOLIDATE ACTIONS**

<u>November 7, 2006</u>

Richard D. Kirk (rk0922)
Ashley B. Stitzer (as3891)
THE BAYARD FIRM
222 Delaware Ave., Suite 900
P.O. Box 25130
Wilmington, DE 19899
(302) 655-5000 (Phone)
(302) 658-6395 (Fax)
rkirk@bayardfirm.com
astitzer@bayardfirm.com

Attorneys for Plaintiff,
SEPRACOR INC.

OF COUNSEL:

Jack M. Stover
Jayson R. Wolfgang
BUCHANAN INGERSOLL & ROONEY PC
One South Market Square
213 Market Street, 3rd Floor
Harrisburg, PA 17101-2121
(717) 237-4800 (Phone)
(717) 233-0852 (Facsimile)
stoverjm@bipc.com
wolfgangjr@bipc.com

Todd R. Walters
Susan M. Dadio
BUCHANAN INGERSOLL & ROONEY PC
1737 King Street, Suite 500
Alexandria, VA 22314-2727
(703) 836-6620 (Phone)
(703) 836-2021 (Facsimile)
walterstr@bipc.com
dadiosm@bipc.com

# **TABLE OF CONTENTS**

Page

I.    THE APPLICABLE LEGAL STANDARDS ............................................1

II.   DEY'S GAMESMANSHIP SHOULD NOT BE PERMITTED
      TO PREJUDICE SEPRACOR ...............................................................2

      A.    Background ..............................................................................2

      B.    Dey's Assertion that the Dey I and II Actions Involve "Identical"
            Issues of Fact and Law Is Wrong ............................................4

      C.    Consolidation Without Modification of the Dey I
            Scheduling Order Would Prejudice Sepracor ...........................5

      D.    Consolidation With Modification of the Dey I
            Scheduling Order Would Not Prejudice Dey ............................6

III.  CONCLUSION ...................................................................................8

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page**</u>

**Cases**

*La Chemise Lacoste v. The Alligator Co.*, 60 F.R.D. 164 (D. Del. 1973) ........................1

*Paul Bernardi v. City of Scranton*, 101 F.R.D. 411 (M.D. Pa. 1983) ........................2

*Rohm & Haas Co. v. Mobil Oil Corp.*, 525 F. Supp. 1298 (D. Del. 1981) ........................2

*Sepracor Inc. v. Breath Ltd.*, No. 06-10043-DPW (D. Mass.) ........................3

*U.S. v. Denstply Int'l, Inc.*, 190 F.R.D. 140 (D. Del. 1999) ........................1

**Federal Statutes**

Fed. R. Civ. P. 42(a) ........................1

21 U.S.C. § 355........................2

35 U.S.C. § 285 ........................4

This brief by Sepracor Inc. ("Sepracor") is in response to the motion, and corresponding memorandum, of Dey, L.P. and Dey, Inc. (collectively "Dey") to consolidate the recently filed Civil Action No. 06-604-KAJ ("Dey II") into the earlier filed Civil Action No. 06-113-KAJ ("Dey I") without any modification of the Scheduling Order (D.I. 30) in the earlier filed action.

Sepracor does not oppose the general concept of consolidating the above-captioned actions. However, the Dey I action and the Dey II action are based on two different Abbreviated New Drug Applications ("ANDAs") filed by Dey with the U.S. Food and Drug Administration ("FDA") at considerably different times and relating to different infringing products. Therefore, procedurally, Sepracor opposes the portions of Dey's consolidation motion that refuse to permit any modification of the Dey I Scheduling Order to account for the newly filed Dey II case. Consolidation without modification of the Dey I Scheduling Order would preclude Sepracor from having a fair and reasonable opportunity to discover and prepare the issues on which it has the burden of proof in the Dey II case.

I.    **THE APPLICABLE LEGAL STANDARDS**

There is no dispute that Rule 42(a) requires, at a minimum, the existence of a common question of law or fact for consolidation. *See* DEY'S MEMORANDUM IN SUPPORT OF ITS MOTION TO CONSOLIDATE ("DEY'S MEMORANDUM") at 3, lines 11-13. However, this Court has discretion with respect to consolidation of actions. FED. R. CIV. P. 42(a); *U.S. v Densply Int'l, Inc.*, 190 F.R.D. 140, 142-43 (D. Del. 1999); *La Chemise Lacoste v The Alligator Co*, 60 F.R.D. 164 (D. Del. 1973) (recognizing that "[w]hether consolidation should be ordered is a matter of sound judicial discretion" and denying

1

consolidation).  Consolidation of actions, even those involving common questions of law

or fact, is not automatic as "the trial court must balance the probable savings of time and

effort against the likelihood that a party might be prejudiced . . . ."  *Paul Bernardi v  City*

*of Scranton*, 101 F.R.D. 411, 413 (M.D. Pa. 1983) (citing *Rohm & Haas Co. v  Mobil Oil*

*Corp ,* 525 F. Supp. 1298, 1309 (D. Del. 1981)).

