222 DELAWARE AVENUE, SUITE 900
P.O. BOX 25130
WILMINGTON, DE 19899
ZIP CODE FOR DELIVERIES: 19801

# THE BAYARD FIRM
### A T T O R N E Y S

MERITAS LAW FIRMS WORLDWIDE
www.bayardfirm.com

302-655-5000
(FAX) 302-658-6395

WRITER'S DIRECT ACCESS

(302) 429-4208
rkirk@bayardfirm.com

October 31, 2007

FILED ELECTRONICALLY

The Honorable Mary Pat Thynge
United States District Court for the District of Delaware
844 North King Street, Lock Box 8
Wilmington, DE 19801

　　　　　RE:　　*Sepracor Inc. v. Dey, L.P. and Dey, Inc.,*
　　　　　　　　　C.A. Nos. 06-113-*** & 06-604-*** (Consolidated Cases)

Dear Magistrate Judge Thynge:

　　　　Following up on our telephone conference today, I am sending you the transcript of a
September 12, 2007 status conference in the Massachusetts litigation (*Sepracor Inc. v. Breath,
Ltd.*, D. Mass., C.A. No. 006-10043-DPW) and the minute order entered by Judge Woodlock
thereafter. The relevant discussion in the transcript starts at page 24 line 20.

　　　　　　　　Respectfully submitted,

　　　　　　　　Richard D. Kirk (rk0922)

cc:　　　Original to Court, by hand
　　　　　All counsel of record as shown on attached service list

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on October 31, 2007, he electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send automatic notification of the filing to the following:

Steven J. Balick, Esquire
John G. Day, Esquire
Tiffany Geyer Lydon, Esquire
Ashby & Geddes
500 Delaware Avenue, 8th Floor
PO Box 1150
Wilmington, Delaware 19899

The undersigned counsel further certifies that, on October 31, 2007, copies of the foregoing document were sent by email and hand to the above local counsel and by email and federal express to the following non-registered participant:

Edgar H. Haug, Esquire
Kimberly J. McGraw, Esquire
Frommer, Lawrence & Haug L.L.P.
745 Fifth Avenue
New York, NY 10151

Elizabeth A. Leff, Esquire
Frommer, Lawrence & Haug L.L.P.
1667 K. Street, N.W.
Washington, D.C. 20006

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk

629446-1

```
0001
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
 4                                   )
     SEPRACOR INC.,                  )
 5                                   )
              Plaintiff,             )
 6                                   )
     v.                              )  CA No. 06-10043-DPW
 7                                   )
     BREATH LIMITED,                 )
 8                                   )
              Defendant.             )
 9                                   )
10
11   BEFORE:  The Hon. Douglas P. Woodlock, District Judge
12
                          STATUS CONFERENCE
13
14
15          John J. Moakley United States Courthouse
                         Courtroom No. 1
16                      One Courthouse Way
                    Boston, Massachusetts  02210
17               Wednesday, September 12, 2007
                           3:30 p.m.
18
19
                    Marcia G. Patrisso, RPR, CRR
20                     Official Court Reporter
                  John J. Moakley U.S. Courthouse
21               One Courthouse Way, Room 3507
22                  Boston, Massachusetts  02210
23                        (617) 737-8728
24
25          Mechanical Steno - Computer-Aided Transcript
0002
 1   APPEARANCES:
 2
            BUCHANAN INGERSOLL & ROONEY PC
 3          By: Susan M. Dadio, Esq.
            1737 King Street, Suite 500
 4          Alexandria, Virginia  22314
            -and-
 5          BUCHANAN INGERSOLL & ROONEY PC
            By: William E. Davis, Esq.
 6          Bank of America Tower, 34th Floor
            100 S.E. Second Street
 7          Miami, Florida  33131-2158
            -and-
 8          ROPES & GRAY LLP
            By: F. Turner Buford III, Esq.
 9          One International Place
            Boston, Massachusetts 02110
10          On Behalf of the Plaintiff
```

```
11        ROSE, CHINITZ & ROSE
          By: Alan D. Rose, Esq. and
12            Michael L. Chinitz, Esq.
          29 Commonwealth Avenue
13        Boston, Massachusetts  02216
          -and-
14        ROTHWELL, FIGG, ERNST & MANBECK, P.C.
          By: Sharon L. Davis, Esq. and
15            E. Anthony Figg, Esq.
          1425 K. Street NW, Suite 800
16        Washington, D.C.  20005
          On Behalf of the Defendant
17
18
19
20
21
22
23
24
25
0003
 1        THE CLERK:  All rise.  This Honorable Court is
 2   now in session.
 3        You may be seated.
 4        Calling the case 06-10043, Sepracor Inc., versus
 5   Breath Limited.
 6        THE COURT:  Let me make a brief preliminary set
 7   of observations concerning the rhetoric and the briefing
 8   here.  I'm generally a believer of the proposition that
 9   every dog gets one free bite.  You've all had yours.  I
10   find the briefing to be beneath contempt.  Perhaps it is
11   that your clients like to read this sort of thing.  And
12   if they do, send it to them.  Don't send it to me.
13        This sniping and whining has no place here.  If
14   you can't conduct yourselves like adults, then try
15   harder, because I don't want to see this.  Frankly, this
16   process of having to read this material has been about
17   as disheartening as anything I've encountered for some
18   time.  So we're past that now, because I'm not going to
19   see it again, I'm certain, because if I do, then the
20   dog's free bite may be turned around.  So I hope we
21   understand each other here.
22        Now, let's turn to this question of the
23   discovery schedule and general schedule.  I share the
24   view of the parties that I'm going to hold this to the
25   Markman hearing in February.  I, frankly, perhaps it's a
0004
 1   limitation of my own, couldn't really follow what was
 2   going on except the holiday season or shutdown between
 3   Christmas and New Year's, and I'm not sure I know what
 4   the alternative schedule and discovery deadline that --
 5   with precision, know what that will be for Sepracor.  So
 6   let me hear it from Sepracor's point of view.
 7        MR. DAVIS:  Yes, your Honor.  My name is William
 8   Davis, on behalf of Sepracor.
 9        We do not have an objection to the extension of
```

```
10   the discovery schedule.  Our one concern is the Markman
11   hearing as of February 21st.  If you look at the prior
12   schedule, there was a 30-day period of time between the
13   close of responsive briefs in the Markman briefing and
14   the actual occurrence of the Markman hearing, and we
15   would like to keep that space in for a number of
16   reasons.  Number one, we don't know how your Honor
17   handles a Markman proceeding, whether or not witnesses
18   will be called or even necessary.
19        At this point we don't know because we haven't
20   seen positions of Breath, but in the event that were to
21   be necessary, we would request at least 30 days so we
22   could prepare witnesses.  The Court may want a tutorial
23   with regard to the science issues in this case.
24        THE COURT:  That schedule doesn't bother me.
25   I'm the one who should be concerned about it because I'm
0005
 1   the one who's going to have to learn about this.
 2   Presumably you won't be filing briefs without having
 3   talked to your witnesses ahead of time.  Presumably
 4   you've been preparing them all along.  So the shortening
 5   of the time period to February 4th isn't so bothersome
 6   to me.  I don't generally like it squeezed in that way,
 7   but.
 8        So if we use February 4th as the responsive
 9   briefs here, what's the problem?
10        MR. DAVIS:  The only problem I've articulated,
11   your Honor, and that is we're just a little concerned
12   about a 14-day period rather than a 30-day period prior
13   to the hearing in anticipation --
14        THE COURT:  It would be astonishing to me if
15   both parties can't figure out what the respective
16   positions are going to be and are able to think them
17   through.  In terms of the choreography of the Markman
18   hearing, I'm here to be educated.  I'm likely to be
19   deferential, within limits, as to how the parties want
20   to present things to me.  And so I'm going to be looking
21   to both sides to tell me what they want to do, and more
22   accurately, perhaps agree upon some mechanism of
23   presenting the case to me.
24        I've carved out two days, and I assume that
25   that's probably the right -- based on what little I know
0006
 1   here, probably the right way to deal with this.  And the
 2   full day -- two full days.  So beyond that, I don't have
 3   a real view about it.  I try to prepare myself for them
 4   and I try -- Markman hearings -- and I try to be
 5   interactive, I guess, if I can, because that's one of
 6   the better ways I know to learn.  But beyond that, I
 7   just don't know.
 8        I mean, do you have some views about it?
 9        MR. DAVIS:  Do you, as a matter of course,
10   entertain tutorials --
11        THE COURT:  Sure.
12        MR. DAVIS:  -- in an objective sort of way to
13   sort of demonstrate the science?
14        THE COURT:  Yes, I do.  And I should tell you
```

