SPC89-05.APA
IWW18
07/13/93

|2c

PATENT APPLICATION
Docket No.  SPC89-05 #27

GP12O5 - 7.299

[MAIL ROOM stamp: JUL 16 1993 PAT & TRADEMARK OFFICE]

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:    Timothy J. Barberich and James W. Young

Serial No.:   07/896,725

Group Art Unit:  1205

Filed:        June 9, 1992

Examiner:  L. Schenkman

For:     METHOD FOR TREATING ASTHMA USING OPTICALLY PURE
         R(-) ALBUTEROL

93 JUL 26 AM10:18

---

**CERTIFICATE OF MAILING**

I hereby certify that this correspondence is being deposited with
the United States Postal Service as First Class Mail in an envelope
addressed to Honorable Commissioner of Patents and Trademarks,
Washington, D.C. 20231 on *July 15, 1993*.
HAMILTON, BROOK, SMITH & REYNOLDS, P.C.

_B. J. Hennis_          *July 14 1993*
Signature                Date

---

## ASSOCIATE POWER OF ATTORNEY

The Honorable Commissioner of Patents
and Trademarks
Washington, D.C. 20231

Sir:

The undersigned, as attorney of record, hereby grants to
Philip E. Hansen, Registration No. 32,700, of the firm of Heslin
& Rothenberg, 450 New Karner Road, P.O. Box 12695, Albany, New
York 12212-2695, an Associate Power of Attorney in the above-
captioned application.

Please continue to send all correspondence to the attention
of the undersigned attorney at Hamilton, Brook, Smith & Reynolds,
P.C., Two Militia Drive, Lexington, MA 02173.

Respectfully submitted,

_Patricia Granahan_

Patricia Granahan
Registration No. 32,227
Attorney for Applicant(s)
(617) 861-6240

Lexington, Massachusetts

Dated: July 13, 1993

DLEV012208




PATENT APPLICATION
DOCKET NO. SPC89-05'

Expedited Procedure Under 37 C.F.R. 1.116
Examining Group 1205

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

#28

Applicant(s): Timothy J. Barberich and James W. Young

Serial No.: 07/896,725                 Group Art Unit: 1205

Filed: June 9, 1992                    Examiner: L. Schenkman

For: METHOD FOR TREATING ASTHMA USING OPTICALLY
     PURE R(-) ALBUTEROL

---

### CERTIFICATE OF MAILING

I hereby certify that this correspondence is being
deposited with the United States Postal Service as
First Class Mail in an envelope addressed to
Honorable Commissioner of Patents and Trademarks,
Washington, D.C. 20231, on

_July 23, 1993_

_B. J. Kunis_          _July 23, 1993_
    Signature              Date

---

The Honorable Commissioner
of Patents and Trademarks
Washington, D.C. 20231

Sir:

Transmitted herewith is a response in the above-identified application.

[X] Small entity status of this application under 37 C.F.R. 1.9 and 1.27 has
    been established by a verified statement previously submitted.

[ ] A verified statement to establish small entity status under 37 C.F.R. 1.9
    and 1.27 is enclosed.

The fee has been calculated as shown below:

| (COL. 1)<br>CLAIMS REMAINING AFTER AMENDMENT | | (COL. 2)<br>HIGHEST NO. PREVIOUSLY PAID FOR | (COL. 3)<br>PRESENT EXTRA | SMALL ENTITY | | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | RATE | ADDIT. FEE | | | RATE | ADDIT. FEE |
| TOTAL * 11 | MINUS | ** 21 | 0 | X 11 | $ 0 | | OR | X 22 | $ |
| INDEP * 3 | MINUS | *** 3 | 0 | X 37 | $ 0 | | | X 74 | $ |
| [ ] FIRST PRESENTATION OF MULTIPLE DEP. CLAIM | | | | +115 | $ | | | +230 | $ |
| | | | | TOTAL = $ 0 | | | | $ | |

DLEV012209

-2-

[ ] Please charge my Deposit Account No. 08-0380 in the amount of $_____.

[ ] A check in the amount of $_____ is attached.

[ ] A separate Petition for Extension of Time is being filed concurrently herewith.

    [ ] Payment for the extension fee is included with the petition.

    [ ] Deposit Account No. 08-0380 is being charged for the extension fee.

[X] The Commissioner is hereby authorized to charge payment of the following fees associated with this communication or credit any overpayment to Deposit Account No. 08-0380.

    [X] Any filing fees under 37 C.F.R. 1.16 for the presentation of extra claims.

    [X] Any patent application processing fees under 37 C.F.R. 1.17.

Any extensions of time that are required to maintain this application in a pending status, if not included herewith, are hereby requested. The Commissioner is hereby authorized to charge such extension fees to Deposit Account No. 08-0380. Two copies of this transmittal letter are enclosed for accounting purposes.

Respectfully submitted,

HAMILTON, BROOK, SMITH & REYNOLDS, P.C.

By _Richard W. Wagner_____
Richard W. Wagner
Registration No. 34,480
Agent for Applicant(s)
(617) 861-6240

Dated: July 23, 1993

A:VAMFEE.FO

DLEV012210

PATENT APPLICATION
Docket No. SPC89-05

Expedited Procedure under 37 C.F.R. 1.116
Examining Group 1205

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

BOX AF

Applicant: Timothy J. Barberich and James W. Young

Serial No.: 07/896,725                    Group Art Unit: 1205

Filed: June 9, 1992                       Examiner: L. Schenkman

Title:   METHOD FOR TREATING ASTHMA USING OPTICALLY
         PURE R(-) ALBUTEROL

---

CERTIFICATE OF MAILING

I hereby certify that this correspondence is being deposited with
the United States Postal Service as First Class Mail in an envelope
addressed to Honorable Commissioner of Patents and Trademarks,
Washington, D.C. 20231 on _July 23, 1993_
HAMILTON, BROOK, SMITH & REYNOLDS, P.C.

_B. J. Norris_          _July 23, 1993_
Signature               Date

---

Amendment After Final Action Under 37 CFR 1.116

The Honorable Commissioner
   of Patents and Trademarks
Box AF
Washington, D.C. 20231

Sir:

        This is in response to the official action of June 7, 1993
(Paper Number 26), which requires response by September 7, 1993.
        Please amend the application as follows:

In the Claims:

        Claim 18, line 2 change "R-albuterol" to -- R(-)albuterol --.

Remarks

        Claims 1 to 6, 8, 9, 13 and 14 were presented in the
application as filed.  Claims 9, 13 and 14 were canceled and
claims 15 through 18 added in applicants' response mailed to the

DLEV012211

-2-

Patent Office on February 10, 1993. Claims 1 to 6, 8 and 15 to 18 are therefore presently pending in the application.

Claim 18 has been amended according to the suggestion of the examiner to correct a typographical error.

In the Office Action of June 7, the rejection of all of the pending claims under 35 U.S.C. §103 was reiterated and made final. In addition, the examiner indicated that the applicants' arguments of February 10 and the Aberg Declaration submitted therewith were not persuasive.

In the new discussion in paragraph 6 of the Office Action, the examiner states "Note the summary of the Brittain et al article regarding the desirability of using the R(-) isomer and its effects on β-adrenoreceptors." The Summary section in the Brittain reference does not address the "desirability" of using the R-isomer; it states that the R-isomer is more potent. Applicants have previously explained that potency does not equate with desirability; other factors must be considered. (E.g., Chloramphenicol is more potent than penicillin V, but in most cases it is not more desirable.)

Moreover, it is not understood by applicants why the teachings of Brittain are isolated and emphasized by the examiner when the equally valid teachings of Hartley and Middlemiss are available which show that the racemate is 1.5 times as potent as the R-isomer. The analysis of selected pieces of the art has been found improper by the CCPA in In re Kuderna (165 USPQ 575). The issue of patentability must be approached "in terms of what would have been obvious to one of ordinary skill in the art at the time the invention was made in view of the sum of all the relevant teachings in the art." [Emphasis in original] In the previous response, applicants have analyzed the teachings of the art taken as a whole; the substance of that response is summarized below.

The thrust of applicants' invention is the reduction of side effects, which arise in the treatment of asthma with racemic albuterol, by the administration of R-(-)-albuterol in place of

DLEV012212

-2-

Patent Office on February 10, 1993. Claims 1 to 6, 8 and 15 to 18 are therefore presently pending in the application.

Claim 18 has been amended according to the suggestion of the examiner to correct a typographical error.

In the Office Action of June 7, the rejection of all of the pending claims under 35 U.S.C. §103 was reiterated and made final. In addition, the examiner indicated that the applicants' arguments of February 10 and the Aberg Declaration submitted therewith were not persuasive.

In the new discussion in paragraph 6 of the Office Action, the examiner states "Note the summary of the Brittain et al article regarding the desirability of using the R(-) isomer and its effects on β-adrenoreceptors." The Summary section in the Brittain reference does not address the "desirability" of using the R-isomer; it states that the R-isomer is more potent. Applicants have previously explained that potency does not equate with desirability; other factors must be considered. (E.g., Chloramphenicol is more potent than penicillin V, but in most cases it is not more desirable.)

Moreover, it is not understood by applicants why the teachings of Brittain are isolated and emphasized by the examiner when the equally valid teachings of Hartley and Middlemiss are available which show that the racemate is 1.5 times as potent as the R-isomer. The analysis of selected pieces of the art has been found improper by the CCPA in *In re Kuderna* (165 USPQ 575). The issue of patentability must be approached "in terms of what would have been obvious to one of ordinary skill in the art at the time the invention was made in view of the sum of all the relevant teachings in the art." [Emphasis in original] In the previous response, applicants have analyzed the teachings of the art taken as a whole; the substance of that response is summarized below.

The thrust of applicants' invention is the reduction of side effects, which arise in the treatment of asthma with racemic albuterol, by the administration of R-(-)-albuterol in place of

DLEV012212

-3-

racemic albuterol. Side effects of drugs which, like albuterol, have a predominant $\beta_2$ agonist component, can arise from a number of interactions, one of which is addressed by the cited prior art: interaction of the primarily $\beta_2$-agonist drug with $\beta_1$ receptors. The Brittain, Hartley, Hawkins and Buckner references address the comparative interaction of albuterol isomers with $\beta_1$ vs $\beta_2$ receptors. None of the references shows that there is any $\beta$-selectivity advantage of R over S or over racemic. On the contrary, Buckner concludes that the ratios of tracheal ($\beta_2$) to atrial ($\beta_1$) activities of R and S are indistinguishable. The earlier Aberg Declaration confirmed that the references by Brittain, Hartley, Hawkins and Buckner do not teach any expectation of decreased side effects from the administration of the pure R isomer as compared to the racemate.

Thus, at the time of filing of applicants' parent application (1/5/90), the references cited would not have motivated a person of ordinary skill to administer the pure R(-) isomer of albuterol for the treatment of asthma on the basis of its receptor selectivity.

The examiner has suggested that increased potency might be a basis for separating enantiomers. However, to the contrary, and mindful that applicants' disclosure does not relate to potency, the art does not encourage the artisan of ordinary skill to resolve and administer pure R albuterol on the basis of potency. The reason for this lack of encouragement is because the theoretical advantage of a pure enantiomer is at most two-fold. A racemate, being a 50:50 mixture, simply acts like half a dose of the pure enantiomer and half a dose of filler. Since chemical resolution of racemic mixtures is never 100% efficient, a resolution will always yield less than 50% of the single isomer. Thus, unless one enantiomer antagonizes the effect of the other, there is no potency-based reason to suffer the loss of material attendant upon their resolution.

A potency ratio significantly greater than 2 between a

DLEV012213

-4-

single enantiomer and its racemate would be consistent with antagonism by one enantiomer and would provide motivation for resolving the racemate. No such teaching is found in any of the references. Therefore, at the time of filing, the art did not suggest using pure R(-) albuterol either for lessened side effects or for potency enhancement. This conclusion was supported by the earlier Declaration of Dr. Aberg.

The examiner has suggested that applicants show comparative therapeutic indices to support their contention of lessened side effects. Applicants provide herewith the Declaration of Dr. Gunnar Aberg to establish that the results of Chapman and of Morley, in view of additional studies now performed by applicants, would indicate to the person of skill in the art that the R-isomer would have a higher therapeutic index in humans than would the racemate. The tests are accepted in the art as being predictive of efficacy in treating humans, and the pending method of use claims are narrowly drawn to the specific use for which the tests are predictive. (See *Ex parte Chwang*, 231 USPQ 751). Thus, as a matter of law, an adequate showing has been made to support patentability of the pending claims.

The examiner has further cautioned the applicants that a showing, if made, might not be persuasive in light of *In re Adamson*. In *Adamson*, the CCPA held that in establishing that one isomer was more potent, the applicants had "done no more than is <u>suggested by the prior art</u> and have ascertained no more than what would be expected by one skilled in the art." [Emphasis added] In the present case, applicants have shown that the art, taken as a whole, does not suggest that the resolution of the racemate and the use of R-(-)-albuterol substantially free of its S-isomer would provide therapy for asthma <u>while simultaneously reducing side effects</u>. Thus, the demonstration of improved therapeutic index by applicants should be persuasive in light of *In re Adamson*.