## II.    DEY'S GAMESMANSHIP SHOULD NOT BE PERMITTED
TO PREJUDICE SEPRACOR

### A.    Background

Under the provisions of the Hatch-Waxman Act, the ANDA applicant has control

over the timing as to when the patentee files these types of "paragraph IV" litigations.  In

particular, when a generic drug applicant files an ANDA with a paragraph IV

certification, the ANDA applicant must provide notice to the innovator drug company

and patentee.  21 U.S.C. § 355(j)(2)(B)(i)-(ii).  The patentee then has forty-five days

upon receipt of such notification to file a patent infringement lawsuit under the provisions

of the Hatch-Waxman Act.  21 U.S.C. § 355(j)(5)(B)(iii).

Here, Dey initially filed ANDA No. 77-800 with a paragraph IV certification

seeking to copy three of Sepracor's highly successful drug products.  *See* DEY'S

MEMORANDUM at 2, lines 6-8 (defining Sepracor's three products as Sepracor's

"'levalbuterol hydrochloride solutions'").  In a letter dated January 9, 2006, Dey provided

notice to Sepracor that it filed ANDA 77-800 seeking to copy Sepracor's "levalbuterol

hydrochloride solutions."  On February 22, 2006, within the forty-five day period

provided under the Hatch-Waxman Act, Sepracor filed suit in connection with Dey's

ANDA No. 77-800.  This case was assigned Civil Action No. 06-113-KAJ.

Dey's notice letter of January 9, 2006 was the second notice letter that Sepracor received by a generic ANDA applicant relating to copies of Sepracor's "levalbuterol hydrochloride solutions." The first notice letter was received from Breath Limited. Thus, by the time Sepracor received Dey's notice letter of January 9, 2006 Sepracor had already filed suit pursuant to the Hatch-Waxman provisions against Breath Limited ("Breath") in the District of Massachusetts. *Sepracor Inc. v. Breath Ltd*, No. 06-10043-DPW (D. Mass.) (currently pending).

After receiving Dey's notice letter of January 9, 2006, and prior to bringing any action under the Hatch-Waxman Act, Sepracor had initiated a number of discussions with Dey and its counsel regarding consolidation of any such action against Dey with the already filed litigation against Breath in Massachusetts so as to have all of the generic challenges relating to copies Sepracor's "levalbuterol hydrochloride solutions" together. *See, e g ,* E-MAILS ON FEBRUARY 7, 2006 BETWEEN DADIO AND KLING (attached hereto as Appendix A) At that time, a scheduling order had not been entered in the Breath litigation. *See* SCHEDULING ORDER ENTERED IN *SEPRACOR INC. V. BREATH LTD* , NO. 06-10043-DPW (D. MASS.) ON MAY 3, 2006 (attached as Appendix A to D.I. 24). Dey would not agree to make consolidation possible. Sepracor nevertheless continued its efforts to make consolidation possible. However, Dey's counsel represented to this Court that, *inter alia,* generic copies of the very same Sepracor "levalbuterol hydrochloride solutions" were "completely different" and thus Dey refused, yet again, Sepracor's efforts to permit consolidation. TRANSCRIPT OF TELEPHONE CONFERENCE ON JULY 19, 2006 (D.I. 27), at 6, lines 15-22.

3

Well after its initial ANDA filing, Dey filed its second ANDA, ANDA No. 78-309, with a paragraph IV certification seeking to copy another of Sepracor's drug products – this time Sepracor's "'levalbuterol solution concentrate.'" *See* DEY'S MEMORANDUM at 2, lines 16-17. Dey's notice letter concerning this further ANDA on one of Sepracor's other products was dated August 14, 2006 – over seven months after its first notice letter. Again, within the forty-five day period provided by the Hatch-Waxman Act, Sepracor filed suit on September 27, 2006. This second Dey case was assigned Civil Action No. 06-604-KAJ.

### B.    Dey's Assertion that the Dey I and II Actions Involve "Identical" Issues of Fact and Law Is Wrong

Sepracor does not dispute that the Dey I and II actions involve the same patents-in-suit. Since both actions involve the same patents-in-suit, it is no surprise that Dey's defenses and counterclaims regarding invalidity and unenforceability of such patents-in-suit are also the same in both the Dey I and II actions. Thus, for Dey, the issues on which it has the burden to prove are the same in the two actions. However, as to the issues on which Sepracor has the burden (*e.g.*, infringement of the patents-in-suit), the Dey I and II actions involve different ANDAs and different products.[1] Thus, contrary to Dey's allegation, "[t]he questions of law and fact raised in the two actions brought by Sepracor against Dey" are not "identical." DEY'S MEMORANDUM at 3, lines 13-14.

---

[1]    Dey argues that, unlike the Complaint in the Dey I case, the Complaint in the Dey II case does not contain "an allegation of willfulness." DEY'S MEMORANDUM at 3 n.3. Dey is once again incorrect. In the Complaints for both the Dey I action and the Dey II action, Sepracor has alleged the cases to be exceptional under 35 U.S.C. § 285. *See, e.g.*, Dey I Complaint for Patent Infringement (D.I. 1), at ¶ 30 & Dey II Complaint for Patent Infringement (D I. 1), at ¶ 30. Dey's willfulness is a basis for exceptional case and Sepracor has put Dey on notice in this regard. *See, e.g.*, Dey I Complaint for Patent Infringement (D.I. 1), at ¶¶ 24-25 & Dey II Complaint for Patent Infringement (D.I. 1), at ¶¶ 24-25.