15    now -- just simply because this is something you might
16    want to think about, and I certainly will be thinking
17    about it -- I have found when there are experts who
18    respect each other professionally, the kind of experts
19    that you would hope in a case like this to see, who have
20    a difference of opinion but are -- have some degree of
21    professional -- share professional craft values, that it
22    is useful for me to let the experts interact with each
23    other.
24            I do it in a form that is colloquially referred
25    to as a hot tub.  And what it generally means is that
0007
 1    the two experts, at the end of the expert presentation,
 2    end up in the jury box over there.  And they get to ask
 3    each other questions based on the presentations that
 4    have gone on.
 5            What I aspire to in this is the equivalent of
 6    circumstances in which I will be the fly on the wall
 7    observing the editorial board meeting of a peer review
 8    journal in the art in which people will simply be
 9    criticizing each other but in a professional fashion,
10    teasing out for me what I -- what they think are the
11    real issues in the case after having listened to it.  It
12    doesn't mean that they're tethered to their attorneys,
13    which is precisely why I like it, and that gives them a
14    chance to interact in a fashion that is somewhat outside
15    of the kabuki dance that is frequently performed in
16    testimonial presentations in court.
17            And so if the experts are of that caliber, you
18    can expect me to ask for that.  Sometimes I spring it on
19    people at the last minute, but I'm not doing that here
20    in part because the cat is a little bit out of the bag.
21    There was an article in the current antitrust review
22    about this technique, and references its use in a
23    variety of different settings including the
24    redistricting case or reapportionment case that I sat
25    on.  And I'm going to have Mr. Lovett send a copy of it
0008
 1    to you so you'll know what I'm thinking about.  But I
 2    welcome any possible way to educate me about this.
 3            The other very valuable dimension to it, from my
 4    perspective, is a shared tutorial to the degree the
 5    parties can agree on it.  You know, it's -- I'm not
 6    trying to impose costs, either, on the parties, but
 7    something that tells me a little bit about what their
 8    shared understanding is to the degree that at least gets
 9    me into the technology or the art or the science on
10    which there are points of disagreement.  So if you can
11    pull something like that together, that's helpful too.
12            What I find least helpful is something that is a
13    stylized adversarial process.  People -- you know,
14    everybody uses PowerPoint nowadays, and I'm as amenable
15    to that as anything else -- I do want stuff ahead of
16    time so I can try to be hot for it -- but that's another
17    way to do it.  But I guess I'd look to the parties first
18    to do it.  This is a major expenditure of my time, to
19    take two full days to deal with this.  And of course

```
20   it's not two full days, it's several days before to try
21   to master the material -- or at least become
22   sufficiently familiar with the material -- to have a
23   view about it.  But I guess that's to be continued?
24         MR. DAVIS:  Yes, your Honor.  There may be
25   issues regarding the prosecution history of the various
0009
1   patents.  Some courts deal with the issue of patent law
2   experts differently than others.
3         THE COURT:  You know, my own view about it is
4   it's an elaborate exercise -- Markman hearings are an
5   elaborate exercise in literary deconstruction of a very
6   odd set of texts, and that's the way I'm supposed to be
7   doing it:  for construction.  But of course I'll get
8   myself exposed to a variety of different things.  I will
9   try to be rigorous in my analysis to exclude from
10  consideration those things that I shouldn't be thinking
11  about; on the other hand, to the degree that somebody is
12  going to say that I can't understand certain terms
13  without looking at the prosecution history, then of
14  course I'll look at the prosecution history.
15        I'm not really interested in experts that are
16  going to tell me how I should read a word unless they
17  tell me that those skilled in the art read the word that
18  particular way.  I'm not going to have artificial rules
19  about the admissibility of testimony at that time.  I
20  used to hate it when state district court judges used to
21  admit everything by saying "res gestae," but that's what
22  I'm likely to do here so I can sort it through at some
23  later point rather than making preliminary
24  determinations about the admissibility and that sort of
25  thing.
0010
1         So I think I know the rules for -- broadly
2   speaking, I know the rules for construction and I'll
3   apply them, but like a judge in a criminal case is
4   exposed to motions to suppress that demonstrate evidence
5   that may not ultimately be used or admissible at trial,
6   I'll nevertheless receive it and try to sort things
7   through that way.
8         So I think what I would like to do is set a
9   schedule for the -- kind of a joint proposal for how
10  this Markman hearing is going to proceed.  I'm assuming
11  that the two days is a reasonable amount of time to do
12  it.  And if somebody says, "No, we can do it in one
13  day," that's great.  But my initial encounter here,
14  fleshed out by the rhetorical detritus that floated up
15  on my desk most recently, suggests to me that I may need
16  two days.
17        MR. DAVIS:  Based upon what we now know of
18  Breath's position, I would believe two days would be
19  more than adequate.
20        THE COURT:  All right.  So now we go back to
21  this schedule kind of thing.  Apart from clinging
22  tenaciously to 30 days for the -- before the filing for
23  the responsive briefs, what other aspects of it are
24  problematic for you?
```

```
25          MR. DAVIS:  There really weren't, your Honor.
0011
 1  It was just the 30 days as opposed to 14 days.
 2          THE COURT:  Okay.  All right.  Well, you know
 3  what?  I would like to have it earlier if I could, but
 4  I'm not moving off that.  And I -- you know, maybe 30
 5  days between the parties' opening briefs and responsive
 6  briefs is a little bit too long, and I might squeeze
 7  that part of it.  I'm not sure that there is any reason
 8  why I shouldn't.  Ordinarily our briefing schedules are
 9  14 days, but if I pushed that back to January 28th?
10          MR. DAVIS:  That would be the responsive brief?
11          THE COURT:  Right.  That seems to me to be okay
12  unless I hear otherwise.  All right.  So January 28th
13  for that.  And the other dates -- I will incorporate the
14  so-called revised dates on the Motion No. 65, which is
15  Breath's motion for extension of discovery deadlines and
16  modification, I'll leave in place.  All right?
17          MR. DAVIS:  All right.
18          THE COURT:  Okay.  Now, let me go to -- perhaps
19  you'll permit me my own rhetorical excess with respect
20  to the willful infringement briefing.  It seems like a
21  kind of formal passive-aggressive pleading.  Everybody's
22  satisfied that willful infringement is not in the case
23  in the formal form, but then it just gets the hell
24  briefed out of it, including multiple briefs on Seagate.
25  Willful infringement didn't seem to be a problem even
0012
 1  before Seagate.  It's more of a problem now, of course.
 2          Why the view that -- is it just a hostage to
 3  fortune to keep the 285 claim in here?
 4          MS. DADIO:  Thank you, your Honor.  Susan Dadio
 5  for Sepracor.
 6          It would be a moot point, your Honor, with the
 7  amendment to the complaint keeping in the exceptional
 8  case and attorney's fees under 285.
 9          THE COURT:  I tend to think so.  But what I
10  don't understand is why the briefing would suggest -- I
11  get the poster of the kitty that is hanging there, "Just
12  hang in there."  You know, it's hard to imagine a 285
13  case -- I know there are such cases -- but without
14  willfulness.
15          MS. DADIO:  Your Honor, the Glaxo case has
16  said -- which is the case, in fact -- said there is not
17  technically the willful infringement because it's an
18  artificial act of infringement as opposed to a genuine
19  act, that 285 is still permissible and --
20          THE COURT:  It is.  But I mean, do you really
21  think you've got an exceptional case for attorney's fees
22  in this case?
23          MS. DADIO:  We do believe, your Honor, that we
24  have a good case for that.  And it's been illustrative,
25  having the depositions that we had recently taken, with
0013
 1  a very particular issue.  There is a statutory provision
 2  in the Hatch-Waxman that requires a generic filer to
 3  certify that the patents that are listed in the Orange
```