For the above stated reasons, applicants believe that the rejections under 35 U.S.C. §103 have been overcome. Applicants

DLEV012214

-5-

respectfully request reconsideration of the application and allowance thereof. If the examiner feels that a telephone conversation would expedite prosecution of this application, he is asked to call applicants' agent at (617) 861-6240.

Respectfully submitted,

*Richard W. Wagner*

Richard W. Wagner
Agent for Applicants
Registration No. 34,480
(617) 861-6240

Lexington, MA 02173

Dated: *July 23, 1993*

DLEV012215



CERTIFICATE OF MAILING

I hereby certify that this correspondence is being deposited with
the United States Postal Service as First Class Mail in an envelope
addressed to Honorable Commissioner of Patents and Trademarks,
Washington, D.C. 20231 on ____ *July 23, 1993*
HAMILTON, BROOK, SMITH & REYNOLDS, P.C.

_B.J. Jerome_          July 23, 1993
    Signature              Date

## DECLARATION

The Honorable Commissioner
   of Patents and Trademarks
Box AF
Washington, D.C. 20231

Dear Sir:

I, Gunnar Aberg, declare:

THAT I am a citizen of Sweden and a resident of the Town of Westborough, Worcester County, Massachusetts;

THAT I am Vice-President of Research and Development, Pharmaceutical Division, Sepracor, Inc., Marlborough, Massachusetts. From 1968 to 1973 I was Director of Pharmacology at Bofors-Nobel Pharma, from 1974 to 1978 I was Group Leader in General Pharmacology at AB Haessle, from 1978 to 1980, I was Director of Pharmacology at Astra Pharmaceuticals, from 1980 to 1982 I was Director of Cardiovascular Pharmacology at Ciba-Geigy;

DLEV012216

-2-                    Docket No. SPC89-05

and from 1982 to 1988 I was Director of Pharmacology, and from
1988 to 1992 Executive Director of Pharmacology, at Bristol-Myers
Squibb;

THAT I am a graduate of the University of Linkoping, Sweden
from which I hold a Ph.D. in Pharmacology and of the University
of Goteborg, Sweden from which I hold a Ph.D. in Zoophysiology,
and that I hold the title of Docent (Associate Professor) in
Applied Pharmacology at the University of Linkoping, Sweden;

THAT I have twenty-five years' industrial experience in the
area of research pharmacology;

THAT I am an author of 86 articles on pharmacology,
including ten articles on adrenergic $\beta$-blockers and $\beta$-agonists
and that I am an inventor on seven U.S. patents and six pending
U.S. applications and that I have made numerous presentations
before professional societies and in universities on the subject
of adrenergic drugs;

THAT I have reviewed the Office Action dated June 7, 1993 in
the above case. I have also reviewed the application in the
above case and the publications of Morley et al. [Brit. J.
Pharmacol. 104, Suppl. 295P (1991)] and Chapman et al. [Trends in
Pharmacological Science 12 231-232 (1992)], and as a result of my
review and general knowledge of the subject area, I make the
following analysis:

In the instant application, Barberich and Young disclose an
unexpected diminution in side effects when the pure R-isomer of
albuterol is administered.  The literature cited in the office
action, which was published prior to applicants' filing date,
provides no evidence for an advantage of either enantiomer of
albuterol on the basis of $\beta_1$ vs $\beta_2$ specificity.

The above-identified recent publications of Morley et al.
and Chapman et al. provide newly available support for
applicants' disclosure.  These references disclose that the S(+)
isomer of albuterol in guinea pigs causes a hypersensitivity to
allergen.  The authors concluded from their experiments that the

DLEV012217

-3-                          Docket No. SPC89-05

desired bronchodilator effect was prone to tachyphylaxis while
the undesirable hypersensitivity to spasmogens was less prone to
tachyphylaxis.  Indeed, in the Chapman et al. paper the authors
recommend that it may be prudent to remove enantiomers that were
previously thought to be biologically inert.  Their results
support a previously undisclosed advantage to the use of pure
R-enantiomer in that the side effect of paradoxical
hypersensitivity is likely to be ameliorated.

Since the studies by Morley and Chapman were all performed
*in vivo*, studies have now been performed under my direct
supervision to investigate the effects of the albuterol isomers
on bronchial smooth muscle preparations *in vitro*.  These
experiments were performed to determine whether the mechanism by
which S(+)albuterol increased airway resistance was a direct
effect on bronchial smooth muscle or was due to some undefined
mechanism that may be species-specific to guinea pigs.

In these experiments, isolated tracheal muscle preparations
were repeatedly subjected to graded doses of spasmogens, such as
carbacholine.  (It has been shown in previous studies that the
effects of betareceptor agonists on isolated bronchial smooth
muscle preparations are similar in human and guinea pig
preparations.)  After the tissues had been caused to contract,
with increasing concentrations of carbacholine ($10^{-8}$M to $10^{-3}$M),
they were washed and some tissues were incubated for 90 min. with
RS-, R(-), or S(+) albuterol at a concentration of $10^{-5}$M, while
other tissues were control tissues, incubated with the Ringer
solution only.  After the incubation period, the tissues were
again carefully washed and subjected to renewed contractions with
the spasmogen.

Results are presented in Figs. 1 through 4.  It was found
that the contractile response to the spasmogen was significantly
($P < 0.01$) increased in bronchial tissue strips that had been
incubated with S(+)albuterol.  No such effect was seen in tissues
that had been incubated with R(-)albuterol, while the sensitizing

DLEV012218

-4-                    Docket No. SPC89-05

effect of the racemate was masked by the presence of the
bronchodilating effect of the R(-) isomer.  One may therefore
conclude that the increased sensitivity to spasmogens by
S(+)albuterol is due to direct effects on bronchial smooth
muscles, rather than to undefined and possibly species-specific
mechanisms.

DLEV012219

-5-                    Docket No. SPC89-05



Fig. 1.  Dose/response curves for carbacholine concentrations in
isolated bronchial smooth muscle preparations.  Control
experiments.

DLEV012220

-6-                                Docket No. SPC89-05



Fig. 2.  Dose/response curves for carbacholine concentrations in isolated bronchial smooth muscle preparations before and after incubation with racemic albuterol (salbutamol).

DLEV012221

-7-                    Docket No. SPC89-05



Fig. 3. Dose/response curves for carbacholine concentrations in isolated bronchial smooth muscle preparations before and after incubation with R(-)albuterol (salbutamol).

DLEV012222

-8-                    Docket No. SPC89-05







Fig. 4. Dose/response curves for carbacholine concentrations in isolated bronchial smooth muscle preparations before and after incubation with S(+)albuterol (salbutamol).

DLEV012223

 

-9-                    Docket No. SPC89-05

The experiments of Chapman et al. and Morley et al. in guinea pigs, in conjunction with our above-described studies, are tests which would be accepted by persons of skill in the brochodilator art as predictive of efficacy and of side effects in humans. They would indicate to the person of skill that R(-)albuterol will have a higher therapeutic index than racemic albuterol with respect to the side effect of hypersensitivity.

I further declare that all statements of the foregoing declaration made of my own knowledge are true and that those made upon information and belief are believed true and further that these statements are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that willful false statements may jeopardize the validity of the above-identified application or any patent issuing thereon.

Signed by me this 19th day of July, 1993.

Gunnar Aberg



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 07/896,725 | 06/09/92 | BARBARICH | T | SPC89- |

12M2/0803

PATRICIA GRANAHAN
HAMILTON, BROOK, SMITH & REYNOLDS
TWO MILITIA DRIVE
LEXINGTON, MA 02173

| SCHENKMAN EXAMINER | |
|---|---|
| ART UNIT | PAPER NUMBER |
| 1205 | 30 |

DATE MAILED: 08/03/93

Below is a communication from the EXAMINER in charge of this application

COMMISSIONER OF PATENTS AND TRADEMARKS

## ADVISORY ACTION

☑ THE PERIOD FOR RESPONSE:

☐ is extended to run _____ from the date of the Final Rejection

☑ continues to run _3/1/8_ from the date of the Final Rejection

☐ expires three months from the date of the final rejection or as of the mailing date of this Advisory Action, whichever is later. In no event however, will the statutory period for response expire later than six months from the date of the final rejection.

Any extension of time must be obtained by filing a petition under 37 CFR 1.136(a), the proposed response and the appropriate fee. The date on which the response, the petition, and the fee have been filed is the date of the response and also the date for the purposes of determining the period of extension and the corresponding amount of the fee. Any extension fee pursuant to 37 CFR 1.17 will be calculated from the date that the shortened statutory period for response expires as set forth above.

☐ Appellant's Brief is due in accordance with 37 CFR 1.192(a).

☑ Applicant's response to the final rejection, filed _7/6/8_ has been considered but it is not deemed to place the application in condition for allowance.

1. ☐ The proposed amendments to the claim and/or specification will not be entered and the final rejection stands because:

a. ☐ There is no convincing showing under 37 CFR 1.116(b) why the proposed amendment is necessary and was not earlier presented.

b. ☐ They raise new issues that would require further consideration and/or search. (See Note)

c. ☐ They raise the issue of new matter. (See Note)

d. ☐ They are not deemed to place the application in better form for appeal by materially reducing or simplifying the issues for appeal.

e. ☐ They present additional claims without cancelling a corresponding number of finally rejected claims.

NOTE: _____

2. ☐ Newly proposed or amended claims _____ would be allowed if submitted in a separately filed amendment cancelling the non-allowable claims.

3. ☑ Upon the filing of an appeal, the proposed amendment ☑ will be ☐ will not be entered and the status of the claims in this application would be as follows:

Allowed claims: _____
Claims objected to: _____
Claims rejected: _1~6 ,8 + 13 –18_

However:
a. ☐ The rejection of claims _____ on references is deemed to be overcome by applicant's response.
b. ☐ The rejection of claims _____ on non-reference grounds only is deemed to be overcome by applicant's response.

4. ☑ The affidavit, exhibit or request for reconsideration has been considered but does not overcome the rejection.

5. ☐ The affidavit or exhibit will not be considered because applicant has not shown good and sufficient reasons why it was not earlier presented.

☐ The proposed drawing correction ☐ has ☐ has not been approved by the examiner.

☐ Other _The declaration is not persuasive since difference_
_between isomers, whether regarding increased_
_activity or reduced side effect, are not_
_undisputed._

LEONARD SCHENKMAN
PRIMARY EXAMINER
GROUP 1200

PTOL-303 REV 3-89

```
> 444
        03aug93 17:15:56 User072820 Session D72.1
                $0.18   0.005 Hrs File1
    $0.18  Estimated cost File1
    $0.06  DIALNET
    $0.24  Estimated cost this search
    $0.24  Estimated total session cost  0.005 Hrs.

File 444:New England Journal of Med.  1985-1993/Jul W4
    (c) 1993 Mass. Med. Soc.
ALERTS can now be set up in file 444.

    Set  Items  Description
    ---  -----  -----------
?s py=1992 and au=spitzer, w?
         1315  PY=1992
            2  AU=SPITZER, W?
    S1      2  PY=1992 AND AU=SPITZER, W?
?t/3/all

1/3/1
00110328
Copyright 1992 by the Massachusetts Medical Society

Beta-Agonists And Death From Asthma (Correspondence)

Woolcock, A.J.; Sears, M.R.; Barnes, P.J.; Staudinger, H.W.; Haas,
J.F.; Gottlieb, Daniel J.; Celli, Bartolome R.; Pearce, Neil; Crane,
Julian; Burgess, Carl; Beasley, Richard; Jackson, Rodney; Ernst,
Pierre; Suissa, Samy; Boivin, Jean-Francois; Spitzer, Walter;
   rwitz, Ralph; Habbick, Brian; Cockcroft, Donald; McNutt, Mary;
Buist, Sonia; Burrows, Benjamin; Lebowitz, Michael D.
The New England Journal of Medicine
Jul 30, 1992; 327 (5), pp 354-357
LINE COUNT: 00231       WORD COUNT: 03200

1/3/2
00109746
Copyright 1992 by the Massachusetts Medical Society

The Use Of Beta-Agonists And The Risk Of Death And Near Death From Asthma
(Original Articles)

Spitzer, Walter O.; Suissa, Samy; Ernst, Pierre; Horwitz, Ralph I.;
Habbick, Brian; Cockcroft, Donald; Boivin, Jean-Francois; McNutt, Mary
; Buist, A. Sonia; Rebuck, Anthony S.
The New England Journal of Medicine
Feb 20, 1992; 326 (8), pp 501-506
LINE COUNT: 00375       WORD COUNT: 05176
?t/9/2

1/9/2
00109746
Copyright 1992 by the Massachusetts Medical Society

T  Use Of Beta-Agonists And The Risk Of Death And Near Death From Asthma
(   ginal Articles)

Spitzer, Walter O.; Suissa, Samy; Ernst, Pierre; Horwitz, Ralph I.;
Habbick, Brian; Cockcroft, Donald; Boivin, Jean-Francois; McNutt, Mary
```

BEST AVAILABLE COPY

DLEV012226

; Buist, A. Sonia; Rebuck, Anthony S.
The New England Journal of Medicine
Feb 20, 1992; 326 (8),pp 501-506
LINE COUNT: 00375    WORD COUNT: 05176
ISSN: 0028-4793

CORPORATE SOURCE: From the Department of Epidemiology and Biostatistics
W.O.S., S.S., P.E., J.-F.B.) and the Department of Medicine, Montreal
eneral Hospital (S.S., P.E.), McGill University, Montreal; the School of
edicine, Yale University, New Haven, Conn. (R.I.H.); the Department of
ommunity Health and Epidemiology (B.H.) and the Department of Medicine
D.C.), University of Saskatchewan, Saskatoon, Sask., Canada; the H.E.
obertson Laboratory, Laboratory and Disease Control Services Branch,
askatchewan Health, Regina, Sask., Canada (M.M.); the Departments of
edicine and Physiology, Oregon Health Sciences University, Portland
A.S.B.); and the Division of Respiratory Medicine, Toronto Hospitals and
he University of Toronto, Toronto (A.S.R.). Address reprint requests to
r. Spitzer at McGill University, Purvis Hall, 1020 Pine Ave. W., Montreal,
C H3A 1A2, Canada. — Supported by a grant from Boehringer-Ingelheim
harmaceuticals, Canada, Ltd. Drs. Suissa and Ernst are research scholars
f the Fonds de la Recherche en Sante du Quebec. Dr. Boivin is a National
ealth Scholar of the National Health Research Development Program of
ealth and Welfare Canada. At the time of the study, Dr. Spitzer was
isiting National Health Scientist of Canada in the United Kingdom,
upported by the National Health Research Development Program. — This study
s based in part on data provided by the Saskatchewan Department of Health.
he interpretations and conclusions contained herein do not necessarily
epresent those of the Government of Saskatchewan or the Saskatchewan
epartment of Health.