4

Dey attempts to dismiss any argument that Sepracor would make regarding the different products at issue in the Dey I and II actions by stating that the accused products "differ only in the concentration of the active ingredient." DEY'S MEMORANDUM at 2, line 2 & 3, line 21. If such difference only relates to concentration, then one must ask why Dey went through the time and expense of filing separate ANDAs on the accused products and why this separate ANDA took over seven months longer for Dey to file and provide Sepracor with the requisite notice of such filing. *See* FDA GUIDANCE FOR INDUSTRY, VARIATIONS IN DRUG PRODUCTS THAT MAY BE INCLUDED IN A SINGLE ANDA at 3 (Dec. 1998) (stating that "[d]ifferent strengths or concentrations of a drug product . . . should be submitted in one original application . . . .") (attached hereto as Appendix B).

Moreover, if the questions of law and fact are identical and the difference in concentration is of no import, then Dey should be willing to admit on the record that the accused product in the Dey II action would necessarily infringe those claims of Sepracor's patents-in-suit that are found to be infringed by Dey's copies of Sepracor's "levalbuterol hydrochloride solutions" in the Dey I action. Not surprising, Dey has not done so.

### C.  Consolidation Without Modification of the Dey I Scheduling Order Would Prejudice Sepracor

When Sepracor sought consolidation in Massachusetts before any implications of an established scheduling order in the Breath case and on the very basis that Dey now claims -- *i e* , "the interests of judicial economy, convenience, and expense," DEY'S MEMORANDUM at 4, lines 14-15 -- Dey refused. Now, over eight months after the Dey I action was filed and some three months after discovery has been ongoing in the Dey I

5

action, Dey completely reverses its stance to the detriment of Sepracor's ability to prove its additional infringement case.

While Dey's proofs on issues of validity and unenforceability may be the same, consolidation of the Dey I and II actions would expand Sepracor's proofs on issues of infringement. The Dey II action involves a separate and later filed ANDA involving a different product. When Sepracor served discovery (both interrogatories and requests for documents) two and three months ago in the Dey I action, Sepracor was not focused on Dey's second ANDA with this different product. Moreover, Sepracor was not even aware of Dey's second ANDA when it negotiated the number of hours for deposition testimony and the number of interrogatories. All along, however, Dey could have informed Sepracor and this Court that a second notice letter based on a new ANDA and different product was forthcoming. Dey could have also produced this new ANDA, ANDA No. 78-309, in the Dey I action but has not.

While Dey needs no further modification of the discovery limits, Sepracor should not be prejudiced by Dey's delay in filing a second ANDA on a different product.

### D. Consolidation With Modification of the Dey I Scheduling Order Would Not Prejudice Dey

Dey should not be heard to argue that it would be prejudiced by a modest increase in discovery limits (*e g* , deposition hours and number of interrogatories) or by a reasonable enlargement of the existing calendar set forth in the Dey I Scheduling Order, as such increases and enlargements are necessitated due to Dey's own actions. It was Dey who refused to make possible consolidation with the Breath case in Massachusetts because the generic copies of Sepracor's "levalbuterol hydrochloride solutions," which are statutorily required to be bioequivalent, are "completely different." Further, Dey filed

6

a separate ANDA on a copy of Sepracor's "levalbuterol inhalation concentrate," a different product than the products already involved in the Dey I action, more than half a year after it filed its ANDA that is the subject of the Dey I Scheduling Order.

Moreover, Dey will not be prejudiced by an enlargement of the calendar in the Dey I matter since, in any event, Dey can not obtain FDA approval or engage in commercial marketing of a copy of Sepracor's "levalbuterol hydrochloride solutions" until after resolution of the Breath action in Massachusetts. *See* SEPRACOR'S LETTER TO JUDGE DATED JULY 17, 2006 (D.I. 24), at 2, lines 22-32. Dey would also not be prejudiced by applying the calendar of the enlarged Dey I Scheduling Order to the Dey II action because Dey will obtain the alleged efficiencies and conveniences of the consolidated actions. Moreover, Dey has no one but itself to blame for its delay in filing this new ANDA and thereby providing notice to Sepracor more than half a year after the Dey I action was filed.

Accordingly, Dey will not be prejudiced by consolidating the Dey I and II actions with an increase in both the discovery limits and calendar of the Dey I Scheduling Order.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Dey's motion to consolidate the

Dey I and Dey II action unless it modifies the Dey I Scheduling Order to modestly

increase the discovery limits and reasonably enlarge the calendar.

November 7, 2006                         THE BAYARD FIRM

                                       /s/ Richard D. Kirk (rk0922)
                                       Richard D. Kirk (rk0922)
                                       Ashley B. Stitzer (as3891)
                                       222 Delaware Avenue, Suite 900
                                       P.O. Box 25130
                                       Wilmington, DE 19899-5130
                                       (302) 655-5000
                                       rkirk@bayardfirm.com

                                       Attorneys for Plaintiff,
                                       SEPRACOR INC.