4    Book that cover the innovator's drug to certify that
5    these patents are non-infringed or invalid, and that
6    that statutory duty of due care is something that both
7    the court in Glaxo and Yamanouchi and other cases have
8    held that there is a strong statutory duty of care,
9    something that the Seagate case did not address.
10           THE COURT:  Well, you know, we're on pleadings,
11   so if somebody wants to plead something, I'm generally
12   ready to let them plead it.  I'm not sure what, if any,
13   effect this has on discovery.  Anything?
14           MS. DADIO:  We don't believe it should, your
15   Honor.
16           MR. FIGG:  Your Honor, our concern is not that
17   they include a request to the Court that this case be
18   declared exceptional at the end of the case and that
19   there be an award of attorney's fees.  We have a similar
20   request in our pleading.  We think ours is more
21   meritorious, but that would be for your Honor to decide
22   at some later point.
23           THE COURT:  That's a comparative judgment, not
24   an absolute judgment, that I'll have to make at the end.
25           MR. FIGG:  That's right.  And that's our point.
0014
1    Our only concern is it seems that both parties have come
2    around to an agreement that willfulness has no place in
3    this case; that a claim for willful infringement cannot
4    be based on the filing of an ANDA and a patent
5    certification even in, in their view, that certification
6    was completely baseless.  What we're concerned about is
7    that the request for exceptionality not be another
8    willfulness claim dressed up in exceptionality clothes.
9    And Judge Tauro in the Aventis v. Cobalt case we think
10   got the analysis right -- and he's been cited in many
11   other cases since then -- which says that if it's
12   exceptionality, it has to be based on something beyond
13   willful infringement:  litigation misconduct, the filing
14   of meritless papers with the court, those sorts of
15   things.  We're not concerned that they make that
16   request; we don't think we're going to do any of those
17   things, but we want it to be clear that willful
18   infringement is not part of this case.
19           And it does impact on discovery, because the
20   other thing that Judge Tauro made clear is that because
21   willful infringement is not part of the case, and
22   because he dismissed the willful infringement claims in
23   that case, which were virtually identical to what we're
24   dealing with here, he said, "Cobalt will not need to
25   raise reliance on advice of counsel as a defense."
0015
1            THE COURT:  But is that here?
2            MR. FIGG:  Well, we're concerned that it may be
3    here.
4            THE COURT:  Well, but anxious concerns don't
5    always get resolved anticipatorily by the trial judge.
6    I don't know that there's any advice of counsel involved
7    in this case.  That's why I asked the question whether
8    or not there's going to be some sort of discovery

```
 9   impact.  Is there advice of counsel involved?
10           MR. FIGG:  Our view, your Honor, is that the
11   case law that both sides have cited in their briefing on
12   this says that the filing of a completely baseless
13   certification can be part of --
14           THE COURT:  I understand.  I think I understand
15   the basic -- is somebody arguing about this now?  I
16   mean, apart from telling me about it, is somebody
17   arguing about it?
18           MR. FIGG:  I don't think so.
19           THE COURT:  Are they saying, "We want your
20   patent counsel here"?
21           MR. FIGG:  I'm sorry?
22           THE COURT:  "We want your patent counsel.  We
23   want to depose him, we want his documents."  Is anybody
24   asking for that?
25           MR. FIGG:  That request has not been made.
0016
 1           MS. DAVIS:  I was just going to say --
 2           THE COURT:  Is this double-teaming?  I was going
 3   to say.
 4           MS. DAVIS:  I'm sorry.  I've been dealing more
 5   directly with the discovery issues, and I do know that
 6   Sepracor has raised in their objections or response to
 7   Breath's document responses and things, when we raised
 8   an objection based on the fact that the discovery sought
 9   would only go to willfulness, they objected to that.  So
10   I don't know where they stand on that issue.
11           THE COURT:  Well, you don't want it, I take it,
12   from your side, from your comparatively meritorious 285.
13           MR. FIGG:  That's correct, your Honor.  Our --
14           THE COURT:  Okay.  So you don't want it.  Just a
15   moment.  Just a moment.  Is there something out there
16   that you wanted -- you know, am I being blissful in my
17   ignorance of the potential of turning this into a
18   discussion about attorney waiver?
19           MS. DADIO:  It is something that Breath has not
20   invoked as a defense to the exceptional case.  But
21   should they invoke reliance upon counsel, then of course
22   we would want to sever.
23           THE COURT:  They said they're not going to do
24   it.  They said they're not going to do it, okay?
25           MS. DADIO:  For any purpose whatsoever in the
0017
 1   case?
 2           THE COURT:  That's my understanding.  I'm just
 3   hearing -- I'm hearing hypotheticals.
 4           MR. FIGG:  You're absolutely correct, your
 5   Honor.  If willfulness -- if willful infringement is out
 6   of the case, there's no reason for us to assert an
 7   advice-of-counsel defense.  The question of whether we
 8   made a pleading or a certification that lacked any basis
 9   is an objective test.  The Court can look to that and
10   determine whether it was baseless or not without getting
11   into what Breath's counsel advised them to do.
12           THE COURT:  Any dispute about that?
13           MS. DADIO:  A point of understanding, your
```

```
14   Honor.  Breath's counsel did file a notice letter to
15   Sepracor which sort of started this whole case, and
16   attached to that was a detailed factual and legal basis.
17   And if I understand correctly -- or I want to make sure
18   that I understand correctly that Mr. Figg is indicating
19   that that notice letter will not be used for any purpose
20   in this case as well, or is he going to assert that that
21   is some form of basis, advice, opinion to support any of
22   his positions, his client's positions?
23          THE COURT:  I really don't know what you're
24   talking about in this sense:  Here's a public
25   disclosure.  Here's the bases for us to take this
0018
 1   position.  It is, I believe, an objective test.  And so
 2   if some attorney is in the tank on this, it's a matter
 3   of indifference.  The question is whether or not that
 4   objective statement of the position that justifies their
 5   providing notice, I guess, is sustainable.  Why do I
 6   have to talk to attorneys about that?
 7          MS. DADIO:  Because, your Honor, Breath's
 8   attorneys signed the notice letter.
 9          THE COURT:  All right.  So, you know, they
10   signed things.
11          MS. DADIO:  And presumably the detailed factual
12   and legal basis came from the attorneys.  And so we --
13          THE COURT:  Well, presumably it came from the
14   client.
15          MS. DADIO:  The legal opinions?
16          THE COURT:  Well, the legal and factual basis
17   is -- the legal basis that I'm going to evaluate in
18   light of the factual -- I am or some fact-finder is
19   going to evaluate.
20          MS. DADIO:  And so they will provide us with a
21   witness who understands that?
22          THE COURT:  I don't know.  This going -- tell
23   you what:  It stays in, and if you want to fight about
24   this in real time as opposed to science fiction time,
25   you can do it and I'll resolve it.  I don't think it's
0019
 1   going to happen that way, and I don't want to deal with
 2   these kinds of speculations about this.  If somebody
 3   decides they're going to do it, raise it.  So maybe this
 4   will be raised and maybe it won't.  I don't know why it
 5   should be, but I don't run your case.  This much I know.
 6   I'm not going to make a decision about pleadings on the
 7   basis of this discussion, apart from saying I'm taking
 8   willfulness out of the case and just substitute the
 9   amended complaint that Sepracor has here with the
10   language taken out.
11          MS. DADIO:  Would your Honor like for us to
12   resubmit that as a formal document that --
13          THE COURT:  Yes, you should.  It will now be the
14   operative pleading in this case.
15          MS. DADIO:  Very well.
16          MR. FIGG:  Your Honor --