Abstract
Background. Morbidity and mortality from asthma appear to be
ncreasing, and it has been suggested that medications used to treat asthma
re contributing to this trend. We investigated a possible association
etween death or near death from asthma and the regular use of beta(sub
)-agonist bronchodilators.
Methods. Using linked health insurance data bases from Saskatchewan,
anada, we conducted a matched case-control study of subjects drawn from a
ohort of 12,301 patients for whom asthma medications had been prescribed
etween 1978 and 1987. We matched 129 case patients who had fatal or
ear-fatal asthma with 655 controls (who had received medications for
sthma but had not had fatal or near-fatal events) with respect to region
f residence, age, receipt of social assistance, and previous
ospitalization for asthma.
Results. The use of beta-agonists administered by a metered-dose
nhaler was associated with an increased risk of death from asthma (odds
atio, 2.6 per canister per month; 95 percent confidence interval, 1.7 to
.9) and of death or near death from asthma, considered together (odds
atio, 1.9; 95 percent confidence interval, 1.6 to 2.4). For death from
sthma, use of the beta-agonist fenoterol was associated with an odds ratio
f 5.4 per canister, as compared with 2.4 for the beta-agonist albuterol.
n a microgram-equivalent basis, the odds ratio for this outcome with
enoterol was 2.3, as compared with 2.4 with albuterol.
Conclusions. An increased risk of death or near death from asthma was
ssociated with the regular use of inhaled beta(sub 2)-agonist
ronchodilators, especially fenoterol. Regardless of whether beta-agonists
re directly responsible for these adverse effects or are simply a marker
or more severe asthma, heavy use of these agents should alert clinicians
hat it is necessary to reevaluate the patient's condition. (N Engl J Med
992;326:501-6.)

TEXT

April 1989, investigators from New Zealand reported the results of a
case-control study in which the use of fenoterol, a selective beta(sub
)-agonist, was found to be associated with an increased risk of death from
t  a (Ref. 1). The study found no similar increase in risk for albuterol,
le other beta-agonist widely used in New Zealand. These findings
ngendered controversy, because the studies were considered subject to bias
rom several sources, including imbalances in the selection of controls and
a the collection of data on exposure to bronchodilators, as well as
nadequate adjustment for differences in the severity of asthma.

In response to this concern, the investigators have reported the
esults of two further case-control studies (Ref. 2,3). In these studies,
lich minimized the bias due to the selection of controls and data
ollection, an association with death from asthma was again found for
enoterol, but not for albuterol. The controversy has been heightened by
le recent report that regular use of fenoterol, as compared with 'as
eeded'' use, was associated with a deterioration in the control of asthma
ymptoms (Ref. 4). A major unresolved question was whether the associations
oserved with the use of fenoterol were also present with other beta(sub
)-agonists.

The Saskatchewan Asthma Epidemiology Project was planned to address
any of these uncertainties (Ref. 5). Specifically, we asked whether
egular, long-term use of beta-agonists in general, and of fenoterol in
articular, was associated with an increased risk of death or near death
rom asthma. In conducting this research, we used the health insurance data
ases of the province of Saskatchewan, where the population of 1.1 million
s insured for the cost of most hospital and ambulatory care and the cost
f prescription drugs. The Saskatchewan data bases, which permit one to
ink information from different sources for each person, have been
es.  bed in detail elsewhere (Ref. 6,7).

Methods
Source and Eligibility of Study Subjects
We began by examining the computerized files of the Saskatchewan
rescription Drug Plan, which held just over 20 million prescriptions for
rugs listed in the Saskatchewan formulary that had been dispensed to
ligible residents of the province 5 to 54 years of age between 1980 and
987. Subjects outside this age range were not included because of the
reater likelihood that drugs prescribed for them were for conditions other
lan asthma. We identified 68,813 beneficiaries of the plan who had
eceived at least one prescription medication commonly used to treat asthma
uring these years. These drugs were fenoterol, albuterol, metaproterenol,
erbutaline, any compound of theophylline, ipratropium bromide, cromolyn,
id inhaled beclomethasone. We then included all drugs prescribed for these
atients during the period 1978 through 1987 and identified 12,301 patients
or whom at least 10 prescriptions for one or more of the asthma drugs had
een dispensed over the 10-year period. Within this geographically defined
ohort, we established the dates that further identified the available
embers of the cohort. The date on which each subject entered the cohort
is defined as the date of the subject's 10th dispensed prescription, the
ibject's fifth birthday, or January 1, 1980, whichever was latest. The
ite of a subject's exit from the cohort was the subject's 55th birthday,
le date of the outcome event (death or near-fatal asthma), the date of the
ibject's emigration from the province, or April 30, 1987, whichever was
irliest.

utcomes and Identification of Case Patients
The case patients were subjects within the cohort who met
:edetermined criteria for near-fatal asthma or death from asthma during
le years 1980 through 1987. If a subject who died of asthma had previously
id a near-fatal episode, the death was chosen as the outcome for analysis.

DLEV012228

The primary hypothesis concerned the association of near deaths plus deaths, treated as a combined outcome measure, with exposure to any beta-agonist dispensed by a metered-dose inhaler.

We searched the data base to identify all the deaths among the 12,301 members of the cohort. Death certificates, coroners' reports, autopsy reports, and hospital-discharge summaries were obtained for all these deaths. Of 180 deaths identified, no documents were found for 15. Three physicians with special expertise in asthma reviewed all available information about the 165 deaths independently and categorized each as being probably due to asthma, possibly due to asthma, or not likely to be due to asthma. The consultants were blinded to the medications used and to the identity of the patients. They classified 44 deaths as probably due to asthma, reaching complete agreement independently for 40 of them and by consensus for the remaining 4.

Patients were classified as having near-fatal asthma if they had hypercarbia (arterial partial pressure of carbon dioxide above 6.0 kPa [45 mm Hg]), nonelective intubation during an acute asthma attack, or both. To identify episodes of asthma that might meet these criteria, we searched the data bases for procedure or billing codes corresponding to cardiopulmonary resuscitation, airway intubation, or assisted ventilation in hospitalized members of the cohort whose discharge diagnoses suggested airway disease (codes 490 to 493 and 496 of the International Classification of Diseases, 9th Revision, Clinical Modification) (Ref. 8). In addition, the medical charts of patients hospitalized for asthma for five days or more at six large referral hospitals were examined. For 99 percent of the hospitalizations of the 964 subjects with potential episodes of near-fatal asthma, hospital-discharge summaries and laboratory results were obtained. Eighty-five subjects were identified as having had one or more probable episodes of near-fatal asthma; the three consultants reached complete agreement independently for 80 of them and by consensus for the remaining 5. A subject's most recent near-fatal episode was used when more than one such episode was identified.

Selection of Controls

Up to eight controls for each case patient were selected randomly within the cohort after they were matched with respect to the following variables: region of residence, receipt of social assistance at any time during the study, age at entry into the cohort, date of entry, and hospitalization at least once in the two years before the event. In addition, the controls were required to have been at risk for the outcome at the time of the event in the case patient, a date we refer to as the index date.

Exposure to Asthma Medications

The principal risk factor examined was long-term use of inhaled beta(sub 2)-agonists delivered by a metered-dose inhaler. We defined long-term use as the use of a drug during the 12 months preceding the index date. The data base also permitted us to count accurately the number of prescriptions dispensed for any of the drugs under study, month by month. We therefore computed the number of units dispensed during the 12 months before the index date, with one unit defined as the amount of beta-agonist dispensed by one metered-dose inhaler per month. When a medication was dispensed as a dry powder or nebulizer solution, one unit was the dose usually prescribed per month. For the other asthma drugs (e.g., oral beta-agonists, theophylline, corticosteroids, and the like), one unit referred to an actual dispensed prescription.

Ascertainment of Adjustment Variables

Data on the use of health services and concomitant medications were obtained to adjust for possible differences between the case patients and the controls. The health insurance files for the case patients and the controls provided a record of their use of health services. From these files we calculated the number of hospitalizations for asthma for each

DLEV012229

study subject and the number of visits to a physician in the two years
before the index event. The use of drugs other than those to treat asthma
was also established from the files of the prescription-drug plan. We
grouped these drugs into four categories: (1) cardiac medications,
including antihypertensive and potassium-sparing diuretic agents; (2)
the biologic drugs, including anticonvulsants, antidepressants, and major
tranquilizers; (3) drugs relatively contraindicated in asthma, specifically
beta-blockers, sedatives, and parasympathomimetic agents; and (4)
non-potassium-sparing diuretic agents. An index of risk was created,
representing the number of categories of concomitant therapy received.

## Statistical Analysis

We initially carried out a bivariate analysis that estimated crude
matched odds ratios; in fact, these were adjusted for the four matching
factors with use of conditional logistic regression (Ref. 9). Multiple
conditional logistic regression for matched sets, (Ref. 10) with a variable
number of controls per case patient, was used to estimate the adjusted odds
ratios for the independent effects of the various asthma medications. The
frequency of use, measured in units, of the two principal beta-agonists
taken by metered-dose inhaler over the 12-month period, was quantified in
three different ways. First, exposure was classified as being present or
absent (a dichotomous variable). Second, exposure was categorized ordinally
in the following four classes, according to the number of metered-dose
inhalers used over the 12 months: 0; 1 to 12; 13 to 24; or 25 or more.
Third, exposure was quantified as the number of units used per month, with
the resulting continuous dose-response odds ratio measuring the increase in
risk per unit per month. For the other asthma medications, we used both the
dichotomous and the continuous classifications.

Because the only formulation of albuterol available in a metered-dose
inhaler contained 100 microg per inhalation, as compared with 200 microg in
each inhalation from the fenoterol inhaler, the odds ratios were also
calculated with the assumption that one unit of fenoterol was equivalent to
two units of albuterol. This was done by dividing the regression
coefficients by 2, and since the logistic model used in the odds ratios was
log-linear, the square root of the coefficient provided the appropriate
estimate of effect.

The goodness of fit of the regression models, particularly the
continuous dose-response model, was addressed in two ways. First, the
assumption of log-linearity for the per-unit odds ratios was evaluated by
comparing the fitted values from the continuous model with the values of
the odds ratios estimated from the ordinal model. Second, the stability of
the odds ratios was verified by assessing the effect of removing
influential observations (Ref. 11). For all the results presented, the
goodness-of-fit and stability evaluations of the regression models resulted
in fluctuations of the estimated odds ratios of +/- 20 percent at most,
well within the magnitude of the random error. Finally, some regression
models were made parsimonious by removing variables that had no effect on
the odds ratios of interest, thus improving their precision. Two-tailed 95
percent confidence intervals are provided for each odds ratio.

## Peer Review

Because this study was funded entirely by Boehringer-Ingelheim
Pharmaceuticals, which has a commercial interest in one of the products
assessed, the investigators and the sponsor agreed on a verifiable
peer-review process. Accordingly, a Scientific Advisory Board was created
that reviewed the protocol in February 1990 after determinations of
feasibility had been done, but before field work had begun. The chairman of
the advisory board assessed and documented changes made in the interim by
the investigators and circulated them to the entire board. The board
reviewed the main results, conclusions, and interpretations of the data in
June 1991.