OF COUNSEL:

Jack M. Stover
Jayson R. Wolfgang
BUCHANAN INGERSOLL & ROONEY PC
One South Market Square
213 Market Street, 3rd Floor
Harrisburg, PA 17101-2121
(717) 237-4800 (Phone)
(717) 233-0852 (Facsimile)
stoverjm@bipc.com
wolfgangjr@bipc.com

Todd R. Walters
Susan M. Dadio
BUCHANAN INGERSOLL & ROONEY PC
1737 King Street, Suite 500
Alexandria, VA 22314-2727
(703) 836-6620 (Phone)
(703) 836-2021 (Facsimile)
walterstr@bipc.com
dadiosm@bipc.com

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on November 7, 2006, he electronically

filed the foregoing document with the Clerk of the Court using CM/ECF, which will send

automatic notification of the filing to the following:

Steven J. Balick, Esquire
John G. Day, Esquire
Tiffany Geyer Lydon, Esquire
Ashby & Geddes
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899

The undersigned counsel further certifies that, on November 7, 2006, copies of

the foregoing document were sent by email and hand to the above local counsel and by

email and first class mail to the following non-registered participant:

Edgar H. Haug, Esquire
Kimberly J. McGraw, Esquire
Frommer, Lawrence & Haug L.L.P
745 Fifth Avenue
New York, NY 10151

Elizabeth A. Leff, Esquire
Frommer, Lawrence & Haug L.L.P
1667 K Street, N.W.
Washington, D.C. 20006

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk

629446v1

# EXHIBIT 6

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                         - - -

    SEPRACOR, INC.,
4                              :        CIVIL ACTION
            Plaintiff,         :
5                              :
        v                      :
6                              :
    DEY, L.P. and DEY, INC.,   :
7                              :
                               :    NO. 06-113 (KAJ)
8          Defendants.
                         - - -
9

10                    Wilmington, Delaware
             Wednesday, November 1, 2006 at 4:00 p.m.
11                   TELEPHONE CONFERENCE

12                         - - -

    BEFORE:          HONORABLE **KENT A. JORDAN**, U.S.D.C.J.
13
                         -- - -
14  APPEARANCES:

15
            THE BAYARD FIRM
16          BY:  RICHARD D. KIRK, ESQ.

17              and

18          BUCHANAN INGERSOLL & ROONEY, PC
            BY:  SUSAN M. DADIO, ESQ.
19              (Alexandria, Virginia)

20              and

21          BUCHANAN INGERSOLL & ROONEY, PC
            BY:  JAYSON R. WOLFGANG, ESQ.
22              (Harrisburg, Pennsylvania)

23                  Counsel for Plaintiff

24
                        Brian P. Gaffigan
25                      Registered Merit Reporter

```
 1    APPEARANCES: (Continued)

 2
                  ASHBY & GEDDES
 3                BY:  TIFFANY GEYER LYDON, ESQ.

 4                     and

 5                FROMMER LAWRENCE & HAUG L.L.P.
                  BY:  KIMBERLY J. McGRAW, ESQ.
 6                     (New York, New York)

 7                     and

 8                FROMMER LAWRENCE & HAUG L.L.P.
                  BY:  ELIZABETH A. LEFF, ESQ.
 9                     (Washington, District of Columbia)

10                     Counsel for Defendants

11

12

13

14

15

16

17

18

19

20                      - oOo -

21              P R O C E E D I N G S

22              (REPORTER'S NOTE:  The following telephone

23    conference was held in chambers, beginning at 4:00 p.m.)

24              THE COURT:  Hi, this is Judge Jordan.  Who do I

25    have on the line?
```

1          MR. KIRK:  Good afternoon, Your Honor.  This

2    is Richard Kirk from the Bayard Firm for the plaintiff

3    Sepracor, Inc.  With me on the line are Todd Walters, Susan

4    Dadio and Jayson Wolfgang from Buchanan Ingersoll & Rooney.

5          THE COURT:  All right.  Who do I have on for

6    Dey, Inc.?

7          MS. LEFF:  Your Honor, this is Elizabeth Leff

8    from Frommer, Lawrence & Haug representing Dey.  I also have

9    on the line with me Kimberly McGraw and our local counsel,

10   Tiffany Lydon.

11         THE COURT:  All right.  Well, this is touched

12   off by a letter that I received from Ms. Lydon complaining

13   about the folks on the Dey side of the case feel inadequate

14   discovery responses.  By now, the Dey attorneys should have

15   seen the letter that came in from Mr. Kirk yesterday so I'll

16   give the ball first to you folks on the Dey side.  Ms. Leff,

17   will you be speaking for Dey?

18         MS. LEFF:  Yes, I will, Your Honor.

19         THE COURT:  Well, then go ahead, if you will,

20   and fire back at what I take to be the response that, hey,

21   we have to given you meaningful responses amounting to

22   over 100,000 documents and that we're responding to

23   interrogatories the same way you are.  That is kind of in a

24   nutshell what I'm taking from that.

25         MS. LEFF:  Yes.  Your Honor, first of all, I'd

1    like to apologize for having to get the Court involved in

2    discovery issues, but Dey would really like to keep this

3    case on a schedule that Your Honor ordered.

4         To date, Sepracor's production, while it may be

5    145,000 documents, has consisted essentially of regulatory

6    documents filed with a government agency.  These documents

7    would all be kept by the company's regulatory department.