17          THE COURT:  I'm sorry.
18          MR. FIGG:  Go ahead, please.
```

```
19          THE COURT:  Let me just say if you can do that,
20    say, by Friday.
21          MS. DADIO:  We can do it tomorrow morning, your
22    Honor.
23          THE COURT:  That's fine.
24          MR. FIGG:  My only comment was we received a
25    sur-reply brief from Sepracor late yesterday afternoon,
0020
1     and it raised a concern in my mind that I would just
2     like to make sure we're all clear about.  Paragraph 24
3     of the amended complaint says, On information and
4     belief, the ANDA -- I'm paraphrasing here -- in its
5     filing of the ANDA to obtain approval to engage in
6     commercial manufacture of Breath's product, Breath's
7     infringement of the Sepracor patents is and has been and
8     continues to be deliberate.
9          Now, they took the word "willful" out of that
10    sentence.  It used to say "continues to be willful and
11    deliberate," and they took the words "willful and" out.
12    And --
13          THE COURT:  No.  I saw that.
14          MR. FIGG:  -- I just want to make sure we're
15    clear that this is simply not another way in their view
16    of saying infringement was willful and --
17          THE COURT:  Well, I'll put it directly.  I think
18    after all this briefing it should be clear.
19          You do not state a claim for willful
20    infringement?
21          MS. DADIO:  That's correct, your Honor.
22          MR. FIGG:  Good enough.
23          THE COURT:  All right.  Now, there's all this
24    stuff about document production, and I -- you know, I
25    don't know what this document production is like, but it
0021
1     reminds me of the comparison -- between 30,000 pages and
2     2.77 million pages of document, as if that were
3     meaningful -- of a New Yorker article.  Probably about
4     40 years ago, 50 years ago, maybe, a press critic for
5     the New Yorker, whose name was A.J. Liebling, he used to
6     write a column called The Wayward Press Room.  And one
7     of his favorite targets was the publisher of the Chicago
8     Tribune whose name was Colonel Robert McCormick.
9     Colonel McCormick was the person who put the world's
10    greatest newspaper on the map, the Chicago Tribune.  In
11    one of his efflorescences Colonel McCormick said that
12    one of the reasons that the Chicago Tribune was the
13    world's greatest newspaper was that if you took the
14    Sunday paper and you weighed it, it was the heaviest
15    newspaper anywhere in the country because of the number
16    of pages.  And so Liebling then conducted an evaluation
17    of which was the best borough in New York based on
18    weighing the telephone books from Queens and the Bronx
19    and Manhattan.  And so when I see something like this I
20    think of Colonel McCormick.
21          It's meaningless to me, how many pages there are
22    here; I'm really concerned with how the parties are
23    going to conduct their discovery.  And I make this
```

```
24   comment after we've already set our discovery schedule.
25   But as a way of getting into what the discovery disputes
0022
 1   are that I can help you resolve -- and all of this is in
 2   an effort to encourage you to help yourselves; that is,
 3   it is not a pleasant experience to come back and deal
 4   with these discovery matters here in court because they
 5   could be resolved elsewhere.
 6          So let's turn to, I guess, because I think I've
 7   dealt with the relevant motions that are really
 8   outstanding now; that is, the motion for Judgment No. 63
 9   on the willful infringement and the modification of an
10   extension of discovery deadline.  What really needs to
11   be dealt with by me here?  You know, it's with great
12   trepidation that I take up your contemplated motions,
13   but perhaps in an effort to relieve you of the burden of
14   further contemplation.
15          So starting with page 5, are there things that
16   we ought to be talking about here?  Is there any reason
17   why some of these documents aren't produced?  I mean,
18   apart from the stated reasons.
19          MS. DAVIS:  I don't know if you want to hear
20   from Breath first as to the things that we're concerned
21   about and why we're concerned.  And maybe if we could
22   work them out here, that would be great.  There are
23   documents that Sepracor is withholding on the ground
24   that they have a confidentiality obligation to the
25   contract manufacturer, the company that actually made
0023
 1   their product, that -- and the reason it particularly
 2   comes to a head here, your Honor, is that we have
 3   learned that one of the documents in particular we're
 4   concerned about was an attachment to the very memorandum
 5   that is part of Sepracor's documentation of the alleged
 6   invention that led to one of their patents, the
 7   manufacturing process formulation patent at issue.
 8          And there's a question with respect to the
 9   conception of that invention and, in fact, whether or
10   not it was Sepracor employees or others at this contract
11   manufacturer who actually conceived of the invention.
12   That's a very important issue for us in the case.
13          THE COURT:  All right.  So what's the story
14   about that?
15          MR. DAVIS:  Your Honor, the only thing we ask is
16   that we be ordered to produce it, and we will produce
17   it.
18          THE COURT:  You are and so you will.
19          MR. DAVIS:  Then we will.
20          THE COURT:  Next?
21          MS. DAVIS:  That sounds good.
22          MR. DAVIS:  It is a document, though.  She used
23   the plural, but it is a document.
24          THE COURT:  All right.  So it's referenced in
25   the memorandum as "document."
0024
 1          MS. DAVIS:  And let me ask, because I don't -- I
 2   have no way of knowing what other documents they have
```

```
 3  withheld.  They have produced some documents from that
 4  manufacturer, they have apparently withheld others.  You
 5  know, the same basis would apply for any documents that
 6  they withheld on the basis of this confidentiality?
 7          THE COURT:  That's my understanding.
 8          MR. DAVIS:  Your Honor, we have these documents.
 9  We have sought authorization to release them; the
10  manufacturer has denied us that authorization.  We just
11  need the comfort of a court order.
12          THE COURT:  Yes.  And if you want a formal court
13  order, you prepare a form of order and I'll sign a form
14  of order.
15          MR. DAVIS:  That's fine.
16          THE COURT:  But I assume that there're in place
17  some forms of protective orders and so on to deal with
18  this.
19          MR. DAVIS:  Yes.
20          THE COURT:  Okay.  So that's dealt with.
21          The second one is expert reports from the Dey
22  litigation.  What's the problem with that?
23          MR. DAVIS:  Our problem there was simply that
24  they're asking for an advance peek of our expert
25  opinions when we have a schedule in this case to address
0025
 1  that issue.
 2          THE COURT:  I'm not buying that.  You know, if
 3  it's been submitted in another litigation, turn it over.
 4          MR. DAVIS:  There are some confidentiality
 5  issues there that we would have to sort through with
 6  regard to Dey confidential information.
 7          MS. DAVIS:  With respect to the -- I mean, the
 8  reports that deal with the validity and inequitable
 9  conduct issues, those -- by definition, those should not
10  contain any Dey confidential information because they
11  have to do with Sepracor's patents and inventions.  So
12  that should not be an issue.
13          MR. DAVIS:  Those are not our reports.  Our
14  reports would be dealing with the infringement.
15          THE COURT:  So you've got them, so turn them
16  over.
17          MR. DAVIS:  Our reports?
18          THE COURT:  Anything that you've received in the
19  course of the Dey litigation.  I don't know why -- just
20  turn the file over.  You can maybe charge them for the
21  Xeroxing.
22          So to the degree that there's some other
23  third-party concerns for confidentiality, I understand
24  that, but I mean for you to work in good faith to
25  resolve that.  But I know of no reason why materials
0026
 1  that are developed in that litigation shouldn't be
 2  turned over here in this.
 3          MR. DAVIS:  The only real serious concern is our
 4  confidentiality obligation vis-a-vis Dey and Dey's
 5  materials that may be part of those reports.
 6          THE COURT:  I think if you resolve it, or at
 7  least approach it in this perspective, my view is that
```