## Results

DLEV012230

Table 1 shows selected characteristics of the study subjects. Overall, he case patients and the controls were similar with respect to age and ex. As compared with the controls, the case patients were hospitalized ore frequently and used the services of physicians more often. They also sed several classes of medications other than asthma drugs more often, a ifference that was more pronounced when only the subjects who died from sthma were considered. When concomitant medications were combined into an ggregate index, their use was more frequent among the case patients who ied of asthma (odds ratio, 2.2; 95 percent confidence interval, 1.0 to .9). In subsequent analyses, the odds ratios were adjusted for differences n the number of hospitalizations and in the index for the aggregate use of ther medications, but not for the number of visits to a physician, because his factor did not prove to be important in any analysis. *Table 1. elected Characteristics of Study Subjects Who Died of Asthma or Had ear-Fatal Asthma *. **TABLE OMITTED**

The relation between the use of asthma medications and the risk of atal or near-fatal asthma is shown in Table 2. In this table, frequencies f exposure to asthma medications are shown in an unmatched format for the ase patients and the controls, with unadjusted matched odds ratios alculated. In addition, odds ratios and 95 percent confidence intervals ere calculated by multivariate matched techniques, including adjustment or the use of other asthma medications, as well as for the number of ospitalizations and the index of use of concomitant medication. *Table 2. atched Odds Ratios for Exposure to Asthma Medication in the Subjects with atal or Near-Fatal Asthma, during the 12 Months before the Index Date *. *TABLE OMITTED**

In this analysis, the adjusted matched odds ratios indicated that both enoterol and albuterol taken by metered-dose inhaler were associated with n increased risk of death from asthma or near-fatal asthma, as well as ith an increased risk of death alone. An increased risk of death or ear-fatal asthma was also found for albuterol taken by nebulizer and for ther inhaled beta-agonists, theophylline, and oral corticosteroids. No ncrease in risk was noted for the use of inhaled corticosteroids and romolyn, considered together. The results were similar when deaths from sthma were considered alone, except that there was no increase in risk ssociated with the use of oral corticosteroids.

In the comparison of crude and adjusted matched odds ratios, an mportant point is apparent about the association between the use of nhaled albuterol and the risk of death from asthma. In Table 2, the crude atched odds ratio for albuterol was 0.9, but it increased to 2.8 after djustment for the use of fenoterol. As Table 3 shows, this increase ccurred because the odds ratio for albuterol was 1.2 among the patients ho also used fenoterol and 3.7 among those who did not. When the odds atio was calculated with adjustment for fenoterol use and other factors, he overall increase in risk for albuterol -- to an odds ratio of 2.8 Table 2) -- became clinically important and statistically significant. The ata in Table 3 also explain why previous studies found a spurious rotective odds ratio for albuterol. When the analysis was restricted to atients who used albuterol or fenoterol but not both, the crude odds atios were 3.7 for fenoterol and 0.3 for albuterol -- i.e., reciprocal atios. *Table 3. Relation of Albuterol Use to the Incidence of Death from sthma, with Adjustment for Use of Fenoterol *. **TABLE OMITTED**

Table 4 refines the analysis of the delivery of fenoterol and lbuterol by metered-dose inhaler by using an ordinal classification of xposure. In this analysis, the categories were the numbers of dispensed nits of either drug over a 12-month period (0, 1 to 12, 13 to 24, and 25 r more). When an odds ratio of 1.0 was assigned to the reference category f no use, the values for death from asthma and near-fatal asthma combined anged from 4.1 to 21.5 for fenoterol and were statistically significant. imilar results were found for albuterol. In the analysis of death from

DLEV012231

sthma the drugs were comparable, except that there were higher odds ratios
or fenoterol at higher levels of exposure. In this ordinal analysis of
xposure, the increasing gradient in risk with increasing use of beta(sub
)-agonists is clear. Patients who received more than two metered-dose
nhalers per month on average had a very large excess risk of death or
e  fatal asthma or of death alone. Fenoterol was available only in doses
f 200 microg per inhalation, and albuterol only in 100-microg doses. So
hat the two medications can be compared on a weight-for-weight basis,
able 4 also includes an ordinal analysis of exposure in which the number
f inhalers of fenoterol was reduced by half. *Table 4. Adjusted Matched
dds Ratios for Inhaled Fenoterol or Inhaled Albuterol in the Subjects with
atal or Near-Fatal Asthma, during the 12 Months before the Index Date,
ccording to an Ordinal Classification of Exposure *. **TABLE OMITTED**

Table 5 shows the odds ratios for each additional unit of inhaled
eta-agonists dispensed per month. As estimated from a regression model,
he odds ratios for any inhaled beta-agonist were 1.9 for death and
ear-fatal asthma and 2.6 for death alone. In a separate model, the odds
atios for each unit of fenoterol were 2.3 for death and near-fatal asthma
nd 5.4 for death only; for albuterol, the odds ratios were 1.9 and 2.4,
espectively. *Table 5. Adjusted Matched Odds Ratios for Inhaled Fenoterol
r Albuterol in the Subjects with Fatal or Near-Fatal Asthma during the 12
onths before the Index Date, According to Models of Continuous Exposure *.
*TABLE OMITTED**

The analysis based on continuous exposure in Table 5 enabled us to
ompare the use of 100 microg of fenoterol with the use of 100 microg of
lbuterol. In this weight-for-weight analysis, the odds ratio for fenoterol
as 1.5 for death and near death combined, similar to the odds ratio of 1.9
or albuterol. Similarly, for death alone, the odds ratio of 2.3 for
enoterol was almost indistinguishable from the value of 2.4 for albuterol.

We also looked at the use of beta-agonists among subjects thought to
e  low risk. Among those not hospitalized for asthma in the previous two
ea.s, the odds ratios for death from asthma remained significantly
levated for both albuterol (2.4; 95 percent confidence interval, 1.3 to
.7) and fenoterol (2.1; 95 percent confidence interval, 1.0 to 4.7).

In this cohort there were 47,842 person-years of follow-up. To
stimate the absolute risks of death from asthma in a population of
atients with asthma we used the distribution of exposure in the 655
ontrols to approximate the person-time during which fenoterol and
lbuterol administered by metered-dose inhaler were used (Ref. 12). The
verall rate of death from asthma was 9.2 per 10,000 person-years (95
ercent confidence interval, 6.8 to 12.4). The rate for fenoterol was 34.6
95 percent confidence interval, 21.4 to 56.1), whereas the rate for
lbuterol was 8.6 per 10,000 person-years (95 percent confidence interval,
.9 to 12.6). For those not taking either of these two inhaled
eta-agonists, the rate of death from asthma was 1.8 per 10,000
erson-years (95 percent confidence interval, 0.4 to 7.5). These absolute
ates are crude and therefore unusable; any comparisons between them do not
ake into account differences with respect to doses and other factors
ssociated with the risk of death from asthma.

Discussion
In a case-control study of subjects drawn from a population-based
ohort, we found that the use of inhaled beta-agonist bronchodilators,
rincipally fenoterol and albuterol, was associated with an increased risk
f the combined outcome of fatal and near-fatal asthma, as well as of death
rom asthma alone.

When investigators earlier reported an increase in mortality from
s  a in various countries around the world, the explanations focused on
ewly introduced treatments (Ref. 13). The case-control studies from New
ealand emphasized the possible role of one particular bronchodilator,
enoterol, while suggesting that other bronchodilators did not similarly

DLEV012232

ncrease the risk of death from asthma (Ref. 1-3). Our study reveals that
he use of beta-agonist drugs as a class, not just that of fenoterol alone,
s associated with an increased risk of death from asthma. Furthermore, the
se of theophyllines, another commonly used class of bronchodilators, was
lso associated with an excess risk of a major adverse event. On the other
and, the antiinflammatory agents cromolyn and inhaled corticosteroids were
ot associated with such a risk.

An important advantage of our study was the availability of data on
he number of metered-dose inhalers dispensed per month. These data
ermitted detailed dose-response analyses for the two beta-agonist agents
ost commonly used. The increased risk of fatal and near-fatal asthma with
he use of albuterol and fenoterol was clinically important for patients
ho used one to two canisters per month. For patients who used more than
wo canisters monthly, both bronchodilators were associated with a greatly
ncreased risk, which was especially marked for fenoterol.

At the time of the study, canisters of fenoterol in Saskatchewan
ontained 200 inhalations, each of 200 microg of drug, whereas those of
lbuterol contained 200 inhalations, each of 100 microg. Because different
ormulations are available elsewhere (100 microg of fenoterol and 200
icrog of albuterol), we examined the risk associated with these two
edications on a weight-for-weight basis. This analysis suggested a similar
isk of death per 100 microg of either drug. The validity of such a
eight-equivalence approach has been supported by in vitro (Ref. 14,15) and
n vivo (Ref. 16,17) studies, as well as by clinical research (Ref. 18-20).

One limitation of our study was that the only data available with
hich to adjust for the severity of asthma were those from the computerized
ata bases. Fieldwork to collect relevant data from hospitals and
hysicians in Saskatchewan may permit further adjustment for severity.
hus, it remains plausible that many of the drugs for asthma appear to
ncrease risk because the patients for whom asthma medications are
rescribed are more likely to die from their more severe asthma. However,
ven among subjects at low risk who were not hospitalized in the two years
efore the index event, both albuterol and fenoterol were associated with a
oubling of the risk of death from asthma. Furthermore, an increase in risk
as much less apparent in the case of antiinflammatory asthma medications,
hich one might expect would be added to the treatment of patients with
ore severe disease that was not controlled with bronchodilator agents
lone.

There are several possible explanations for the association between
eta-agonists and death from asthma. We have already commented on the
ikelihood that patients for whom asthma medications are prescribed have
ore severe disease than other patients with asthma. A second possibility
is that beta-agonists have adverse effects on organ systems other than the
ungs. beta-Adrenergic agonists have long been under special scrutiny
ecause of their potential for cardiotoxicity (Ref. 21) and their potential
o induce hypokalemia (Ref. 22). A review of the available clinical
information, however, suggests that at most 7 of the 44 deaths from asthma
in our study might have been sudden and therefore possibly cardiac in
rigin. Rapidly progressive respiratory failure was much more common, as
as been recently suggested by others (Ref. 23).

Recent evidence suggests that beta(sub 2)-agonists may make asthma
orse, (Ref. 4) perhaps by increasing airway hyperresponsiveness (Ref.
4-26). According to this explanation, beta-agonists are precursors of
severe asthma, possibly leading to death, so that distinguishing the
relative effects of the disease and of its treatment is difficult in
observational studies such as ours.

Clinicians should also remain alert to another possible mechanism --
hat the benefits of beta(sub 2)-agonists for symptoms engender
verreliance on this form of asthma management. If patients and their
hysicians are misled by the control of symptoms into thinking that the

DLEV012233

patient's underlying asth▉ ▉is stable, necessary anti▉flammatory treatment
or other medications may be withheld while the patient's disease becomes
life-threatening. Severe attacks of asthma may also become the rule with
the use of beta-agonists if sensitivity to bronchoconstrictive agents is
increased while maximal airway narrowing is maintained, and attacks may
… more rapidly, as has recently been suggested (Ref. 27). Whatever the
nature of the associations observed, whether they are causal relations or
markers of severity, heavy use of these medications should send a clear
signal to the patient and physician that the likelihood of a major adverse
event is markedly increased and that further evaluation is needed.

We are indebted to the following members of the Scientific Advisory
Board for reviewing the protocol for this study and the final report:
Professors Peter Barnes (University of London), Bernard Begaud (University
of Bordeaux), Nicholas Day (Cambridge University), Michael Hensley
(Newcastle University, Australia), Michel Ibrahim, chairman (University of
North Carolina), Helmuth Kewitz (Free University of Berlin), Albert Sheffer
(Harvard University), and Stephen Walter (McMaster University); to Peter
Burney (United Medical and Dental Schools-St. Thomas Hospital, University
of London); and to many others whose dedication made this study possible,
in particular Brenda Hemmelgarn, Lucie Blais, and Leah Lueck.

CITED REFERENCES

. Crane J, Pearce N, Flatt A, et al Prescribed fenoterol and death from
  asthma in New Zealand, 1981-83: case-control study. Lancet
  1989;1:917-22.
. Pearce N, Grainger J, Atkinson M, et al Case-control study of prescribed
  fenoterol and death from asthma in New Zealand, 1977-81. Thorax
  1990;45:170-5.
. Grainger J, Woodman K, Pearce N, et al Prescribed fenoterol and death
  from asthma in New Zealand, 1981-7: a further case-control study.
  Thorax 1991;46;105-11.
. Sears MR, Taylor DR, Print CG, et al Regular inhaled beta-agonist
  treatment in bronchial asthma. Lancet 1990;336:1391-6.
. Horwitz RI, Spitzer W, Buist S, et al Clinical complexity and
  epidemiologic uncertainty in case-control research: fenoterol and
  asthma management. Chest 1991;100:1586-91.
. West R. Saskatchewan health data bases: a developing resource. Am J Prev
  Med 1987;4:Suppl 2:25-7.
. Strand LM, West R. Health databases in Saskatchewan. In: Strom B, ed.
  Pharmacoepidemiology: the sciences of post-marketing drug surveillance.
  New York: Churchill Livingstone, 1989:189-200.
. Department of Health and Human Services. The international
  classification of diseases, 9th revision, clinical modification:
  ICD-9-CM. Vol. 1. Diseases: alphabetic index. 2nd ed. Washington, D.C.:
  Department of Health and Human Services, 1980. (DHHS publication no.
  (PHS) 80-1260).
. Breslow NE, Day NE. Statistical methods in cancer research. Vol. 2. The
  design and analysis of cohort studies. Lyon, France: International
  Agency for Research on Cancer, 1987. (IARC scientific publications no.
  82).
0. Breslow NE, Day NE. Statistical methods in cancer research. Vol. 1. The
  analysis of case-control studies. Lyon, France: International Agency
  for Research on Cancer, 1986. (IARC scientific publications no. 32).
1. Storer BE, Crowley J. A diagnostic for Cox regression and general
  conditional likelihoods. J Am Stat Assoc 1985;80:139-47.
2  Rothman KJ, ed. Modern epidemiology. Boston: Little, Brown, 1986.
3. Poynter D. Fatal asthma -- is treatment incriminated? J Allergy Clin
  Immunol 1987;80:423-7.
4. Olsson OAT, Swanberg E, Svedinger I, Waldeck B. Effects of

DLEV012234

beta-adrenoceptor agonists on airway smooth muscle and on slow-contracting skeletal muscle: in vitro and in vivo results compared. Acta Pharmacol Toxicol (Copenh) 1979;44:272-6.