8    They require little review for privilege because they're not

9    privileged by definition.  They would require little, if

10   any, review for relevance since they all concern the Xopenex

11   product which Sepracor has admitted falls within the scope

12   of the asserted patent.  In sum, these are documents which

13   could have been put together and produced in a week's time

14   at most.

15        Dey's concern and the reason we raised all of

16   this with the Court is that if it took Sepracor somewhere

17   between three-to-five months to produce documents which are

18   easily gathered and reviewed, we're concerned at how long

19   it will take Sepracor to produce documents collected from

20   divergent sources which also need to be reviewed for

21   privilege and relevance.  It's not a matter of the number

22   of documents, it's a matter of the ease with which these

23   documents could have been collected and produced.

24        I also wanted to respond to the issue that was

25   raised with respect to rolling production.  The parties

1    agreed to a rolling production and a rolling production

2    should have allowed for a more efficient production because

3    it means that the documents are produced when they are

4    ready and not held back until all documents are ready.  If

5    Sepracor had been producing the documents on a rolling

6    basis, there wouldn't have been any need for this conference

7    call because more than these regulatory documents would have

8    been produced.

9            I also would like to make it clear that the

10   patent documents that Sepracor states that it produced from

11   law firms were produced only as a result of third-party

12   subpoenas that Dey served to those firms.  Sepracor agreed

13   to produce the documents only in exchange for Dey withdraw-

14   ing the subpoena for the documents and the deposition.

15           Sepracor's statement to this court that Dey is

16   well aware that documents from a third firm are being

17   produced in two days was news to me.  On October 26th, I

18   received a letter from Ms. Dadio informing me that those

19   documents would be produced once she received the documents

20   from the third party's attorney and any relevant and

21   nonprivileged -- and once they were gone through for

22   relevance and privilege.  There is no indication in their

23   letter that they were going to be produced on a date they

24   were due, which is November 2nd.  And, in fact, I sent her

25   a letter back the next day asking her to provide me with a

1    day on which they were going to be produced, if they were

2    not produced on November 2nd.  She never responded to that

3    letter.

4              The problem with the document production is

5    they have not provided a single document relating to the

6    development of this invention and inventor's notebook,

7    things that are very clearly relevant and necessary for

8    Dey to be able to prove its case.

9              Now, with respect to the interrogatory

10   responses, in our letters we provided only two examples

11   due to space constraints, but my September 26th letter to

12   Ms. Dadio sets out all of those issues.  If the Court would

13   like us to go through each of them, I'm prepared to discuss

14   those deficiencies.

15             THE COURT:  No, I'd like you to respond to

16   what they say, which is, hey, they asked a contention

17   interrogatory but they didn't ask us to identify ordinary

18   and plain meanings.  Besides, when we asked them a question

19   that did ask that, they said, well, you're premature so they

20   can hardly be heard to complain.  This is the sort of not

21   atypical, well, they're not doing anything.  We're not doing

22   anything other than what they're doing kind of defense.

23             MS. LEFF:  Your Honor, I really wish that we

24   had produced to you our responses to their interrogatories

25   because I have two responses to that.  The first is with

1    respect to the objections, the prematurity, Dey did make

2    those objections in a general basis so that we could

3    preserve our rights in the future if additional information

4    became available.  But, on the other hand, Dey did answer,

5    provide substantive answers, responses to those contention

6    interrogatories, including those that requested the ordinary

7    and customary meaning of claims terms.  We have, each of the

8    claim terms, we provided the ordinary and customary meaning

9    of them.  So we didn't withhold any information based on

10   that objection.  Rather, we made that objection to preserve

11   our rights in the future.

12            THE COURT:  Okay.  I think I've --

13            MS. LEFF:  With respect to the describing of the

14   detail, why we didn't -- that they didn't -- sorry.  That

15   they did not request us to describe the ordinary meaning of

16   words.  I don't understand really how Sepracor could state

17   that a request that said describe in full detail how each

18   element of each asserted claims could be construed, how that

19   couldn't include providing the ordinary and customary

20   meaning for each element.

21            THE COURT:  Okay.  I'll tell you what, we'll ask

22   them that now.

23            MS. LEFF:  Okay.  Thank you, Your Honor.

24            THE COURT:  Who is speaking on behalf of

25   Sepracor?

1          MR. WALTERS:  Your Honor, this is Todd Walters.

2     And I will address, overall, all of the issues.

3          THE COURT:  Okay.  Well, take it away,

4     Mr. Walters.

5          MR. WALTERS:  Where do you want me to start?

6     With our document production.

7          THE COURT:  I sure do.

8          MR. WALTERS:  Or with --

9          THE COURT:  No, I want you to go to documents

10    because I am troubled to here that three months after

11    discovery requests are served, the documents that your

12    opponents have are public record documents and nothing but

13    public record documents.  I mean if that is an accurate

14    statement, I don't think they're out of line to be a bit

15    nonplussed by that.  So you go ahead and explain that to me,

16    if you would.

17         MR. WALTERS:  Your Honor, there is a lot of

18    accusations and, in our view, mischaracterizations of what

19    Sepracor has been doing in terms of the collection, review

20    and production of documents.

21         THE COURT:  Well, let's get a baseline set,

22    though; all right?

23         MR. WALTERS:  Yes.

24         THE COURT:  Is it accurate that they gave you

25    the document requests more than three months ago?