8    may give rise to the discovery of relevant material for
9    this case; and that I am directing you to use your best
10   efforts to obtain the information, including the Dey
11   confidential information, in order to achieve that.  And
12   if it's necessary for another court to act on that, then
13   I will look to you to get another court to act on it.
14   But my view on the basis of what I now know is that
15   materials in that litigation should be turned over here
16   to save time and save dispute here, unless there's
17   something outstanding that I don't now understand.
18            MR. DAVIS:  Just so you know, your Honor, we
19   have turned over all the materials in that case other
20   than these reports.
21            THE COURT:  That's my understanding.  But I
22   believe it was Wilson Pickett who said 99 percent is not
23   good enough?
24            All right.  So privilege issues?  What do you
25   want me to do about that.
0027
1             MS. DAVIS:  I think at the moment -- we fairly
2    recently received the revised privilege log that
3    purported to address some of our issues, and we've just
4    been going through that to make sure we understand.  I'm
5    hopeful we can work those issues out among the parties.
6    So we don't have anything with particularity to present
7    for decision at this point, and hopefully we won't get
8    to that point.
9             THE COURT:  Okay.  The testimony of Mr.
10   Barberich?
11            MS. DAVIS:  We're still waiting for a date, your
12   Honor, from Mr. Barberich who was the inventor of five
13   of the patents.
14            MR. DAVIS:  We'll be providing them with a date,
15   your Honor.  He's been out of the country.
16            THE COURT:  Now it's on the front burner rather
17   than the back burner.  Let's get this done.
18            MR. DAVIS:  It will get done.
19            THE COURT:  The motion for summary judgment on
20   the '289 patent.  What's going on there?  I mean, is
21   that just hopeful or is it -- I don't mean -- I'm sure
22   all of your positions are comparatively well-founded, if
23   that's the term of art today.  What are you planning, to
24   file something on January 28th?
25            MS. DAVIS:  Your Honor, what we would be
0028
1    planning to file -- one of the issues that I think we
2    may want to address is what the timing of the summary
3    judgment motion should be.  And I think that would come
4    up in the context of talking about the trial date.  But
5    I know the original proposed stipulation between the
6    parties place the summary judgment motion filing after
7    the Markman decision came down.  I think our view is
8    that that's really not necessary and not really
9    compatible with resolving this case expeditiously
10   because that means there's a long period there where
11   nothing's essentially moving forward in the case and
12   then summary judgment motions would be afterwards.

```
13          The way we would propose --
14          THE COURT:  What's the main things you've got to
15  do this fall?
16          MS. DAVIS:  Well, between the time that the
17  Markman hearing occurs and the decision comes down, and
18  then if we wait another -- I believe the original
19  proposal had 45 days after that decision for the opening
20  brief of summary judgment, that would stretch things
21  out.  And I think what we would propose, and what we
22  have done in a lot of cases typically, is have summary
23  judgment motions -- or file summary judgment motions
24  either concurrently with or during the same general time
25  frame with the Markman briefing, because the summary
0029
1   judgment motions -- certainly the summary judgment
2   motions that we contemplate -- can be briefed based on
3   or relating to what the outcome of the claimed
4   construction is.  So we can write the brief in a way
5   that explains how it relates to the pending claimed
6   construction issue.
7           THE COURT:  Let me just introduce my concern,
8   which is you don't want to choke me.  And so -- and the
9   parties seem to think that they've gotten done
10  everything that they want to do when they bring the
11  wheelbarrow up to the clerk's office and dump it there.
12  I have a somewhat different view.  I want to do it in an
13  orderly fashion.  I don't -- I have no particular view.
14  I mean, I think I have a -- I should say I have a
15  general view of Markman hearings, which is there's never
16  a right time for a Markman hearing, there's only a
17  tolerable time for it that the parties may feel
18  comfortable with.
19          I've done it a variety of different ways:  I've
20  done it, you know, in conjunction with summary judgment
21  motion, I've done it standalone.  All I want is an
22  efficient way that isn't going to stun me into
23  insensibility when I'm confronting piles of paper that
24  people have submitted.  And so that's the touchstone for
25  all of this.  I want things to move along, too.  I don't
0030
1   want the parties to be waiting around.  On the other
2   hand, you may have to wait around a little bit if
3   there's any complexity to the Markman dispute, so...
4           Those are all the issues of great generality, is
5   all I can say with respect to it.  But you follow along
6   with -- you know, I'm not sure why it was that the '289
7   got a little three, and then the four remaining ones got
8   all lumped together.
9           MS. DAVIS:  I can explain that, your Honor.  The
10  patents in this case really do break down into those two
11  groups.  The '289 patent is a patent addressed to the
12  formulation, to the specific aspects of the levalbuterol
13  formulation and the stability of that formulation.  And
14  without going into further detail, all the other
15  patents, the '755, '994, '090, '002, '093, all deal with
16  a method of using levalbuterol to treat certain
17  diseases:  asthma, chronic asthma, acute asthma.  So
```

```
18   they're two entirely different issues.
19         THE COURT:  In your fondest dreams do you plan
20   on having summary judgment motions for all five of those
21   patents contemporaneous with the Markman hearing?
22         MS. DAVIS:  Yes, your Honor.  Our view is that
23   under -- really under any claim construction, but
24   certainly our claim construction, those claims are all
25   anticipated by prior art.
0031
 1         MR. DAVIS:  May I, your Honor?
 2         THE COURT:  Sure.
 3         MR. DAVIS:  We obviously take a different view.
 4   There will be competing motions for summary judgment.
 5   We plan to file a motion for summary judgment addressing
 6   to the issue of infringement.  And to the extent that we
 7   have a claim construction from your Honor, it makes that
 8   stack of paper a lot smaller in terms of -- and that's
 9   why we would urge adhering to the 45 days after the
10   Markman hearing -- or 45 days after the Markman
11   determination, which was --
12         THE COURT:  Let me tell you my preliminary view
13   about this.  I can be persuaded, but not easily, of an
14   alternative, and that is I'd like to do the claim
15   construction first.  That will permit me to have some
16   better knowledge of the art and what's involved here.
17   And, you know, setting 45 days is -- I can set it
18   shorter, but I think you may want to digest what I have
19   to say, and it will be very difficult for me to consume
20   what all that is suggested is going to be offered there
21   without just, you know, kind of getting clocked.
22         MS. DAVIS:  We would ask your Honor -- I can
23   appreciate that, but we would ask if we could use
24   something less than 45 days given that the parties will
25   know, obviously, the basic idea of what they're planning
0032
 1   to write.  Based on the possible claim construction, I
 2   don't think it requires a full 45 days of attention to
 3   turn the opening briefs around.  And if you could give
 4   it something shorter than that, we'd prefer that.
 5         THE COURT:  All right.  So 30 days seems a
 6   reasonable amount of time.  Thirty days after the
 7   Markman determination the parties will have an
 8   opportunity to file motions for summary judgment.
 9         Now let me go to the trial period.  I would
10   think, and I would try to govern my own allocation of
11   resources and time to permit this to be tried this
12   summer, and I want to understand what the practical
13   impacts are from the parties on that.  That would mean
14   that I would try to turn it around in a couple of months
15   maximum, the Markman, and then try to move quickly on to
16   the summary judgment motions and try to make it possible
17   for us to, you know, try the case the end of June, July,
18   August, whatever.  Is that a realistic time -- and let
19   me add something else:  This is not meant to be a test
20   of manhood or womanhood to say unlike psychiatrists who
21   will not get August off, and if there are competing
22   vacation plans or longstanding plans and all of that,
```

```
23   obviously I will accommodate those.  But it's hard
24   enough to get people in for trials during the summer,
25   and so if I've got a big trial that's planned, I'm happy
0033
 1   enough to have it, and the scheduling seems to me to
 2   work for that.
 3          MR. DAVIS:  My question, your Honor, would have
 4   been -- or when you say "summer," are you talking about
 5   the early part of the summer or the later part of the
 6   summer?  We have experts from out of the country that we
 7   need to accommodate and --
 8          THE COURT:  I'm not really thinking of anything
 9   yet.  I've got the entire -- right now --
10          MR. DAVIS:  Our preference would be towards the
11   latter part of the summer.
12          THE COURT:  I have no -- nothing really
13   scheduled -- I don't think I have any trials scheduled
14   at this point.  I'm looking around for --
15          MR. DAVIS:  Our preference would be
16   August/September, given what we need to do to prepare to
17   try the case and things of that nature.
18          THE COURT:  Unlikely September, more
19   July/August.  And how long -- I understand you've got --
20   this is in its formative stages, but how long a trial do