15. Zaagsma J, van der Heijden PJCM, van der Schaar MWG, Bank CMC. Differentiation of functional adrenoceptors in human and guinea pig airways. Eur J Respir Dis Suppl 1984;135:16-33.

16. Wong CS, Pavord ID, Williams J, Britton JR, Tattersfield AE. Bronchodilator, cardiovascular, and hypokalaemic effects of fenoterol, salbutamol, and terbutaline in asthma. Lancet 1990;336:1396-9.

17. Arai Y, Nitta T, Shida T, Shioda H. Anti-asthmatic effects and drug tolerance of selective beta-adrenergic stimulants in guinea pigs. Eur J Respir Dis Suppl 1983;128:506-8.

18. Tang OT, Flatley M. A comparison of effects of inhaling a combined preparation of fenoterol with ipratropium bromide (Duovent) with those of fenoterol and salbutamol. Postgrad Med J 1984;60:Suppl 1:24-7.

19. Salome CM, Wright W, Sedgwick CG, Woolcock AJ. Acute effects of fenoterol (Berotec) and ipratropium bromide (Atrovent) alone or in combination on hyperresponsiveness in asthmatic subjects. In: Armour CL, Black JL, eds. Mechanisms in asthma: pharmacology, physiology, and management. Vol. 263 of Progress in clinical and biological research. New York: Alan R. Liss, 1988:405-19.

20. Hockley B, Johnson NM. Fenoterol versus salbutamol nebulization in asthma. Postgrad Med J 1983;59:504-5.

21. Speizer FE, Wegman DH, Ramirez A. Palpitation rates associated with fluorocarbon exposure in a hospital setting. N Engl J Med 1975;292:624-6.

22. Lulich KM, Goldie RG, Ryan G, Paterson JW. Adverse reactions to beta-2-agonist bronchodilators. Med Toxicol 1986;1:289-99.

23. Molfino NA, Nannini LJ, Martelli AN, Slutsky AS. Respiratory arrest in near-fatal asthma. N Engl J Med 1991;324:285-8.

24. Kraan J, Koeter GH, v d Mark TW, Sluiter HJ, de Vries K. Changes in bronchial hyperreactivity induced by 4 weeks of treatment with antiasthmatic drugs in patients with allergic asthma: a comparison between budesonide and terbutaline. J Allergy Clin Immunol 1985;76:628-36.

25. Kerrebijn KF, van Essen-Zandvliet EEM, Neijens HJ. Effect of long-term treatment with inhaled corticosteroids and beta-agonists on the bronchial responsiveness in children with asthma. J Allergy Clin Immunol 1987;79:653-9.

26. van Schyek CP, Graafsma SJ, Visch MB, Dompeling E, van Weel C, van Herwaarden CLA. Increased bronchial hyperresponsiveness after inhaling salbutamol during 1 year is not caused by subsensitization to salbutamol. J Allergy Clin Immunol 1990;86:792-800.

27. Sterk PJ, Bel EH. The shape of the dose-response curve to inhaled bronchoconstrictor agents in asthma and in chronic obstructive pulmonary disease. Am Rev Respir Dis 1991;143:1433-7.

?b 154

      03aug93 17:21:15 User072820 Session D72.2
          $7.80   0.100 Hrs File444
              $1.40  2 Type(s) in Format  3
              $1.00  1 Type(s) in Format  9
              $2.40  3 Types
      $10.20  Estimated cost File444
      $1.20  DIALNET
      $11.40  Estimated cost this search
      $11.64  Estimated total session cost    0.105 Hrs.

File 154:MEDLINE  1985-1993/SEP (9309W4)

    Set  Items  Description

**This Page is Inserted by IFW Indexing and Scanning
Operations and is not part of the Official Record**

## BEST AVAILABLE IMAGES

Defective images within this document are accurate representations of the original
documents submitted by the applicant.

Defects in the images include but are not limited to the items checked:

☐ **BLACK BORDERS**

☒ **IMAGE CUT OFF AT TOP, BOTTOM OR SIDES**

☐ **FADED TEXT OR DRAWING**

☐ **BLURRED OR ILLEGIBLE TEXT OR DRAWING**

☐ **SKEWED/SLANTED IMAGES**

☐ **COLOR OR BLACK AND WHITE PHOTOGRAPHS**

☐ **GRAY SCALE DOCUMENTS**

☐ **LINES OR MARKS ON ORIGINAL DOCUMENT**

☐ **REFERENCE(S) OR EXHIBIT(S) SUBMITTED ARE POOR QUALITY**

☐ **OTHER:** _____

## IMAGES ARE BEST AVAILABLE COPY.
As rescanning these documents will not correct the image
problems checked, please do not report these problems to
the IFW Image Problem Mailbox.

DLEV012236



8·6·93

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:  Timothy J. Barberich and James W. Young

Serial No.:  07/896,725          Group Art Unit:  1205

Filed:      June 9, 1992         Examiner:  L. Schenkman

Title:      METHOD FOR TREATING ASTHMA USING
            OPTICALLY PURE R(−) ALBUTEROL

<u>Record of Telephonic Interview</u>

To:  Hon. Commissioner of Patents and Trademarks
     Washington, D.C.  20231

Dear Sir:

     This is not an amendment, nor it is intended to be
responsive to any official Action from the Patent and Trademark
Office. Rather it is intended to make of record the substance of
a telephonic interview between Examiner Schenkman and applicants'
undersigned representative on August 3, 1993.

     On August 2, 1993 applicants' representative telephoned
Examiner Schenkman and requested the opportunity to discuss the
Examiner's final rejection of June 7, 1993 and applicant's
response thereto submitted July 23, 1993. Examiner Schenkman
graciously agreed to call applicant's representative after he had
received and read the response.

     On August 3, 1993, Examiner Schenkman called applicant's
representative and indicated that he had received and read the
response, and that it was his intention nonetheless to maintain
his rejection. He indicated that the basis of his rejection was
the belief that when there are two enantiomers, the person of
skill always expects that one will be more active. Applicants

DLEV012237

-2-                    SPC89-05

pointed out that in the present case the art was not silent on
what the person of skill ought to expect.  The art, described in
earlier responses and declarations provided by applicants,
teaches that there is no advantage to isolating either pure
isomer over the racemate for the purpose of enhancing potency.

Examiner Schenkman then stated his belief that the art
showed that the R-isomer would have fewer side effects.
Applicants' representative explained that none of the art,
available at the time of filing of the application, taught that
there would be any advantage to using either isomer for
diminution of side effects.  In fact, the combined teachings of
the art were clear on the point that there would be no advantage
to using pure R-albuterol.

The Examiner asked what the declaration of Gunnar Aberg
showed.  Applicants' representative explained that the
declaration showed that sensitization to spasmogens is associated
with S-albuterol, but not with R, and that therefore there was a
previously unappreciated advantage to the resolution and use of
pure R-albuterol.  The Examiner inquired whether that wasn't what
Morley and Chapman had shown.  Applicants' representative agreed
that was indeed what Morley and Chapman had shown, but that both
of the Morley and Chapman references appeared subsequent to the
filing date of the instant application and were therefore
independently supportive of applicants' position.

Examiner Schenkman reiterated his position that a person of
skill would still expect one isomer to be better than the other.
Had applicants isolated an unknown enantiomer or had the
enantiomers been difficult to separate, and applicants devised a
separation, he believed that might provide allowable subject
matter, but under the present circumstances he felt R-albuterol
would be unpatentable to applicants.  Applicants' representative

DLEV012238

-3-                      SPC89-05

pointed out that the pending claims were not to R-albuterol, per
se, but to a use of R-albuterol and suggested a Jepson-type claim
of the format:

> "In a method of using albuterol to treat asthma, the
> improvement which comprises reducing side effects by
> administering R-albuterol in place of racemic albuterol."

Examiner Schenkman did not believe that this would address his
concerns either, because the treatment of asthma was a known use
and the R-isomer was known isomer. He indicated that issue had
been reached on this point, and the interview was then concluded.

On August 4, 1993 applicants' representative telephoned
Examiner Schenkman to cite a 1987 decision of the Board of Patent
Appeals and Interferences (ex parte Ferrari), which was believed
highly relevant to the Examiner's concerns about the
patentability of known enantiomers. Ferrari had sought claims to
(-)-moprolol. Moprolol was known to exist as a racemic mixture
of enantiomers, and the art would have led one to expect that the
(-) enantiomer would possess essentially all of the known
antihypertensive activity. The inventors found an unexpected
beneficial result relating to cardiac side effects for the (-)
enantiomer. The Board held that the claims were patentable on
the basis of an unexpected, improved side effect profile. A copy
of that decision is enclosed herewith for the convenience of the
Examiner.

Also included for the convenience of the Examiner is a copy
of an article by Spitzer et al. [New England Journal of Medicine
326, 501-506 (1992)] which emphasizes the clinical and
therapeutic importance of the hypersensitivity reaction
associated with racemic albuterol namely that it appears to lead

DLEV012239

-4-                              SPC89-05

to increased risk of death from asthma or near fatal asthma (page
6, third and fourth paragraph and page 8, fourth and fifth full
paragraphs).  The use of optically pure R-albuterol, as claimed
by applicants, avoids this serious side effect.  However, such
use of R-albuterol is neither taught nor suggested by the prior
art.

                              Respectfully submitted,


                              Philip E. Hansen
                              Agent for Applicants
                              Registration No. 32,700

Dated:  August  4 , 1993

HESLIN & ROTHENBERG, P.C.
450 New Karner Road
P.O. Box 12695
Albany, New York 12212-2695

Telephone:  (518) 452-5600
Facsimile:  (518) 452-5579

DLEV012240



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 07/896,725 | 06/09/92 | BARBARICH | T | SPC89- |

```
                                 12M2/0812            SCHENKMAN, J
    PATRICIA GRANAHAN                                 EXAMINER
    HAMILTON, BROOK, SMITH & REYNOLDS
    TWO MILITIA DRIVE                          ART UNIT    PAPER NUMBER
    LEXINGTON, MA 02173                         1205          32

                                              DATE MAILED: 08/12/93
```

Below is a communication from the EXAMINER in charge of this application.
**COMMISSIONER OF PATENTS AND TRADEMARKS**

## ADVISORY ACTION

☒ THE PERIOD FOR RESPONSE:

    ☐ is extended to run _____ from the date of the Final Rejection.

    ☒ continues to run _3_4_ from the date of the Final Rejection.

    ☐ expires three months from the date of the final rejection or as of the mailing date of this Advisory Action, whichever is later. In no event however, will the statutory period for response expire later than six months from the date of the final rejection.

    Any extension of time must be obtained by filing a petition under 37 CFR 1.136(a), the proposed response and the appropriate fee. The date on which the response, the petition, and the fee have been filed is the date of the response and also the date for the purposes of determining the period of extension and the corresponding amount of the fee. Any extension fee pursuant to 37 CFR 1.17 will be calculated from the date that the shortened statutory period for response expires as set forth above.

☐ Appellant's Brief is due in accordance with 37 CFR 1.192(a).

☒ Applicant's response to the final rejection, filed _8/5/93_ has been considered with the following effect, but it is not deemed to place the application in condition for allowance.

1. ☐ The proposed amendments to the claim and/or specification will not be entered and the final rejection stands because:

    a. ☐ There is no convincing showing under 37 CFR 1.116(b) why the proposed amendment is necessary and was not earlier presented.

    b. ☐ They raise new issues that would require further consideration and/or search. (See Note).

    c. ☐ They raise the issue of new matter. (See Note).

    d. ☐ They are not deemed to place the application in better form for appeal by materially reducing or simplifying the issues for appeal.

    e. ☐ They present additional claims without cancelling a corresponding number of finally rejected claims.

    NOTE: _____

2. ☐ Newly proposed or amended claims _____ would be allowed if submitted in a separately filed amendment cancelling the non-allowable claims.

3. ☐ Upon the filing of an appeal, the proposed amendment ☐ will be ☐ will not be, entered and the status of the claims in this application would be as follows:

    Allowed claims: _____

    Claims objected to: _____

    Claims rejected: _____

    However,

    a. ☐ The rejection of claims _____ on references is deemed to be overcome by applicant's response.

    b. ☐ The rejection of claims _____ on non-reference grounds only is deemed to be overcome by applicant's response.

4. ☒ The affidavit, exhibit or request for reconsideration has been considered but does not overcome the rejection.

5. ☐ The affidavit or exhibit will not be considered because applicant has not shown good and sufficient reasons why it was not earlier presented.

☐ The proposed drawing correction ☐ has ☐ has not been approved by the examiner.