1    MR. WALTERS:  We received the document request

2    on July 17th.

3    THE COURT:  Okay.  And is it accurate that the

4    documents that have been produced to date are all public

5    record documents?

6    MR. WALTERS:  That is not correct, Your Honor.

7    The documents that we have produced thus far, the 145,000

8    plus pages of documents are documents that are regulatory

9    documents filed with the FDA that are confidential documents

10   because they are not made public by the FDA.  We did go

11   through each of those documents to find out what was in that

12   collection page by page to make sure we knew what we were

13   producing to the other side.

14   THE COURT:  Well, let me ask this question.

15   They may be confidential, as you say, and not public

16   documents.  Are they documents, however, which are clearly

17   not privileged because they are already submitted to a

18   third-party, that is, the United States Government?  By

19   definition, there could be no claim of attorney-client

20   privilege with respect to these documents; right?

21   MR. WALTERS:  I don't believe there is any

22   document -- well, certainly no document that we produced

23   that was privileged.  We did have to go through the entire

24   collection to make sure that that was the case, that there

25   was no privileged documents in Sepracor's collection.

1          THE COURT:  That's what I'm trying to find out.

2    I have an accusation or an assertion from your opponents

3    that they have given us nothing, and maybe I misapprehended

4    when I say "public record documents" but a more precise

5    statement would be regulatory documents, as you've put it,

6    and which your opponents say they can't be privileged.  By

7    definition, since they gave them to the FDA, they cannot

8    be privileged documents.  Now I want you to correct me if I

9    have mistaken their argument or if they're wrong in their

10   assertion.

11          In other words, why would you go through, page

12   by page, a set of 145,000 documents if it's in fact the

13   case that these were all documents submitted to the FDA and,

14   therefore, could not have been privileged under the

15   attorney-client privilege?

16          MR. WALTERS:  Several reasons, Your Honor.  We

17   had to make sure that what was in there were all documents

18   that went to the FDA, one.  And, number two, we wanted to

19   make sure those documents were relevant to the issues in

20   this case.

21          THE COURT:  Okay.  So I guess we're all agreed

22   that you needed to do some kind of review to make sure that

23   everything that was in your own file that was labeled FDA

24   delivered materials really was FDA delivered materials

25   because that's the only way something privileged could have

1    snuck in there; right?  Is if it was mislabeled and somehow

2    got into the file that you thought was all material that had

3    been given to the FDA.  Am I correct about that?

4                MR. WALTERS:  That is correct, Your Honor.

5                THE COURT:  Okay.  So some kind of review you

6    deemed was important for that purpose.

7                MR. WALTERS:  Well, we would be remiss in just

8    producing documents without a review of them in the first

9    place.

10               THE COURT:  Okay.  And that's because you wanted

11   to guard against some misfiled document that was really

12   privileged getting out, and I guess you're saying also

13   because you wanted to look at some relevance point; right?

14               MR. WALTERS:  That is correct, Your Honor.

15               THE COURT:  Okay.  Now, on the relevance

16   point --

17               MR. WALTERS:  We wanted to look at each of

18   those documents because we wanted to know what was in the

19   collection before we actually produced them so that we did

20   not produce documents that were potentially privileged or

21   documents that were not relevant to the issues in the case.

22               THE COURT:  As to relevance, your opponents say,

23   well, that is just nonsense, judge, because these are all

24   documents that bear on some FDA approval process that goes

25   directly to a product that is conceded to be within the

1    scope of our request.

2              Do you want to hit back at that assertion?

3              MR. WALTERS:  Regardless of whether the ultimate

4    products are conceded to be within the scope of claims or

5    this litigation in any way, we still believe that we would

6    be remiss if we did not look at each and every document

7    before we produced it.

8              THE COURT:  Okay.  Well, I'm not telling you

9    that you can't do that.  You can certainly do that.  But

10   here is what I can tell you.  The Federal Rules of Civil

11   Procedure give you 30 days to make a response.  Sensible

12   parties, working together, work out additional time when

13   there are lots of documents.

14             I am telling you I'm smelling smoke where your

15   opponents are saying fire.  It feels to me like there may

16   be a slow roll going on here, because even though it's not

17   unwise for you to make a check just to see that nothing got

18   misfiled, and just to make sure, well, this really is

19   everything we thought was in that file, I tend to agree with

20   Ms. Leff that if they've given you document requests more

21   than THREE months ago and the best you've got to show for

22   it after this amount of time is you gave them the FDA

23   regulatory files, you haven't been doing all that great a

24   job in my view in terms of being responsive and staying on

25   track with discovery.  So we're going to be on schedule

1 here.

2       I'm not telling you that I'm granting them some

3 kind of relief because frankly I don't understand them to

4 be saying as to document production, we want some relief.

5 I understand them to be saying, judge, we're worried.

6 And based on what I'm hearing and what I've read, I think

7 they've got reason to be worried. So if we come off the

8 track, at least at this point, you're going to look like

9 the folks who put the rock on the tracks and caused things

10 to come off, and that's not going to be good for anybody.