21   you think it is?
22          MR. DAVIS:  Does your Honor try these on full
23   trial days or --
24          THE COURT:  It feels like it for everybody
25   that's involved, but it's nine to one.
0034
 1          MR. DAVIS:  Nine to one?
 2          THE COURT:  Yes.
 3          MR. DAVIS:  Probably two to three weeks on a
 4   nine-to-one schedule.
 5          MS. DAVIS:  That sounds in the ballpark from our
 6   perspective.
 7          THE COURT:  Okay.  So now let me back it up
 8   another way, which is to say, if you have vacation
 9   plans, or want to establish vacation plans -- I'm not
10   asking today, and I also know I'm not the final arbiter
11   in your households for this -- try to figure out what
12   that might be.  Because I would be thinking of something
13   July/August, I would think, on this.  I'm just trying to
14   get my time frame.
15          I'll tell you one other thing, which is I've
16   done this -- I did it last year, and I got to the point
17   with the summary judgment motions, I just couldn't
18   finish them in a timely fashion -- I didn't finish them
19   until about a month ago -- and so I established a later
20   schedule.  But it's not going to leave my desk until I'm
21   happy with it, or at least not really unhappy with
22   whatever I have.  And while I'll try to set it according
23   to a schedule like that, there's a possibility that I'll
24   take a look at these summary judgment motions, or even
25   the Markman, and say, "I need more time."  But I'll tell
0035
 1   you as quickly as possible.  Right now I would be
```

```
 2  talking about some period of time in that July/August
 3  time period, and you're the first people to tell me what
 4  the off-limit weeks would be, okay?
 5          So you'll talk about that and we'll work our way
 6  back on the schedule to deal with that.  But assume -- I
 7  hate to say that because I always disappoint myself and
 8  you -- but assume 45 days for the decision in the
 9  Markman matter as kind of an outside, and then another
10  45 days for the summary judgment.  I would set those
11  down promptly once the briefing is completed for them,
12  but it will be something like that.  So that will give
13  you some idea.  I'm not sure what -- I'm not sure I
14  haven't just pushed us out of the summer already.  But
15  you think about a schedule that works for you, and get
16  back to me.  And, say, two weeks from now?
17          MR. DAVIS:  Yes, your Honor.
18          THE COURT:  So kind of preliminary status
19  report, recommendation for scheduling and that sort of
20  thing.  So that is the 26th we'll have something on that
21  that I could take a look at.
22          So now let's go to Sepracor's potential motions
23  view.
24          MR. DAVIS:  Your Honor, we have two here that
25  are probably interrelated which we can probably talk
0036
 1  about at the same time.
 2          THE COURT:  Okay.
 3          MR. DAVIS:  It's (I) and (3I).
 4          THE COURT:  Okay.
 5          MR. DAVIS:  The '289 patent has quantitative
 6  type of limitations.  And we had requested in June of
 7  '06 for the -- some samples so that we could test them
 8  in the manner in which they've been packaged because, in
 9  essence, it's a packaging-type patent.  And we have not
10  received samples that are not -- that are -- we've
11  received expired samples.  We just got them, as a matter
12  of fact.  And we anticipate filing --
13          THE COURT:  Mr. Chinitz, did you think you were
14  going to escape without me making a comment on the
15  record?
16          MR. CHINITZ:  Your Honor, I --
17          THE COURT:  No.  No, you don't have to -- there
18  are others in the courtroom who would like to join you.
19  But you're free to go.
20          MR. CHINITZ:  Thank you, your Honor.
21          MR. DAVIS:  Your Honor, it's important to us
22  that we receive samples that are manufactured and
23  packaged in accordance with the directions contained in
24  the ANDA which was filed for purposes of determining the
25  infringement positions.  Some of them -- the ANDA, when
0037
 1  it was originally filed -- comes in packages with the
 2  nitrogen flush without.  Now they're proceeding along
 3  with a nitrogen flush.  So we need samples that have a
 4  nitrogen flush in the package.  And we need them in
 5  order to conduct our stability testing in order to
 6  determine --
```

```
 7          THE COURT:  Okay.  So what's the --
 8          MS. DAVIS:  Well, they have been provided
 9    with -- let me backtrack a little bit.  The only batch
10    of product that has ever been made was made in December
11    2004.  And that's all that has been made; that's all
12    that we have.  When the sample issue was raised -- the
13    first time that I became aware of the sample issue was
14    as a result of a letter from Ms. Dadio in July.  And as
15    soon as that came up, I got her a set of samples that we
16    had.
17          The product was made 50 percent in packages with
18    the nitrogen flush, 50 percent without the nitrogen
19    flush.  The client sent me packages that were the same
20    way; i.e., they sent me half with and half without.
21    Since I had gotten both kinds, I sent them both kinds.
22    If they don't want the ones that were done without the
23    nitrogen flush, they don't have to use them.  But they
24    have samples both with and without the nitrogen flush.
25          THE COURT:  So is it --
0038
 1          MS. DAVIS:  Now they've asked me for some more,
 2    and I -- and the woman at the company that has the
 3    responsibility over the samples has been out on
 4    vacation.  She's just come back.  And they've asked if
 5    we could provide some additional samples with nitrogen
 6    flush, and I'm checking on that.  I think we may have a
 7    few other extras, I just don't know yet.  But all of the
 8    samples that we have are the same age.  So the issue of
 9    the age of the sample, which I should add is not really
10    relevant to any of the issues that are raised when you
11    asked me to explain why it is --
12          THE COURT:  If I'm correct, all of the samples
13    are in the same basic state of aging?
14          MS. DAVIS:  Yes, they're all the same age.
15          THE COURT:  And you're going to use your best
16    efforts to get additional nitrogen flush samples?
17          MS. DAVIS:  Yes.  To the extent we have extras,
18    we'll give them some more extras.
19          THE COURT:  All right.  And that will be done
20    by?
21          MS. DAVIS:  That should be done by the end --
22    certainly by the end of next week.
23          THE COURT:  Okay.  So we'll use the 28th as a
24    drop-dead date that they'll provide you with additional
25    samples along those lines.
0039
 1          MS. DAVIS:  The only thing I have to say is that
 2    I have not been able to speak to her directly to confirm
 3    that we actually have some that we can send without
 4    jeopardizing the FDA samples that we have to retain.
 5          THE COURT:  I bet they do.  Maybe you'll help
 6    her find them.
 7          MS. DAVIS:  Yes.
 8          THE COURT:  Okay?
 9          MS. DAVIS:  Okay.
10          THE COURT:  So I think that takes care of those,
11    doesn't it?
```

```
12          MR. DAVIS:  Yeah, except that it feeds over to
13  the (3I).  This is one, your Honor, that I don't believe
14  is ripe, really, for argument today.
15          THE COURT:  If it's not --
16          MR. DAVIS:  It needs to be briefed.
17          THE COURT:  Yeah.  If it's going to be briefed,
18  and if it can't be worked out by the parties.
19          MR. DAVIS:  This one involves what we believe to
20  be some dissolved oxygen tests that were conducted by
21  Breath that have appeared -- or at least traces of which
22  have appeared on their privilege log.  And as I'm sure
23  your Honor is aware, although Rule 26 is not an absolute
24  work-product privilege under certain circumstances,
25  these are tests that probably can't be replicated, and
0040
 1  we would like the opportunity to argue to your Honor
 2  that we should be entitled to see these tests and the
 3  results of these tests, especially in the context where
 4  all they have is expired product.  So we would like the
 5  opportunity to brief that.
 6          THE COURT:  Just briefly, your response?
 7          MR. FIGG:  Briefly, your Honor, what this has to
 8  do with is an express limitation in the claims of the
 9  '289 patent.  The '289 patent has a numerical limitation
10  on the amount of oxygen in the product.  So for them to
11  meet their burden of proving that Breath infringes that
12  patent, they have to demonstrate that Breath's product
13  meets that limitation.
14          It's our view, your Honor, to the extent we
15  have retained an expert to advise us on that issue,
16  until such time as we see what their proofs are, we're
17  not -- I don't believe we're required to determine
18  whether that expert is going to be a testifying expert
19  or a non-testifying expert.  If they don't meet their
20  burden of proving that we meet that limitation, these --
21  this will simply be work product of a non-testifying
22  expert that need not ever be produced.  If we determine
23  that this is --
24          THE COURT:  You're talking about it as if it was
25  produced in anticipation of litigation; is that right?
0041
 1          MR. FIGG:  It definitely was produced in
 2  anticipation of litigation.
 3          THE COURT:  Okay.  And it hasn't fully been
 4  completed at this point, or tested?
 5          MR. FIGG:  I'm sorry.  What --
 6          THE COURT:  It has not been fully completed at
 7  this point?  The testing has not been fully completed?
 8          MR. FIGG:  Well, we don't know what their proofs
 9  on this issue will be, and so we don't know whether we
10  need this sort of testimony to meet their infringement
11  arguments or not.  They simply have pled generally that
12  we infringed their claim, but we don't know what the
13  bases for those positions are and we don't know whether
14  this will ever be something that Breath will need to
15  rely on.
16          THE COURT:  Okay.  Well, I think I can just give
```