☐ Other _The Ferrion Olision is not controlling since the isomers possess a different activity than the octo's isomer or the racemate, nat-trans. Also the prior cited art (e.g. Hartley etal) discloses increased activity (primary) of the (R-) isomer. No further amendment will be considered_

LEONARD SCHENKMAN
PRIMARY EXAMINER
GROUP 1200

PTOL-303 (REV 3-80)

DLEV012241





IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant: Barberich et al.

Serial No. 07/896,725          Group Art Unit: 1205

Filed: June 9, 1992          Examiner: Schenkman

Title: METHOD FOR TREATING ASTHMA USING OPTICALLY
PURE R(−) ALBUTEROL

REQUEST FOR EXTENSION OF TIME
37 CFR §1.136(a)

Hon. Commissioner of Patents and Trademarks
Washington, D.C. 20231

Dear Sir:

Applicant hereby requests an extension of three (3) months for filing a Response to an Office Action dated June 7, 1993. A check in the amount of $420 to cover this request is enclosed. The Commissioner is hereby authorized to charge payment of any fees associated with this communication or credit any overpayment to Deposit Account No. 08-1935.

Respectfully submitted,

Philip E. Hansen
Agent for Applicant
Reg. No. 32,700

Dated: December 7, 1993

HESLIN & ROTHENBERG, P.C.
450 New Karner Road
P.O. Box 12695
Albany, New York 12212-2695
Tel: (518) 452-5600
Fax: (518) 452-5579

090 BA 12/23/93 07896725          1 217     420.00 CK

DLEV012242

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|---|
| 08/163,581 | 12/07/93 | 514 | | 646 | 1205 | |

TIMOTHY J. BARBERICH, CONCORD, MA; JAMES W. YOUNG, PALO ALTO, CA.

**CONTINUING DATA****************
VERIFIED    THIS APPLN IS A CON OF  07/896,725 06/09/92 ABN
            WHICH IS A CON OF  07/461,262 01/05/90 ABN

**FOREIGN/PCT APPLICATIONS**********
VERIFIED
None RA

Certificate
SEP 3 0 2003
of Correction

FOREIGN FILING LICENSE GRANTED 01/07/94          ***** SMALL ENTITY *****

| Foreign priority claimed | | AS FILED → | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|---|
| | | | MA | 0 | 11 | 3 | $355.00 | SPC8905 |

PHILIP E. HANSEN
HESLIN & ROTTENBERG          5 Columbia Circle
P O BOX      RD
ALBANY, NY 12206   12203-5160

METHOD FOR TREATING ASTHMA USING OPTICALLY PURE (R)-ALBUTEROL

U.S. DEPT. of COMM.-Pat. & TM Office-

| | | | | CLAIMS ALLOWED |
|---|---|---|---|---|
| NOTICE OF ALLOWANCE MAILED | | | | Total Claims |
| | Assistant Examiner | | | |
| ISSUE FEE | | | | DRAWING |
| | | | | Sheets Dwg. |
| | RAYMOND J. HENLEY III | | | |
| | PATENT EXAMINER | | | |
| | GROUP 120  ART UNIT 125  Primary Examiner | | | ISSUE BATCH NUMBER |
| | PREPARED FOR ISSUE | | | |
| Label Area | | | | |

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

(FACE)

DLEV012243

BEST AVAILABLE COPY

**BEST AVAILABLE COPY**

### SEARCHED

| Class | Sub | Date | Exmr. |
|-------|-----|------|-------|
| *updated from parent* | | | |
| 514 | 649 | 2/17/94 | RH |
| *updated* | | 7/14/94 | RH |
| 514 | 826 | ✓ | ✓ |

### SEARCH NOTES

|  | Date | Exmr. |
|--|------|-------|
| Reviewed Parents | 7/21/94 | RH |

### INTERFERENCE SEARCHED

| Class | Sub | Date | Exmr. |
|-------|-----|------|-------|
| 514 | 649 | 7/25/94 | RH |
| ✓ | 826 | ✓ | ✓ |

DLEV012244



Staple Issue Slip Here

| POSITION | ID NO. | DATE |
|---|---|---|
| CLASSIFIER | | |
| EXAMINER | 405 | 1-5-94 |
| TYPIST | 323 | 1/7 |
| VERIFIER | 352 | 1-8-94 |
| CORPS CORR. | | |
| SPEC. HAND | | |
| FILE MAINT. | | |
| DRAFTING | | |

INDEX OF CLAIMS

(LEFT INSIDE)

BEST AVAILABLE COPY

DLEV012245

OMB No. 0651-0011 (12/31/86)

08/163581

| DOCKET NUMBER | ANTICIPATED CLASSIFICATION OF THIS APPLICATION: | | PRIOR APPLICATION: | |
|---|---|---|---|---|
| | CLASS | SUBCLASS | EXAMINER | ART UNIT |
| 0-05 | | | L. Schenkman | 1205 |

Commissioner of Patents and Trademarks
Box FWC
Washington, D.C. 20231

This is a Request for filing a ☐ continuation-in-part ☒ continuation ☐ divisional application under 37 CFR 1.62 of prior application Serial No. 07/896,725 , filed on 6-9-92 entitled METHOD FOR TREATING ASTHMA USING OPTICALLY PURE (R)-ALBUTEROL by the following named inventor(s):

| FULL NAME OF INVENTOR | FAMILY NAME Barberich | FIRST GIVEN NAME Timothy | SECOND GIVEN NAME J. |
|---|---|---|---|
| RESIDENCE & CITIZENSHIP | CITY Concord | STATE OR FOREIGN COUNTRY Massachusetts | COUNTRY OF CITIZENSHIP United States |
| POST OFFICE ADDRESS | POST OFFICE ADDRESS 73 Nashoba Road | CITY Concord | STATE & ZIP CODE/COUNTRY MA 01742/U.S.A. |
| FULL NAME OF INVENTOR | FAMILY NAME Young | FIRST GIVEN NAME James | SECOND GIVEN NAME William |
| RESIDENCE & CITIZENSHIP | CITY Palo Alto | STATE OR FOREIGN COUNTRY California | COUNTRY OF CITIZENSHIP United States |
| POST OFFICE ADDRESS | POST OFFICE ADDRESS 765 Talisman Court | CITY Palo Alto | STATE & ZIP CODE/COUNTRY CA 94303/U.S.A. |
| FULL NAME OF INVENTOR | FAMILY NAME | FIRST GIVEN NAME | SECOND GIVEN NAME |
| RESIDENCE & CITIZENSHIP | CITY | STATE OR FOREIGN COUNTRY | COUNTRY OF CITIZENSHIP |
| POST OFFICE ADDRESS | POST OFFICE ADDRESS | CITY | STATE & ZIP CODE/COUNTRY |

The above identified prior application in which no payment in the issue fee, abandonment of, or termination of proceedings has occurred, is hereby expressly abandoned as of the filing date of this new application. Please use all the contents of the prior application file wrapper, including the drawings, as the basic papers for the new application. (note 37 CFR 1.60 may be used for applications where the prior application is not to be abandoned.)

1. ☐ Enter the amendment previously filed on _____ under 37 CFR 1.116 but unentered in the prior application.

2. ☐ A preliminary amendment is enclosed.

The filing fee is calculated on the basis of the claims existing in the prior application as amended at 1 and 2 above:

| Claims | (1) For | (2) Number filed | (3) Number extra | (4) Rate | (5) Calculations |
|---|---|---|---|---|---|
| | Total Claims | 11 — 20= | – 0 – | X $22.00 | $ – 0 – |
| | Independent Claims | 3 — 3= | – 0 – | X $74.00 | – 0 – |
| | Multiple Dependent Claim(s) (if applicable) | | | +$ 230.00 | – 0 – |
| | | | | Basic Fee | + $710.00 |
| | | | | Total of above calculations = | 710.00 |
| | Reduction by 1/2 for filing by small entity (Note 37 CFR 1.9, 1.27, 1.28) if applicable, affidavit must be filed also. | | | | – 355.00 |
| | | | | Total National Fee $ | 355.00 |

DLEV012246

3. ☒ The Commissioner is hereby authorized to charge fees under 37 CFR 1.16 and 1.17 which may be required, or credit any overpayment to Deposit Account No. 08-1935

4. ☒ A check in the amount of $ 355.00 is enclosed.

5. ☐ A new oath or declaration is included since this application is a continuation-in-part which discloses and claims additional matter.

6. ☒ Amend the specification by inserting before the first line the sentence:

This application is a ☐ continuation-in-part, *now abandoned* ☒ continuation, ☐ division, of application Serial No. 07/896,725 , filed 6/9/92 *wherein*. *still in effect.*

7. ☐ A verified statement claiming small entity status is ~~enclosed (It is enclosed in or will apply to this or the prior application)~~

8. ☐ Priority of application Serial No. ____ filed on ____ in ____ is claimed under 35 U.S.C. 119.

9. ☒ The prior application is assigned of record to ____ Sepracor, Inc.

10. ☐ The power of attorney in the prior application is to: Hamilton, Brook, Smith and Reynolds, P.C.; Associate Power of Attorney to Philip E. Hansen filed July 14, 1993

11. ☒ Also enclosed    Express Mail Certificate

Address all future communications to: (May only be completed by applicant, or attorney or agent of record)

Philip E. Hansen, Heslin & Rothenberg, P.C.

450 New Karner Road, P.O. Box 12695

Albany, New York 12205

It is understood that secrecy under 35 U.S.C. 122 is hereby waived to the extent that if information or access is available to any one of the applications in the file wrapper of a 37 CFR 1.62 application, be it either this application or a prior application in the same file wrapper, the Patent and Trademark Office may provide similar information or access to all the other applications in the same file wrapper.

December 7 , 1993
_____
Date

_____
Signature
Philip E. Hansen, Reg. No. 32,700

☐ inventor(s)
☐ assignee of complete interest
☒ Attorney or agent of record
☐ filed under §1.34(a)



## CERTIFICATE OF MAILING BY "EXPRESS MAIL"

In re Application of: Barberich et al.

METHOD FOR TREATING ASTHMA USING OPTICALLY PURE
(R)-ALBUTEROL

Attorney Docket No.: 0701.027B

"EXPRESS MAIL" MAILING LABEL NO.  TB321785882US

Date of Deposit          December 7, 1993

     I hereby certify that this paper is being deposited
with the U.S. Postal Service "Express Mail Post Office
to Addressee" service under 37 CFR 1.10 on the date
indicated above and addressed to Commissioner of
Patents and Trademarks, Box FWC, Washington, D.C.
20231.


          Rita F. Palumbo
(Typed or printed name of person mailing paper or fee)


          *Rita F. Palumbo*
(Signature of person mailing paper or fee)

DLEV012248

# PATENT APPLICATION FEE DETERMINATION RECORD
### Effective October 1, 1992

**Application or Docket Number** 163581

## CLAIMS AS FILED - PART I

| FOR | NUMBER FILED (Column 1) | NUMBER EXTRA (Column 2) | SMALL ENTITY RATE | FEE | OR | OTHER THAN SMALL ENTITY RATE | FEE |
|---|---|---|---|---|---|---|---|
| BASIC FEE | | | | $355.00 | OR | | $710.00 |
| TOTAL CLAIMS | 11 | minus 20 = * | x$11= | | OR | x$22= | |
| INDEPENDENT CLAIMS | 3 | minus 3 = * | x 37= | | OR | x 74= | |
| MULTIPLE DEPENDENT CLAIM PRESENT | | | +115= | | OR | +230= | |

* If the difference in column 1 is less than zero, enter "0" in column 2.

| | | | TOTAL | 355 | OR | TOTAL | |

## CLAIMS AS AMENDED - PART II

### AMENDMENT A

| | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE | ADDITIONAL FEE | OR | OTHER THAN SMALL ENTITY RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|
| Total | * | Minus | ** | = | x$11= | | OR | x$22= | |
| Independent | * | Minus | *** | = | x 37= | | OR | x 74= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | | + 115= | | OR | +230= | |
| | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

### AMENDMENT B

| | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE | ADDITIONAL FEE | OR | OTHER THAN SMALL ENTITY RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|
| Total | * | Minus | ** | = | x$11= | | OR | x$22= | |
| Independent | * | Minus | *** | = | x 37= | | OR | x 74= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | | + 115= | | OR | +230= | |
| | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

### AMENDMENT C

| | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE | ADDITIONAL FEE | OR | OTHER THAN SMALL ENTITY RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|
| Total | * | Minus | ** | = | x$11= | | OR | x$22= | |
| Independent | * | Minus | *** | = | x 37= | | OR | x 74= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | | +115= | | OR | +230= | |
| | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

FORM PTO-875
(Rev. 10-92)

Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

DLEV012249

 

PATENT APPLICATION SERIAL NO. 08/163581

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

070 TH 12/21/93 08163581                1 201      355.00 CK 0701 027B

PTO-1556
(5/87)

DLEV012250



-1-                           Docket No. SPC89-05

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:  Timothy J. Barberich and James W. Young

Applicant's Docket No.:  SPC89-05     Group Art Unit:  1205

Filed:                              Examiner:

Title:  METHOD FOR TREATING ASTHMA USING OPTICALLY
        PURE R(-) ALBUTEROL

To:  Hon. Commissioner of Patents and Trademarks
     Washington, D.C.  20231

## PRELIMINARY REMARKS

Dear Sir:

This application is a file wrapper continuation of our earlier application, serial number 07/896,725 which is itself a continuation of application serial number 07/461,262.