11       So my strong urging to you is on this document

12 production, if you don't have somebody going through

13 inventor notebooks already, you better get somebody going

14 through inventor notebooks. If you want to do a rolling

15 production, fine. You better start rolling out some

16 inventor notebooks and some things that aren't FDA

17 regulatory material. That is something that occurs to me,

18 in a big ticket patent case with plenty of lawyers on both

19 sides, could have happened sooner than three months after

20 the requests were served.

21       So that takes care of the documents. And I

22 presume I'm being clear enough that we're going to have

23 responses that include something besides regulatory

24 documents going over in the very near future. Okay,

25 Mr. Walters?

1           MR. WALTERS:  Absolutely, Your Honor.  I

2    understand you loud and clear.

3           There is another issue I would like to address

4    with regard to documents, if it's possible.

5           THE COURT:  Sure, go ahead.  Bring it up.

6           MR. WALTERS:  In our collection of documents,

7    we have interviewed many people and collected many paper

8    documents in this process and we are striving very, very

9    hard to get all of those documents produced.  Where I have

10   concerns at the moment is on the electronic discovery from

11   both sides, and it appears to me that we would have to

12   get together, from both sides, an understanding how we're

13   going to go about in reaching agreement on how electronic

14   discovery is going to be collected and produced which

15   requires, for example, exchange of search terms.

16          THE COURT:  Well, that does require that.  And

17   if you folks can't get together on it, pursuant to my

18   scheduling order, there is a set of protocols that is in

19   place under the E-discovery default rules in this court.

20   And they're usually a little more -- what is the right way

21   to put it?  They're not the most streamlined procedures but

22   they are a good default.

23          MS. LEFF:  Your Honor, if I may?  This is

24   Elizabeth Leff.  We have agreed to follow those default

25   procedures.

1          THE COURT:  Then I'm not sure what you folks are

2    having a problem about.  You just need to sit down and get

3    your agreement going because those procedures are pretty

4    straightforward.  If you're following those procedures, I'm

5    mystified because I don't understand what the breakdown is.

6          MS. LEFF:  Well, Your Honor, if I may.  This is

7    Elizabeth Leff again.  We have a problem with search terms

8    because the Sepracor people have asked us to provide and

9    suggest search terms.  The problem is we don't know what is

10   in their documents.  We don't know what, for example, the

11   Xopenex project was called, what the inside name of it was,

12   so we wouldn't know to give them those terms.

13         THE COURT:  But you would certainly know -- do

14   you have me on speakerphone, Ms. Leff?

15         MS. LEFF:  No, I don't.

16         THE COURT:  Then you need to let me break in

17   when I feel like I need to break in.

18         You certainly are in a position to give them

19   some suggestions.  I mean if you can identify for me like

20   you just did, well, here is one area where we can't tell you

21   exactly how to frame it, you need to help us, that's fine,

22   but are you telling me you can't put together any list of

23   search terms?

24         MS. LEFF:  No, I am not.  We put together a

25   list and we would like to exchange lists and the Sepracor

1    attorneys have been insisting we provide our list first and

2    then they will provide us with a list.

3                    THE COURT:  All right.  Well --

4                    MR. WALTERS:  Your Honor?

5                    THE COURT:  Yes.

6                    MR. WALTERS:  This is Todd Walters.  May I

7    respond?

8                    THE COURT:  Well, you actually don't even need

9    to.

10                   MR. WALTERS:  Okay.

11                   THE COURT:  As I understand it, you want to get

12   at their documents, right, Ms. Leff, on behalf of Dey?

13                   MS. LEFF:  Yes.

14                   THE COURT:  Okay.  Well, is there a reciprocal

15   set of requests that has come your way where they're asking

16   for documents from you?

17                   MS. LEFF:  Yes, we both have requests for

18   documents.

19                   THE COURT:  All right.  Then, Mr. Walters, what

20   is the problem with the simultaneous exchange?

21                   MR. WALTERS:  There is no problem from our side,

22   Your Honor.

23                   THE COURT:  Okay.  Well, then if there is no

24   problem from either side, just do it.

25                   MS. LEFF:  Yes, Your Honor.

1                    THE COURT:  Just get it done.

2                    MR. WALTERS:  Your Honor, I would suggest that

3      the parties get together and have this resolved by the end

4      of the week.

5                    THE COURT:  Good plan.  Go ahead and do it.

6                    Now, I'm going to have to jump off here in just

7      a moment and so I only have a moment to hear from you,

8      Mr. Walters, but go ahead and respond, if you could, to the

9      assertion that you just are being unfair in the way you are

10     reading their contention interrogatories and you ought to be

11     able to give a response.  That is sort of the gist of it.

12                   MR. WALTERS:  Sure, Your Honor.  Let me address

13     the issue of ordinary meaning and their request for us to

14     provide an ordinary meaning.

15                   In their document request, they asked us to

16     construe the claims.  And when we received that request, it

17     was our understanding that we would do what a normal patent

18     attorney would do in construing a claim.  One, we would go

19     and look through the claims, identify terms that might have

20     an unusual meaning based on the specification, the file

21     history or any extrinsic evidence.  And if so, we would

22     explain how those terms should be construed.  That is how

23     we understood their document requests.

24                   In contrast to their request, we specifically

25     asked them to give us --

1           THE COURT:  You are talking about

2    interrogatories here, right?