17  you general outlines.  Would you agree this was prepared
18  in anticipation of litigation?  I don't think that I'm
19  going to be, at least at the outset, turning it over,
20  ordering it turned over.  So you can make whatever
21  motion you want to make about it, but if this is other
22  than in anticipation of the litigation, it's a little
23  bit different for me.  But I'm not sure that you need it
24  for your case-in-chief.
25              MR. DAVIS:  Okay.  Well, that's why I said I
0042
 1  think this is not quite ripe.
 2              THE COURT:  Well, you work on it but --
 3              MR. DAVIS:  But we --
 4              THE COURT:  But my general view is to give some
 5  fairly substantial scope to the experts to try different
 6  things out and do different kinds of testing, and that
 7  doesn't necessarily have to be shared unless you can
 8  show me in some fashion that it is necessary for your
 9  case-in-chief.
10              MR. DAVIS:  That's what we were trying to signal
11  by putting this in here, is that down the road we may be
12  making a motion like that in order to demonstrate or to
13  convince you that the exception to the work-product rule
14  would be -- would have application here.
15              THE COURT:  Well, okay.  And trust me on this,
16  this will be the last time I will say it, but don't
17  waste your breath.
18              MR. DAVIS:  Your Honor, with regard to (2I) and
19  I believe (4), they have -- Breath has agreed to present
20  a 30(b)(6) witness on behalf of Cobalt.
21              THE COURT:  Right.
22              MR. DAVIS:  And we believe that we would like
23  the opportunity to take that 30(b)(6) deposition before
24  we address whether or not (2I) and (4) are necessary.
25              THE COURT:  Well, am I correct that -- I'm not
0043
 1  sure I understand the state of the docket.  There are
 2  letters rogatory that have been filed -- proposed,
 3  right, or they --
 4              MR. DAVIS:  We have filed a motion for either a
 5  motion to compel or, alternatively, letters rogatory,
 6  but a resolution to that was reached by them offering a
 7  30(b)(6) witness for Cobalt.
 8              THE COURT:  Okay.  So --
 9              MR. DAVIS:  After that took place we took the
10  30(b)(6) witness of Breath and learned some things that
11  we didn't know prior to that which may or may not cause
12  us to revisit the issue of either a motion to compel or
13  letters rogatory.  But I guess what I'm saying here is
14  in the interest of efficiency, it may all be mooted by a
15  thorough 30(b)(6) witness from Cobalt, it may not.
16              MS. DAVIS:  We think it will, your Honor, and we
17  had hoped this issue was already resolved, so I hope it
18  is resolved.
19              THE COURT:  Okay.  So to be continued, I
20  guess --
21              MR. DAVIS:  Yes.

```
22              THE COURT:  -- on that.
23              MS. DAVIS:  Yes, your Honor.
24              THE COURT:  All right.  And does that cover fine
25      chemicals or not?
0044
 1              MR. DAVIS:  Yes, it does.
 2              THE COURT:  The rest of the stuff, I guess, is
 3      in the works?
 4              MR. DAVIS:  Yes.  We are reviewing their
 5      supplement to interrogatories and really don't have a
 6      position as of today, much like they don't, with regard
 7      to the privilege issue.  We would like to amend the
 8      stipulated protective order to add any in-house counsel
 9      to the stipulated protective order.
10              THE COURT:  All right.  Is there going to be a
11      problem with that?
12              MS. DAVIS:  No.  We've already agreed to it,
13      your Honor.
14              MR. DAVIS:  And we've already talked about our
15      proposed summary judgment motions.
16              THE COURT:  All right.  Okay.  So I guess I've
17      given you the 28th for status filing and for the
18      obligation to turn over certain materials, and then I'll
19      review it from that perspective.  And we're holding to
20      the February 18th and 19th?
21              MR. ROSE:  Your Honor, I thought the Court said
22      February --
23              THE COURT:  I'm sorry.  The 21st and 22nd for
24      the --
25              MR. ROSE:  I thought the Court initially said
0045
 1      September 26th for the status portion --
 2              THE COURT:  Oh, did I?
 3              MR. ROSE:  I think you just said the 28th.
 4              THE COURT:  It's the 26th.  Right.  Absolutely.
 5      Okay.  Anything else here?
 6              MR. FIGG:  No, your Honor.
 7              THE COURT:  Okay.  So I think you have some
 8      sense of my views here about how to make the case move
 9      along, which is as efficiently as possible without
10      distractions, okay?
11              All right.  We'll be in recess.
12              MS. DAVIS:  Thank you, your Honor.
13              MR. FIGG:  Thank you, your Honor.
14              THE CLERK:  All rise.
15              (The proceedings adjourned at 4:35 p.m.)
16                  C E R T I F I C A T E
17              I, Marcia G. Patrisso, RPR, CRR, Official
18      Reporter of the United States District Court, do hereby
19      certify that the foregoing transcript constitutes, to
20      the best of my skill and ability, a true and accurate
21      transcription of my stenotype notes taken in the matter
22      of Civil Action No. 06-10043-DPW, Sepracor Inc. v.
23      Breath Limited.
24                  /s/ Marcia G. Patrisso_____
                    MARCIA G. PATRISSO, RPR, CRR
25                   Official Court Reporter
```