### Status of Claims

Claims 1 to 12 were presented in the '262 case as originally filed.  Claims 7, 10, 11 and 12 were canceled and claims 13 and 14 were added in the response of September 23, 1991 in the '262 case.  Claims 9, 13 and 14 were canceled and claims 15, 16, 17 and 18 were presented in the response of February 10, 1993 in the '725 case.  Claims 1 to 6, 8 and 15 to 18 are therefore presently pending in the application. Three of these are independent claims (claims 1, 6 and 15).

All of the claims were rejected in the final action of June 7, 1993 (paper number 26) and the rejection was maintained in two subsequent advisory actions (papers 30 and 32).  Thus, the status of the claims at the end of prosecution in the parent ('725) case was as follows:

| Allowed Claims | Claims Objected To | Claims Rejected |
|---|---|---|
| None | None | 1 to 6, 8, 15 to 18 |

DLEV012251

-2-                    Docket No. SPC89-05

### Status of Amendments

An amendment was proffered in applicants' response of
July 23, 1993, but it was not entered.  The amendment is not
believed necessary for further prosecution and has not been
subsequently presented.

### Summary of the Invention

Applicants' invention is directed to a method of treating
asthma and reducing the undesirable side effects associated
with racemic albuterol by using the R isomer of albuterol
substantially free of the S isomer.  R-albuterol may be
combined with a bronchodilator, antihistamine or analgesic.
Methods and pharmaceutical compositions relating to the
combination also fall within the inventive concept.

The administration of $\beta$-agonists for the treatment of
asthma is commonly accompanied by undesirable side effects.
Evidence suggests that $\beta_2$-agonists may make asthma worse,
perhaps by increasing airway hyperresponsiveness to
spasmogens.  This gives rise to the most serious of the side
effects associated with the use of $\beta$-agonists to treat asthma:
death from asthma.  In this regard, Spitzer et al. [New
England Journal of Medicine 326, 501-506 (1992)] have shown
that racemic albuterol, taken by metered dose inhaler, was
associated with an increased risk of death from asthma or near
fatal asthma.  When the odds ratio was calculated with
adjustment for all factors, the increase in risk (to an odds
ratio of 2.8) was clinically important and statistically
significant.

Applicants have surprisingly found that, with regard to
hypersensitivity, there is an unexpected advantage to the use
of the pure R isomer.  Applicants have shown (see the
declaration of Gunnar Aberg accompanying the response of July
23, 1993) that the S isomer causes a hypersensitivity to
allergen and that the desired bronchodilator effect due to the
R isomer is prone to tachyphylaxis (desensitization), whereas

DLEV012252

-3-                Docket No. SPC89-05

the undesired hypersensitivity arising from the S isomer is
less prone to tachyphylaxis.  This means that, in order to
achieve bronchodilation, a patient in chronic treatment
requires ever-increasing doses of racemic albuterol.  While
greater and greater doses of R-albuterol are needed to provide
the desired bronchodilation, the accompanying greater and
greater doses of S-albuterol dramatically increase the
patient's susceptibility to asthmatic attack.  Similar results
have appeared, subsequent to applicants' invention, in two
independent publications from other labs [Morley et al.,
British Journal of Pharmacology, 104, Supplement, 295P (1991)
and Chapman, et al. Tran. In Pharm. Science 13, 231-232
(1992)].  Thus, by eliminating the S-isomer and its
undesirable hypersensitization, applicants have found an
unexpected benefit to the use of the pure R isomer for the
treatment of asthma.


                        Issues
     1.   In the office action of June 7, 1993, a final
rejection in the parent case, the examiner rejected claims 1
to 6 and 15 to 18 over Chemical Abstracts 89:123259m for
"reasons of record."  The reasons of record are found in the
office action of August 20, 1990, in which the examiner states
that the reference teaches the use of albuterol to treat
asthma and that it is his position that the determination of a
particular isomer to employ would be a matter of obvious
alternatives to one skilled in the art.
     2.   The examiner also rejected claims 1 to 5 as
unpatentable under 35 U.S.C. §103 over Brittain et al. [Brit.
J. Pharmacol. 48, 144-147 (1973)], Hartley et al. [J. Med.
Chem. 14, 895 (1971)] and Buckner et al. [JPET 189, 616-625
(1974)].  These references are relied upon to teach "the
greater bronchodilation activity of the R isomer over the S
isomer."
     3.   Claims 6, 8 and 15 to 18 were rejected under 35
U.S.C. §103 as obvious over Brittain et al, Hartley et al, and

DLEV012253

-4-                    Docket No. SPC89-05

Buckner et al, as before and further in view of Chemical
Abstracts "for reasons of record." There is no "record" with
regard to claims 15 to 18, which were newly presented in the
response immediately preceding the rejection. One assumes
from analogy to earlier office actions that the examiner takes
the position that the Brittain, Hartley and Buckner references
teach greater bronchodilation activity of the R isomer, and
that the Chemical Abstracts reference teaches albuterol in
combination with other drugs.

    4.  The examiner's position is that the declaration
under 37 C.F.R. 1.132 of Gunnar Aberg of July 23, 1993 "failed
to show unexpected activity or less undesirable side effects
(e.g. comparative therapeutic indices)."

    5.  The examiner cited the case of In re Adamson [125
USPQ 233] for the proposition that a showing of unexpected
activity in a Rule 132 declaration might not overcome his
obviousness rejection.

                        Argument

Issue 1 - The rejection of claims 1 to 6 and 15 to 18 over
Chemical Abstracts 89:123259m.

    The Chemical Abstracts reference is directed to a
comparison of bronchodilator effects of racemic albuterol and
drug combinations incorporating racemic albuterol. The
reference does not teach or suggest the use of an optically
pure isomer of albuterol either alone or in combination.
Arguably, the reference teaches away from the use of a single
isomer to reduce side effects: it states, "a combination of
salbutamol [albuterol] and hydroxyzine seems, therefore, to be
one rational means of treating asthma with fewer side effects
than the salbutamol-hydroxyzine-theophylline mixture, but
still about the same effectiveness." Thus, the goal of the
reference appears to be to lower the side effects associated
with albuterol. However, rather than separate the enantiomers
and use one enantiomer, as taught by applicants, (which the

DLEV012254

-5-                    Docket No. SPC89-05

examiner has alleged would be obvious) the authors turned
instead to modulating components of the mixture.

The examiner's position that "the determination of a
particular isomer to employ would be a matter of obvious
alternatives" is only true if it is obvious that the use of a
single isomer provides an advantage.  That teaching is
entirely missing from the reference.  In this regard, it is
worth noting that the mere fact that enantiomers exist does
not render the use of a particular enantiomer obvious.  In
order to use an enantiomer, one must first prepare or isolate
the single pure enantiomer.  Because chemical resolution of a
racemic mixture is never 100% efficient, a resolution will
always yield less than 50% of the single isomer.  Chiral
syntheses are similarly expensive and/or inefficient.  As
stated by others (e.g., European patent application 256586,
page 2, line 8) "a major reason for the continued use of
mixtures of stereoisomers is that the cost of separation of
the stereoisomers exceeds the potential advantage of a
possible increase in activity."  It would not have been
obvious to prepare and use optically pure R-albuterol because
there is no suggestion of any advantage of R-albuterol in the
reference.

Issue 2 - The rejection of claims 1 to 5 as obvious over
Brittain et al., Hartley et al. and Buckner et al.

Brittain et al. show that both enantiomers and the
racemic mixture of albuterol are very selective for $\beta_2$
receptors, but the isomeric activity ratio of R- and S-
albuterol on isolated tracheal muscle ($\beta_2$) vs atrial muscle
($\beta_1$) is "impossible to calculate...because the isomers are
virtually inactive on this tissue."  The potency ratio of R(-)
vs racemic albuterol in $\beta_2$ receptors as measured by
acetylcholine-induced bronchospasm in anesthetized guinea pigs
is 1.28, in acetylcholine-induced pulmonary resistance in
anesthetized dogs is 2.3 and on isolated guinea pig trachea is

DLEV012255



0.90 (i.e. the racemate is 1.1 times as potent as the R isomer). Thus, from a study of the Brittain reference one may conclude nothing definitive regarding either the selectivity of R vs racemic or of the potency of R vs racemic.

Hartley and Middlemiss teach that both isomers and the racemic mixture of albuterol act on $\beta_2$ receptors rather than $\beta_1$ receptors. The effects of the R isomer and the racemic mixture are equiactive on $\beta_2$ receptors of the intact guinea pig trachea and indeed the racemate is reported to be 1.5 times as potent as the R isomer. There is no clear teaching with regard to selectivity between $\beta_1$ and $\beta_2$-receptors, which might indicate the potential for side effects. Thus no conclusion can be drawn from Hartley and Middlemiss as to whether the R isomer would enjoy any advantage over racemic albuterol in terms of side effects.

The study by Buckner and Abel examines the ratio of activity of the R and S isomers of albuterol in guinea pig atria and guinea pig trachea. They concluded "even though the potencies of single isomers may differ as much as twenty-four fold between atria and trachea, the stereoselectivity for production of activity is the same." That is, the selectivity, as measured by the ratio of tracheal to atrial activity, is the same for the two isomers. Buckner did not examine racemic albuterol, so no conclusion can be drawn as regards any potency advantage of a single pure R isomer vs the racemate.

In an earlier office action (December 9, 1991) the examiner had rejected the same claims over an additional reference by Hawkins et al. [J. Med. Chem. 16, 856-857 (1973)]. Although the rejection over Hawkins was not maintained in the final office action, it appears pertinent to the substance of the rejection, which might otherwise lack a balanced consideration of the art. In their studies, Hawkins et al. found that the R enantiomer was 2.15 times as potent as the racemate. They did not examine any tissue other than guinea pig trachea so that no conclusion relating to relative

DLEV012256

selectivity could be drawn.

The issue of patentability must be approached "in terms of what would have been obvious to one of ordinary skill in the art at the time the invention was made in view of the sum of all of the relevant teachings in the art ..." [In re Kuderna (165 USPQ 575)]. There are two teachings that could have rendered the use of R-albuterol obvious: (1) a teaching that it is more than twice as potent as the racemate (which would indicate that the S-isomer's activity is antagonistic to the R-isomer's potency); or (2) a teaching that fewer side effects are associated with the R isomer. Neither of these teachings is found in any of the references. However, the art is not silent on what the person of skill ought to expect; it teaches that there is nothing to be gained, either in potency or side effects, by resolving the racemic albuterol. Hawkins et al. and Buckner et al. appear to indicate that the R isomer is about twice as potent as the racemate (which merely indicates that the S-isomer is inert). Hartley et al. teaches that the racemate is about 1.5 times as potent as the R isomer (which would indicate that the S-isomer has some therapeutic potency); Brittain et al. indicates that one or the other isomer is more potent, depending on the test. There is a certain lack of agreement among the references concerning the relative potency of the R isomer and the racemate, and the person of ordinary skill in the art would be, at least, confused by the cited references.

If one ignores some of the references, it appears that the R isomer may enjoy a theoretical twofold potency advantage over the racemate. However, even assuming that R-albuterol is twice as potent as the racemate, this would not motivate a person of skill and experience in the pharmaceutical industry to prepare and administer the pure R isomer. This is because, as discussed above, a process for the resolution of racemic albuterol would inevitably produce R-albuterol in less than 50% yield, whereas assuming that S-albuterol is totally inert ballast, the use of the racemic albuterol would, at worst,



provide 50% of the potency of the pure R. Thus there is
nothing to be gained by resolving the racemate. A potency
ratio significantly greater than two between a single
enantiomer and its racemate would be consistent with
antagonism by one enantiomer and would provide motivation for
resolving the racemate. However, no such teaching is found in
any of the references, even when viewed selectively.
Therefore at the time of filing, the art did not, on the basis
of potency, suggest any practical advantage to using pure R
albuterol.

A second basis for separating enantiomers would be to
provide lessened side effects. Indeed, the unexpected
diminution in side effects when the pure R isomer of albuterol
is administered is the basis of the instant application, but
it is not suggested by any of the references. As explained in
the July 23, 1993 declaration of Gunnar Aberg, side effects of
drugs that have a predominant $\beta_2$ agonist component can arise
from four presently recognized interactions: (a) non-
adrenergic effects; (b) interaction of the $\beta$-agonist with $\alpha$-
receptors; (c) interaction of the $\beta_2$ agonist with $\beta_1$ receptors;
and (d) interaction of the $\beta_2$ agonist with $\beta_2$ receptors.

(a) Non-adrenergic effects can be triggered by
interaction with any of the hundreds of other
receptors and by non-receptor interactions, and they
can originate from portions of the drug molecule
outside the $\beta_2$ pharmacophore. They are, for this
reason, difficult to predict or screen for.
Applicants are aware of no teachings in the
literature of relative liabilities of racemate or
enantiomers of albuterol as regards non-adrenergic
effects, and theoretically such differences would be
improbable.

(b) Interaction of $\beta$-agonists with $\alpha$-receptors
are known in first generation adrenergics but are
not generally of clinical significance in second
generation agonists like albuterol. Likewise,

DLEV012258



-9-                    Docket No. SPC89-05

applicants are aware of no art that would suggest
any distinction between racemate and enantiomers on
this basis.