3           MR. WALTERS:  Pardon?

4           THE COURT:  You said document requests.  I

5    assume mean interrogatories.

6           MR. WALTERS:  Yes.  I'm sorry.  Interrogatories.

7    We specifically asked them to give us the definition of any

8    term that they say is given its ordinary meaning.  So we

9    have asked for two different things.  I apologize if you

10   took from our letter to the court yesterday that we were

11   suggesting that they did not give us what they had indicated

12   was an ordinary meaning, and I would like to address that

13   point very quickly as well.

14          THE COURT:  Sure.

15          MR. WALTERS:  But the document request -- I'm

16   sorry -- the interrogatories that we served were styled

17   quite differently than the interrogatories that we received.

18          THE COURT:  Well, let me ask you something real

19   quick here, okay?  Because I'm going to have to jump off

20   in just a minute to address another set of parties issues.

21   Because I'm looking at the letter that I got from Mr. Kirk,

22   and it says on page three of that letter:  "On your client's

23   behalf, Dey's second specific complaint is that Sepracor

24   has not described in full detail the basis for Sepracor's

25   infringement contentions.  However, as Dey is well aware,

1    the only information available to Sepracor regarding the

2    accused products at the time Sepracor filed its responses

3    to interrogatories was information provided under

4    confidentiality," et cetera, et cetera.

5              Now, who is the confidentiality obligation owed

6    to that you are referring to there?

7              MR. WALTERS:  We are giving information when we

8    received notice that the ANDA was filed from the party who

9    filed the ANDA.  In this case, it was Dey.

10             THE COURT:  So let me make sure I've got this

11   right.  You are saying you can't respond to Dey's own

12   request for discovery because you owe a confidentiality

13   obligation to Dey?

14             MR. WALTERS:  Our understanding of the statute

15   is that the only purpose we can use that information for is

16   for filing suit.

17             THE COURT:  And are you saying that that is not

18   some reading of the statute or some benefit of the statute

19   that Dey can't waive and say, hey, if you want to use our

20   stuff to try to explain why you think we infringe, go ahead

21   and do it?  You don't think they can ask that?

22             MR. WALTERS:  If they would like to do that, we

23   would be happy for them to do that and we would supplement

24   answers.  We would ask the Court that we also get their

25   additional documents so that we can give them a full answer

1    and not be updating our interrogatory response on a monthly

2    basis.

3              THE COURT:  Yes.

4              MS. LEFF:  Your Honor, if I may just address

5    that quickly?

6              With respect to breach of confidentiality,

7    Sepracor specifically asked that if they sued us, they be

8    allowed to keep those documents to use for the litigation.

9    So they actually were allowed to use those documents for the

10   litigation.  Otherwise, they would have had to return them

11   to us two months after they received the notice of our ANDA

12   filing.

13             THE COURT:  Well, the bottom line is you want

14   them to answer your interrogatory; right?

15             MS. LEFF:  Yes.

16             THE COURT:  Okay.  Well --

17             MS. LEFF:  But, secondly, I would just like to

18   say these are not formulation documents, these are method of

19   use documents.  It would be highly unusual for them to even

20   need that information to tell us why they filed suit against

21   us on method of use patents.

22             THE COURT:  All right.  Well, here is the end of

23   the call.  I'm hearing Dey say, look, tell us why you think

24   we infringe.  That's a standard contention interrogatory.

25   Give it up, folks, on the Sepracor side.  I think you can

1    take it as a given now that they want you to use whatever

2    information is in your possession or at your disposal to

3    explain to them your good faith basis for asserting that

4    they are infringers by virtue of the filing of their ANDA.

5    So I'm expecting you to give them a response that is full as

6    you can make it and in good faith and that ought to be done

7    forthwith.  So let's get it done; all right?

8                MS. LEFF:  Your Honor, can I ask that they

9    respond to the rest of the interrogatories pursuant to my

10   letter to Ms. Dadio of the 26th?

11               THE COURT:  Well, I think I have given you all

12   enough instruction here for you to work out what you need

13   to work out, okay?  If I have to get into it on an

14   interrogatory-by-interrogatory basis, I'll do it, but I can

15   promise if I'm put in that position, the party that I think

16   put me in that position by acting in less than full good

17   faith will pay some sort of freight for it, and I just

18   don't expect that that is going to happen.  I expect parties

19   to behave in a way that is sensible and not standing on

20   technical points that really don't have a foundation when

21   examined closely.

22               So anyway, I think I have said enough in this

23   call to get people, I hope, operating on the same page.  But

24   I'll give you like 30 seconds a piece to tell me if there

25   is something ambiguous about what I tried to communicate.

22

1    Mr. Walters?

2                    MR. WALTERS:  I don't believe so, Your Honor.

3                    THE COURT:  All right.  Ms. Leff?

4                    MS. LEFF:  Your Honor, I don't believe so.  I

5    would just like to know dates by which we can expect

6    responses.

7                    THE COURT:  Okay.  Well, then you guys take it

8    off-line and talk about dates.  I believe my comment

9    that these things should happen forthwith indicates that

10   I'm intending that it hat happen pretty darn quick.

11                   MS. LEFF:  Thank you, Your Honor.

12                   THE COURT:  All right.  We're done.  Thanks.

13                   (Telephone conference ends at 4:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25