**From:** ECFnotice@mad.uscourts.gov
**Sent:** Wednesday, September 12, 2007 6:35 PM
**To:** CourtCopy@mad.uscourts.gov
**Subject:** Activity in Case 1:06-cv-10043-DPW Sepracor Inc. v. Breath Limited Order on Motion for Judgment on the Pleadings

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### United States District Court

### District of Massachusetts

### Notice of Electronic Filing

The following transaction was entered on 9/12/2007 at 6:34 PM EDT and filed on 9/12/2007
**Case Name:**        Sepracor Inc. v. Breath Limited
**Case Number:**    1:06-cv-10043
**Filer:**
**Document Number:** No document attached

### Docket Text:
Electronic Clerk's Notes for proceedings held before Judge Douglas P. Woodlock : Status Conference held on 9/12/2007: Atty's Dadio, W. Davis and Beaufort for the Pltff, Atty's Chinitz, S. Davis, Figg and Rose for the Deft. Court addresses the parties re: abundance of filings in this case; Pltff does not object to extensions of scheduling order; parties give oral arguements re: motion for extensions; Court GRANTS [65] Motion for Extension of Time to Complete Discovery with the amendment that responses to briefs on claim construction are due 1/28/08. Court will issue a revised Order; Court addresses the parties re: procedures pertaining to the Markman Hearing set for 2/21/08 @ 2/22/08. Court Orders the parties to file a joint memo re: the Markman Hearing; Parties are to file a Preliminary Joint Status Report re: proposed Jury Trial dates; Court GRANTS [63] Motion for Judgment on the Pleadings to the extent that the Pltff will file an Amended Complaint by 9/13/07. Court Orders the Pltff to provide the Deft with (1) document relating to invention of '289 patent that is being withheld from production on the grounds of third-party confidentiality; (2) expert reports from Dey litigation and make a good faith effort to resolve third-party confidentiality issues; Court Orders the Pltff to provide dates onwhich Mr. Barberich is available for deposition; Court further grants the Pltff's request and Order's dispositive motions and supporting memoranda filed within 30 days of the Court's final claim construction ruling. (Court Reporter Marcia Patrisso) (Lovett, Jarrett)

**1:06-cv-10043 Notice will be electronically mailed to:**
William L. Patton wpatton@ropesgray.com, SamplePlead@ropesgray.com
Alan D. Rose, Sr adr@rose-law.net
Michael L. Chinitz mlc@rose-law.net
Jack M. Stover jack.stover@bipc.com
Jayson R. Wolfgang wolfgangjr@bipc.com, beverly.posey@bipc.com, christine.brody@bipc.com, karen.brown@bipc.com, laura.peterson@bipc.com, mildred.davis@bipc.com
Susan M. Dadio dadiosm@bipc.com

Todd R. Walters walterstr@bipc.com
William A. Rakoczy wrakoczy@rmmslegal.com
Paul J. Molino paul@rmmslegal.com
Deanne M. Mazzochi dmazzochi@rmmslegal.com
Adam G. Kelly akelly@rmmslegal.com
Amy D Brody abrody@rmmslegal.com
Willian E Davis William.Davis@bipc.com
S. Lloyd Smith lloyd.smith@bipc.com
R. Eizabeth Brenner-Leifer ebrenner@rfem.com
Sharon L. Davis sdavis@rfem.com, sdavis@rfem.com
John A. Evans jevans@rfem.com

**1:06-cv-10043 Notice will not be electronically mailed to:**

E. Anthony Figg
Rothwell,Figg,Ernst & Manbeck
Suite 800
1425 K Street
Washington, DC 20005

Joseph A Hynds
Rothwell, Figg, Ernst & Manbeck P.C.
1425 K. Street Suite 800
Washington, DC 20005

Lara E. Monroe-Sampson
Rakoczy Molino Mazzochi Siwik LLP
6 West Hubbard Street
Suite 500
Chicago, IL 60610

Barbara Webb Walker
1737 King St
Suite 500
Alexandria, VA 22314