(c)  The interaction of $\beta_2$ agonists with $\beta_1$
receptors, causing pulmonary agents to exhibit
cardiac side effects, is well documented and has
been discussed above for Brittain, Hartley, Buckner
and Hawkins.  The literature cited provides no
evidence for an advantage of either enantiomer of
albuterol on the basis of $\beta_1$ vs. $\beta_2$ specificity.

(d)  The fourth interaction, $\beta_2$ agonists acting
at $\beta_2$ receptors giving rise to tachyphylaxis and
sensitization, is known but not described in any of
the references cited for albuterol.

Thus, in January of 1990 when the grandparent of the
present application was filed, there was no teaching in the
art that the use of pure R-albuterol enjoyed any advantage in
diminution of side effects.


Issue 3 - The rejection of claims 6, 8 and 15 to 18 over
Brittain et al, Hartley et al, Buckner et al and Chemical
Abstracts.


The inadequacy of Brittain, Hartley and Buckner to
support the rejection of applicants' claims to the use of R-
albuterol has been presented above.  The addition of the
Chemical Abstracts reference, while indicating that racemic
albuterol has been used with other drugs, does not supply the
missing teaching regarding the advantage of the use of the R
isomer in diminishing side effects.


Issue 4 - The setting aside of the Declaration of Dr. Gunnar
Aberg.


Accompanying the response of July 23, 1993, applicants
provided a declaration from Dr. Gunnar Aberg to establish that



his results and those of Chapman and of Morley would indicate
to the person of skill in the art that the R isomer would have
a higher therapeutic index in humans than would the racemate.
Dr. Aberg averred that the tests relied on as evidence are
accepted in the art as being predictive of efficacy in
treating humans; the pending method of use claims are narrowly
drawn to the specific use for which the tests are predictive.
[See Ex parte Chwang (231 USPQ 751).]  Dr. Aberg's
credentials were presented in the declaration and his
conclusions as to side effects and unexpected activity cannot
be set aside by the examiner without some basis for so doing.
None was presented.  Therefore it is presumed that the
declaration is accepted for what it teaches; namely, that a
person of skill in the art would accept the studies in guinea
pig trachea and the experiments of Chapman et al. and Morley
et al. (described below) as predictive of a higher therapeutic
index for R-albuterol.  Applicants believe that the examiner's
position that the declaration "failed to show unexpected
activity or less undesirable side effects" cannot be
maintained.

　　　Dr. Aberg described experiments carried out in his
laboratory in which isolated tracheal muscle preparations were
subjected to graded doses of a spasmogen.  It was found that
the contractile response to the spasmogen was significantly
increased in bronchial tissue strips that had been incubated
with S-albuterol.  No such effect was seen in the tissues that
had been incubated with R-albuterol.  Dr. Aberg concluded that
the increased sensitivity to spasmogens from treatment with S-
albuterol was due to a direct effect on bronchial smooth
muscle.

　　　Subsequent to the filing of applicants' original
application, Morley et al. (op. cit.) and Chapman et al. (op.
cit.) independently disclosed that the S isomer in bronchial
tissue causes a hypersensitivity to allergen.  Chapman et al.
stated, "It has long been recognized that the use of
sympathomimetics for asthma therapy is associated with a range

DLEV012260

of inconsistent or frankly paradoxical effects...our findings indicate that it may be prudent to remove enantiomers that were previously thought to be biologically inert." Thus Morley and Chapman came to the same conclusion as applicants' original disclosure, and did so with the same understanding of the prior art as a whole: namely, that no expectation of an improved side effect profile was previously attached to the use of a single enantiomer.

In the period since the final office action of June 7, 1993 in the parent case, additional support for the conclusions drawn in the Aberg declaration has come to the attention of applicants. British patent application 2,255,503, filed more than a year after applicants' '262 application, discloses that the long standing problems inherent in therapy with albuterol and other $\beta_2$ sympathomimetic bronchodilators may unexpectedly be ameliorated by the expedient of administering the drug not, as hitherto, in the form of a racemic mixture, but as the R isomer (page 8, line 25 to line 33 of the copy enclosed). The problems that may be avoided are enumerated on page 12. A series of experiments is disclosed at page 15 to page 16 in which guinea pigs were challenged with intravenous histamine after intravenous infusion of S-albuterol or vehicle. The results indicated a profound hypersensitivity induced by S-albuterol. The British application comes to the same conclusion as did Dr. Aberg in his declaration: subjects receiving R-albuterol will exhibit a lessened tendency to hyperreactivity with equivalent benefit in terms of bronchodilator action (see page 24, line 3 to line 8 of GB 2,255,503).

This evidence of unexpected activity cannot, as a matter of law, be disregarded by the examiner. [In re Merck, 231 USPQ 375, 380 (Fed. Cir. 1986).]

Issue 5 - The applicability of the decision In re Adamson.

In the office action of June 7, 1993, the examiner indicated that no showing (even if applicants have made one)

DLEV012261

-12-                    Docket No. SPC89-05

would be persuasive in view of the decision *In re Adamson*.
Although *In re Adamson* teaches that optical isomers *per se* are
normally obvious over the corresponding known racemate, the
decision should not be extended to stand for the proposition
that a new method for using an isomer is unpatentable,
particularly where, as here, the method unexpectedly provides
an improved therapeutic ratio. For example, the claims of
U.S. patent 4,851,444 (to Sunshine et al.) cover a method for
using S-(+)-ibuprofen for onset-hastened analgesia, although
(S)-ibuprofen *per se* was well known at the time of filing the
application for a new use.

In *Adamson*, the CCPA held that in establishing that one
isomer was more potent, the applicants had "done no more than
what is suggested by the prior art and have ascertained no
more than what would be expected by one skilled in the art"
[Emphasis added]. Applicants' showing goes far beyond the
evidence of enhanced potency at issue in *Adamson*. In the
present case, applicants have shown that the resolution of the
racemate and the use of R-(-)-albuterol substantially free of
its S-isomer would provide therapy for asthma while
simultaneously reducing side effects. As explained above,
this is not suggested by the prior art. To the contrary, the
art suggests that there would be no reduction in side effects.
Thus, the decision in *Adamson* has no bearing on the
patentability of this application.

Respectfully submitted,

Philip E. Hansen
Agent for Applicant
Registration No. 32,700

Dated: December 7, 1993
HESLIN & ROTHENBERG, P.C.
450 New Karner Road
P.O. Box 12695
Albany, New York 12212-2695
Telephone: (518) 452-5600
Facsimile: (518) 452-5579

DLEV012262

#34

Sheet 1 of 1

| INFORMATION DISCLOSURE CITATION | Docket No. 0701.027B | Serial No. 08/163,551 |
|---|---|---|
| | Applicant: Barberich et al. | |
| | Filing Date: | Group: 1205 |

## U.S. PATENT DOCUMENTS

| Examiner Initial | Document Number | Date | Name | Class | Subclass | Filing Date If Appropriate |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | Document Number | Date | Country | Class | Subclass | Translation Yes | No |
|---|---|---|---|---|---|---|---|---|
| PG | A | 2255503 | 07/1992 | Great Britain | | | X | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

## Other Documents (including Author, Title, Date, pertinent public. etc.)

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |

Examiner: [signature]    Date Considered: 2/24/94

DLEV012263





126
1-27-9
030

# 25

THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:   Barberich et al.

Serial No.:   08/163,581        Group Art Unit:  1205

Filed:     December 7, 1993      Examiner: unknown

Title:     METHOD FOR TREATING ASTHMA USING
            OPTICALLY PURE R(-) ALBUTEROL

## NOTIFICATION OF CHANGE IN CORRESPONDENCE ADDRESS

TO: HON. COMMISSIONER OF PATENTS AND TRADEMARKS
     Washington, D.C. 20231

Dear Sir:

    Notification is hereby given that effective January 1, 1994
the correspondence address for the above-referenced application
is:

              Philip E. Hansen
          Heslin & Rothenberg, P.C.
            5 Columbia Circle
        Albany, New York  12203-5160

                 Respectfully submitted,

                 Philip E. Hansen
                 (Reg. No. 32,700)

Dated: Jan 19, 1994

Heslin & Rothenberg, P.C.
5 Columbia Circle
Albany, New York  12203-5160
Telephone: (518) 452-5600
Facsimile: (518) 452-5579

MPF-28

DLEV012264



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 08/163,581 | 12/07/93 | BARBERICH | T | SPC8905 |

12M2/0225

PHILIP E. HANSEN
HESLIN & ROTHENBERG, P.C.
5 COLUMBIA CIRCLE
ALBANY, NY 12203-5160

HENLEY    EXAMINER

| ART UNIT | PAPER NUMBER |
|---|---|
| 1205 | 36 |

DATE MAILED: 02/25/94

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☒ This application has been examined    ☒ Responsive to communication filed on _12/7/93_    ☐ This action is made final.

A shortened statutory period for response to this action is set to expire _3_ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☒ Notice re Patent Drawing, PTO-948.
3. ☒ Notice of Art Cited by Applicant, PTO-1449.
4. ☒ Notice of Informal Patent Application, Form PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐ _____

**Part II    SUMMARY OF ACTION**

1. ☒ Claims _1-6, 8 And 15-18_ are pending in the application.

Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims _____ have been cancelled.

3. ☐ Claims _____ are allowed.

4. ☒ Claims _1-6, 8 And 15-18_ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____ Under 37 C.F.R. 1.84 these drawings are ☐ acceptable ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been ☐ approved by the examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed on _____ has been ☐ approved. ☐ disapproved (see explanation).

12. ☐ Acknowledgment is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. _____ filed on _____

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

**EXAMINER'S ACTION**

PTOL-326 (Rev. 9-83)

DLEV012265

Serial Number: 08/163,581                                          -2-
Art Unit: 1205

### CLAIMS 1-6, 8 AND 15-18 ARE PRESENTED FOR EXAMINATION

---

Applicants' amendment, preliminary remarks and the Information Disclosure Statement filed December 7, 1993 have been received and entered into the application. Accordingly, the specification at page 1 has been amended and as reflected by the attached, completed form PTO-1449, the submitted reference has been considered.

---

Claims 1-6 and 15-18 remain rejected under 35 U.S.C. § 103 as being unpatentable over Chemical Abstracts 89:123259m (Muittari et al.), already of record, for the reasons of record as maintained in the last Office action dated August 12, 1993.

Applicants' arguments have been carefully considered, but fail to persuade the Examiner of error.

Applicants have averred that the reference does not teach or suggest the use of an optically pure isomer of albuterol either alone or in combination. While the Examiner does agree that an optically pure isomer of albuterol is not highlighted, it cannot be agreed that such an isomer is not suggested by the authors. The individual isomers would have been obvious variants over the corresponding racemate because of their presence in the racemate. It would further have been expected that each isomer would not possess the same efficacy

DLEV012266

Serial Number: 08/163,581                                    -3-
Art Unit: 1205

or side effect profile since the racemate would be expected to exhibit the

combined effects of the isomers.

Also, it is argued that the reference teaches to lower the side effects

associated with albuterol and thus away from the presently claimed invention

because of the adjunctive use of hydroxyzine. Applicants find support for this

position in the statement by Muittari et al. that "a combination of salbutamol and

hydroxyzine seems, therefore, to be one rational means of treating asthma with

fewer side effects than the salbutamol-hydroxyzine-theophylline mixture, but still

about the same effectiveness". The Examiner, however, cannot agree and finds

this statement to mean that the salbutamol-hydroxyzine combination produced

fewer side effects than the salbutamol-hydroxyzine-theophylline combination

because in the former, theophylline, a known central nervous system stimulant,

was absent.

Applicant further argues that it would have only been obvious to employ one

of the isomers of the racemate if it were obvious that one of the isomers provided

an advantage over the other. However, as expressed above, it would have been

obvious to the skilled artisan that each isomer would not possess the same

efficacy or side-effect profile as the other given that the activity exhibited by the

racemate would have been recognized as being the result of the additive actions of

each isomer.

DLEV012267

Serial Number: 08/163,581                                        -4-
Art Unit: 1205

Applicants also offer at page 5 that "it is worth noting that the mere fact that enantiomers exist does not render the use of a particular enantiomer obvious" (emphasis original). The Examiner cannot concur given the court's finding in In re Adamson et al., 275 F2d 952, 125 USPQ 233 (CCPA 1960) and Brenner et al. v. Ladd, Comr. Pats., 171 F2d 319, 80 USPQ 150 (CCPA 1948) that an optically active isomer is unpatentable over a prior art racemate or optical isomer of opposite rotation in the absence of unexpected or unobvious beneficial properties.

Thus, for these reasons, the claims are deemed to be properly rejected.

Claims 1-5 remain rejected under 35 U.S.C. § 103 as being unpatentable over Brittain et al., Hartley et al. and Buckner et al., each of record, for the reasons of record as maintained in the last Office action in further view of Hawkins et al., also already of record.

Applicants' arguments have been carefully considered, but fail to persuade the Examiner of error in his determination.

Respecting Brittain et al., applicants conclude at page 6 of their remarks that "from a study of the Brittain reference one may conclude nothing definitive regarding either the selectivity or R vs racemic or of the potency of R vs racemic." However, the statement in Brittain at the sentence bridging pages 146-7 that "It was not surprising therefore, to find that (-) salbutamol was much more active than (+) salbutamol.", clearly speaks to the contrary.

DLEV012268