```
                     IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF DELAWARE

SEPRACOR INC.,                         :
                                       :
           Plaintiff,                  :
                                       :
      v.                               :
                                       :
DEY, L.P. and DEY, INC.,               :
                                       :
           Defendant.                  :
                                       : Civil Action No. 06-113-JJF
_____ _____ _____        : (CONSOLIDATED)
                                       :
SEPRACOR INC.,                         :
                                       :
           Plaintiff,                  :
                                       :
      v.                               :
                                       :
BARR LABORATORIES, INC.,               :
                                       :
           Defendant.                  :
                                       :
```

Joseph M. O'Malley, Jr., Esquire and Bruce M. Wexler, Esquire of
PAUL, HASTINGS, JANOFSKY & WALKER, LLP, New York, New York.
Jack B. Blumenfeld, Esquire and Karen Jacobs Louden, Esquire of
MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware.

Attorneys for Plaintiff, Sepracor Inc.

Edgar H. Haug, Esquire and Sam V. Desai, Esquire of FROMMER,
LAWRENCE & HAUG, New York, New York.
Elizabeth A. Leff, Esquire of FROMMER, LAWRENCE & HAUG,
Washington, D.C.
Steven J. Balick, Esquire; John G. Day, Esquire and Tiffany Geyer
Lydon, Esquire of ASHBY & GEDDES, Wilmington Delaware.

Attorneys for Defendants, Dey, L.P. and Dey, Inc.

George C. Lombardi, Esquire; Imron T. Aly, Esquire and Elizabeth
H. Erickson, Esquire of WINSTON & STRAWN LLP Chicago, Illinois.
Richard K. Herrmann, Esquire and Mary B. Matterer, Esquire of
MORRIS JAMES LLP, Wilmington Delaware.

Attorneys for Defendants, Barr Laboratories, Inc..

_____

**MEMORANDUM OPINION**

December 18, 2008
Wilmington, Delaware

Farnan, District Judge

This action was filed by Plaintiff Sepracor Inc.
("Sepracor") against Defendants Dey, L.P., Dey, Inc., and Barr
Laboratories, Inc. (collectively, "Defendants") alleging
infringement of United States Patent Nos. 5,362,755 ("the '755
patent"); 5,547,994 ("the '994 patent"); 5,760,090 ("the '090
patent"); 5,844,002 ("the '002 patent") and 6,083,993 ("the '993
patent") (collectively the "patents-in-suit"). The parties
briefed their respective positions on claim construction, and the
Court conducted a Markman hearing on the disputed terms. This
Memorandum Opinion provides the Court's constructions of the
disputed terms.

## BACKGROUND

The patents-in-suit all claim priority to the single parent
application that ultimately resulted in the '755 patent, and they
all share the same specification. Briefly, the patents-in-suit
pertain to methods of using the optically pure R(-) isomer of
albuterol to treat bronchial disorders while at the same time
reducing side effects associated with the use of the racemic
mixture of albuterol.

## DISCUSSION

## I. The Legal Principles of Claim Construction

Claim construction is a question of law. Markman v.
Westview Instruments, Inc., 52 F.3d 967, 977-78 (Fed. Cir. 1995),

1

aff'd, 517 U.S. 370, 388-90, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). When construing the claims of a patent, a court considers the literal language of the claim, the patent specification and the prosecution history. Id. at 979. Of these sources, the specification is "always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." Phillips v. AWH Corporation, 415 F.3d 1303, 1312-17 (Fed. Cir. 2005)(quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). However, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004)(quoting Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

A court may consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, in order to assist it in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. Phillips, 415 F.3d at 1318-19; Markman, 52 F.3d at 979-80. However, extrinsic evidence is considered less reliable and less useful in claim construction than the patent

and its prosecution history. Phillips, 415 F.3d at 1318-19
(discussing "flaws" inherent in extrinsic evidence and noting
that extrinsic evidence "is unlikely to result in a reliable
interpretation of a patent claim scope unless considered in the
context of intrinsic evidence").

In addition to these fundamental claim construction
principles, a court should also interpret the language in a claim
by applying the ordinary and accustomed meaning of the words in
the claim. Envirotech Corp. v. Al George, Inc., 730 F.2d 753,
759 (Fed. Cir. 1984). If the patent inventor clearly supplies a
different meaning, however, then the claim should be interpreted
according to the meaning supplied by the inventor. Markman, 52
F.3d at 980 (noting that patentee is free to be his own
lexicographer, but emphasizing that any special definitions given
to words must be clearly set forth in patent). If possible,
claims should be construed to uphold validity. In re Yamamoto,
740 F.2d 1569, 1571 (Fed. Cir. 1984).

## II.  The Meaning of the Disputed Terms

The core dispute among the parties is the scope of the term
"side effects," which is used in most of the asserted claims.
The following claim from the '755 patent is illustrative of how
this term is used in the asserted claims:

3

> 1. A method of treating asthma in an individual with
> albuterol, while reducing side effects associated with
> chronic administration of racemic albuterol, comprising
> chronically administering to the individual a quantity
> of an optically pure R(-) isomer of albuterol
> sufficient to result in bronchodilation while
> simultaneously reducing undesirable side effects, said
> R isomer being substantially free of its S(+) isomer.

In general, Defendants maintain that the claims should be limited

to the reduction of specific "side effects" set forth in the

specification, while Sepracor contends that the term should be

understood more broadly.

Although the exemplary claim above refers explicitly to

"asthma" treatment, not all asserted claims include an explicit

"asthma" limitation. Such a claim from the '002 patent is as

follows:

> 1. A method of inducing bronchodilation or providing
> relief of bronchospasm, comprising administering to an
> individual a quantity of optically pure R-(-) albuterol
> sufficient to induce said bronchodilation.

A subsidiary dispute among the parties is whether claims such as

these should be limited specifically to the treatment of asthma

or an asthma attack, notwithstanding the lack of an explicit

reference to "asthma."

Finally, some of the asserted claims refer to either

"chronic administration" or "acute administration" of R(-)

albuterol. See, e.g., '090 patent claim 1; '994 patent claim 1.

An additional subsidiary dispute among the parties concerns the

meaning of these terms.

4

## A. "Side Effects"

| Sepracor's Construction | Dey's Construction | Barr's Construction |
|---|---|---|
| The side effects are those associated with chronic administration of racemic albuterol. The side effects are not limited in scope to the examples that are specifically identified in the patent specification. | Beta-adrenergic and teratogenic side effects associated with the periodic or prophylactic administration of albuterol that are caused directly by the S(+) enantiomer of albuterol. | Central nervous system effects (such as tremor, nervousness, shakiness, dizziness and increased appetite), cardiac effects (such as cardiac arrhythmia), and teratogenic effects associated with chronic administration of racemic albuterol. |

### 1. The Parties' Contentions

Dey contends that the term "side effects" is limited to "beta adrenergic" and "teratogenic" side effects caused directly by the S(+) enantiomer of albuterol. In support of this position, Dey notes that the specification explains that "it is important to have a composition which is a potent broncho-dilator and which does not exhibit the adverse side effects of many beta-adrenergic drugs." (D.I. 264 at 21 (citing '755 patent at 1:50-53).) Dey further notes that the specification explains that "certain levels of racemic albuterol can cause teratogenic effects . . . ." (Id. at 1:63-66.) Based on these excerpts from the specification, Dey argues that the term side effects must be limited to "beta adrenergic" and "teratogenic" side effects. Dey

5

further contends that "side effects" encompasses only effects caused "directly" by the S(+) enantiomer of albuterol. For this limitation, Dey relies on the prosecution histories, noting, for instance, that the patentee argued during prosecution of one patent that his "invention clearly distinguishes over the prior art by specifying the R(-) isomer, rather than the racemate or the S(+) isomer, to result in bronchodilation and to reduce undesirable side effects associated with beta-adrenergic drugs . . . ." (D.I. 265, Exh. 10 at DLEV012082.)

A point of great contention is whether certain side effects, most notably airway hyperreactivity, that were allegedly discovered only after filing should be excluded from the definition of "side effects." Dey notes that during prosecution of the '755 patent, the patentees stated that "applicants did not specifically disclose airway hyperreactivity as a side effect to be avoided by the use of the pure R isomer . . . ." (Id. at DLEV012278.) Thus, according to Dey, the patentees conceded that there was no support in the specification to include "airway hyperreactivity" in the definition of "side effects." (D.I. 264 at 23.) Dey further contends that reduction of airway hyperreactivity was unknown to the inventors at the time of filing and was, in fact, identified by other researchers. (Id.) In these circumstances, Dey argues, including airway hyperreactivity in the definition of "side effects" improperly

expands the scope of Sepracor's patent beyond what the patentees were actually in possession of at the time of filing. (See id. at 22-23.) Thus, in its claim construction Answering Brief, Dey clarifies that its construction is intended to encompass only "side effects typically associated with beta-adrenergic drugs as of the priority date . . . ." (D.I. 279 at 3 n.3 (emphasis added).) Whether Sepracor is attempting to improperly expand the scope of its claims to encompass side effects discovered only after filing appears to be the key dispute among the parties.

Like Dey, Barr relies on the specification for its construction of "side effects," contending that the patentees "defined" the term in the specification when stating that "[t]hese side effects include central nervous system effects, such as tremor, nervousness, shakiness, dizziness and increased appetite, and cardiac effects, such as arrythmia," and could include "teratogenic effects associated with albuterol." (D.I. 270 at 11 (quoting '755 patent at 3:25-35).) Accordingly, Barr's construction limits the term "side effects" to these specific side effects, and would categorically exclude airway hyperreactivity from the definition of "side effects." Barr argues strenuously that any broader construction would render the claims invalid as indefinite or invalid under the written description requirement. (D.I. 270 at 12-17.) With regard to indefiniteness, Barr argues that the "side effects" claim term

7

"was the one and only distinction Sepracor made over the prior art," and, as such, requires both special focus and a construction that provides a "definite boundary" as to what "side effects" are within the scope of the claim. (D.I. 270 at 13.) With regard to written description, Barr, like Dey, contends that at the time of filing it disclosed the "side effects" it was aware of in the specification and cannot now, through a broad claim construction, claim "side effects" that were discovered post-filing. (Id. at 14-17.)

Sepracor contends that the term "side effects" should not be limited to the specific side effects mentioned in the specification. Sepracor notes that in listing "side effects" the patent prefaces such lists with phrases like "for example" or "such as," making clear that the listed side effects were not intended to be exhaustive. (D.I. 268 at 10-11.) Sepracor further contends that it would be unreasonable to limit "side effects" to those listed in the specification because certain claims of the '755 patent were allowed precisely on the basis of the term "side effects" not being limited to one of the many examples set forth in the specification. (Id. at 11.) Specifically, Sepracor notes that during prosecution of the '755 patent, Dr. Gunnar Aberg, the Vice President of Research and Development at Sepracor, submitted to the PTO a declaration and two accompanying journal articles demonstrating that airway

hyperreactivity was reduced through the use of the optically pure
R(-) isomer of albuterol. (See D.I. 265, Exh. 10 at DLEV012149-
57.) Because the journal articles appeared subsequent to filing,
the patentees argued, they supported the notion that, at the time
of filing, side effect reduction through the use of the optically
pure R(-) isomer of albuterol was unexpected. (Id. at
DLEV012125-26.) The patentees further argued that although the
specification did not explicitly disclose airway hyperreactivity,
it is "certainly a side effect and avoiding airway
hyperreactivity could be said to reasonably flow from the
disclosure of avoiding side effects." (Id. at DLEV012278.)
Ultimately, the examiner allowed the claims, stating that, in his
opinion, the Aberg declaration established that it would not have
been expected from the prior art that R(-) albuterol did not
cause airway hyperreactivity. (Id. at DLEV012293.) With the
claims having been allowed for this reason, Sepracor maintains
that it would be unreasonable to exclude airway hyperreactivity
from their scope.

### 2. The Court's Construction

The Court will first address the ostensibly core issue of
whether Sepracor is attempting to improperly expand the scope of
its claims to encompass "side effects," most notably airway
hyperreactivity, that were allegedly discovered only after
filing. None of the cases cited by the parties appear to be

9

precisely on point. Sepracor relies on a set of cases that
allegedly stand for the proposition that patent claims can in
fact encompass "after-arising" technology. However, in the cases
relied upon by Sepracor, a recurring theme is that at the time of
filing the allegedly "after-arising" technology was in fact known
in the art.[1]  Here, by contrast, there is little to suggest that
at the time of filing Sepracor was aware that the use of
optically pure R(-) albuterol could reduce airway
hyperreactivity.  Furthermore, unlike the cases cited by
Sepracor, it is clear from the claim language and prosecution
history that the term "side effects" is at the very essence of

_____

[1] See, e.g., Superguide Corp. v. DirecTV Enters., 358 F.3d
870, 879 (Fed. Cir. 2004) ("Although analog may have been the
dominant format of video data when the '578 patent application
was filed, we have little doubt that those skilled in the art
knew of the existence of digital video data at the time.");
Marsh-McBirney, Inc. v. Montedoro-Whitney Corp., 882 F.2d 498,
504 (Fed. Cir. 1989) ("At the time of the invention, acoustic
probes were part of the prior art. Marsh was aware of them, and
testified that he chose to use the electromagnetic probe because
it best served his needs. But that is not to say that he excluded
acoustic probes from his patent."); Bd. of Trs. v. Roche
Molecular Sys., 528 F.Supp.2d 967, 980 (N.D. Cal. 2007)("[T]his
new type of antiretroviral therapy was anticipated.  Articles
published in 1990 and 1991 discussed protease inhibitors,
indicating they were known. It just took three or four years for
their development and availability.").

the invention. Indeed, during prosecution, the patentees repeatedly distinguished the prior art on the basis of the R(-) isomer reducing side effects, further explaining that "[t]he thrust of Applicant's invention is the reduction of side effects, which arise in the treatment of asthma with racemic albuterol . . . ." (D.I. 271, Exh. 13 at 2-3; see generally D.I. 270 at 3-6.) Thus, construing the term "side effects" to cover after-arising technology in this case may very well be at odds with the rationale - most often employed in doctrine of equivalents cases - for allowing patents to cover such technology. See, e.g., Varco, L.P. v. Pason Sys. USA Corp., 436 F.3d 1368, 1376 (Fed. Cir. 2006) ("Because this case seems to present an instance of after-arising technology (e.g., improvements on prior innovations), the district court may find it appropriate to consider infringement under the doctrine of equivalents."); Datascope Corp. v. Smec, Inc., 776 F.2d 320, 326 (Fed. Cir. 1985) ("As this court and its predecessor courts have stated, 'an embellishment' made possible by technological advances may not permit an accused device to escape 'the web of infringement.'").

Defendants, on the other hand, rely principally on Schering Corp. v. Amgen, Inc., 222 F.3d 1347 (Fed. Cir. 2000). In Schering, the parties disputed the meaning of the term "IFN-α," which, at the time of filing, was understood to refer to only a single type of protein. Id. at 1353. However, at the time of

11

litigation, scientists understood the term to refer to several
families of proteins. Id. at 1353-54. Nevertheless, the Federal
Circuit held that the mere use of this term "did not and could
not enlarge the scope of the patent to embrace technology arising
after its filing." Id. at 1353. Unlike the cases cited by
Sepracor, the Schering case provides no indication that the
alleged after-arising protein was, at the time of filing, known
or otherwise suggested in the art.

However, critical to the result in Schering was that the
Federal Circuit had understood the patentee as having "expressly"
limited the meaning of "IFN-$\alpha$" to encompass only the single
protein described in the original application. Id. Here, by
contrast, there is no clear expression limiting or defining the
term "side effects" to be those set forth in the original
application. Indeed, post-Phillips, there remains a high bar for
the court to conclude that the patentee explicitly defined a term
within the specification. See, e.g., Abbott Labs. v. Andrx
Pharms., Inc., 473 F.3d 1196, 1210-11 (Fed. Cir. 2007)
(overruling a district court that concluded that the phrase
"[t]he pharmaceutically acceptable polymer is a water-soluble
hydrophilic polymer . . ." amounted to an express definition of
"pharmaceutically acceptable polymer"). Here, as Sepracor
correctly notes, the specification refers to specific "side
effects" not with definitional language, but with language

12

suggesting that the enumerated side effects are merely exemplary. (See, e.g., '755 patent at 1:47-50 ("side effects, such as central nervous system stimulatory effects and cardiac arrhythmia"); id. at 2:6-9 (referring to "undesirable side effects, for example, central nervous system stimulatory effects and cardiac disorders").) This militates against adopting either Dey's or Barr's construction, both of which essentially propose to limit the term "side effects" to those specifically set forth in the specification.

Furthermore, unlike Schering, where the disputed claim term was "IFN-$\alpha$," the disputed claim term here, "side effects," is not clearly technical in nature, but is a general term amenable to facile understanding. As the Federal Circuit explained in Phillips, "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005). The Court views this case as being in that category. Accordingly, rather than limit the claims to specific side effects in the specification, the Court will construe "side effects" to be, as Sepracor contends, effects other than the desired therapeutic

effect associated with the administration of racemic albuterol.
(See D.I. 302 at 111; D.I. 283 at 3.)

     With this construction, the Court has not accepted Dey's
proposal that side effects be limited to those caused "directly"
by the S(+) enantiomer of albuterol.  The claims plainly
associate the "side effects" with the administration of "racemic
albuterol" and are not limited to the side effects associated
with a particular enantiomer.  Though certain statements in the
prosecution histories can be interpreted as characterizing "side
effects" to be associated with only the S(+) isomer of albuterol,
other statements are clear that the claim language is referring
broadly to side effects "associated with the racemic mixture or
the therapeutically inactive isomer, i.e. the S(+) isomer, of
albuterol, but not with the R(-) isomer."  (D.I. 265, Exh. 10 at
DLEV012112 (emphasis in original).)  In these circumstances, the
Court does not see a clear and unmistakable disavowal of claim
scope necessary for a court to limit the claims.  See Voda v.
Cordis Corp., 536 F.3d 1311, 1321 (Fed. Cir. 2008) ("[I]n order
to disavow claim scope during prosecution a patent applicant must
clearly and unambiguously express surrender of subject matter.")
(citations omitted); see also Phillips, 415 F.3d at 1317
("[B]ecause the prosecution history represents an ongoing
negotiation between the PTO and the applicant, rather than the
final product of that negotiation, it often lacks the clarity of

                                                              14

the specification and thus is less useful for claim construction purposes.").[2]

**B. "Chronic Administration" And "Chronically Administering To The Individual"**

| Sepracor's Construction | Dey's Construction | Barr's Construction |
|---|---|---|
| To administer the drug to a human on a <u>recurring</u> basis to prevent or reduce the extent to which bronchospasms occur. | Treating periodically or prophylactically. | Treating prophylactically or periodically. |

Citing a medical dictionary that defines "chronic" as being "marked . . . by frequent recurrence over a long time . . . ," Sepracor contends that its definition corresponds to the plain meaning of the term "chronic." (D.I. 283 at 12.) Sepracor further argues that the prosecution histories support their construction. Specifically, during prosecution of the '755 patent, the examiner "questioned in light of the specification" whether claims pertaining to the treatment of "chronic asthma

---

[2] Defendants have argued that if the Court were to accept Plaintiff's proposed claim construction, the patents may be invalid on grounds such as indefiniteness and written description. Of course, Defendants may be correct and Plaintiff's patents may ultimately be found invalid on these grounds. However, in the Court's view, the facts of this case present circumstances where indefiniteness and written description are best dealt with in a context other than the Court's initial consideration of claim construction.

15

patient" were supported.  (D.I. 265, Exh. 10 at DLEV012274).  In
response, Sepracor submitted the declaration of Dr. T. Scott
Johnson, who opined therein that "if the treatment were not
chronic, cessation of administration might or might not lead to
an immediate [asthma] attack, but it would certainly lead to
reestablishment of the disease condition."  (Id. at DLEV012281-
82.)  Based on this, Sepracor concludes that "chronic
administration" must correspond to "recurring" administration.

Like Sepracor, Defendants also rely on the Johnson
declaration for their construction.  In particular, Defendants
note that in the same passage of the Johnson declaration cited by
Sepracor, Dr. Johnson explained specifically that the
"application was referring to chronic therapy when it speaks of
either prophylactic or periodic administration."  (Id.)
Defendants further point out that Sepracor obtained allowance of
its claims specifically on the basis of the Johnson declaration.
(See id. at DLEV012292-93.)

Given that both parties direct the Court to the Johnson
declaration for support in construing "chronic administration,"
and given that the claims were, in fact, allowed on the basis of
the Johnson declaration, the Court will look to the Johnson
declaration for its construction of the "chronic administration"
term.  On review, the Court concludes that the section of the
Johnson declaration relied upon by Defendants speaks most

16

directly to the meaning of the term "chronic" as it is used in
the context of the '755 patent. Indeed, Dr. Johnson specifically
explained that the patent was "referring" to chronic therapy when
discussing "either prophylactic or periodic administration." By
contrast, the excerpts of the Johnson declaration relied upon by
Sepracor merely lay the foundation for why "chronic
administration," a term not used in the specification, may
nevertheless be understood as "either prophylactic or periodic
administration." Accordingly, the Court will construe "chronic
administration" to mean, as Defendants contend, prophylactic or
periodic administration.

## C. "Acute Administration"

| Sepracor's Construction | Dey's Construction | Barr's Construction |
|---|---|---|
| Administration to treat an acute attack of asthma. | Treatment after the onset of an asthma attack. | No construction offered. |

This disputed term appears only in Claim 1 of the '994
patent, which explicitly pertains to a "method of treating an
acute attack of asthma." Accordingly, the dispute over this term
does not actually pertain to whether it refers to treatment of an
asthma attack. Rather the dispute appears to be over the timing
of treatment. Dey contends that "acute administration" is
limited to treatment only "after" the onset of an asthma attack,
while Sepracor apparently asks for a broader definition, though

17

Sepracor does not clearly state what that definition should be. Indeed, Sepracor states in a small table introducing its discussion of this term that it should be given its "plain meaning – administration to treat an acute attack of asthma." (D.I. 283 at 17.) But in the text that immediately follows, Sepracor states the term "refers to a one time administration as opposed to chronic administration which requires recurring use." (Id.) Sepracor offers no evidence – either intrinsic or extrinsic – in support of either of these constructions.

Dey, by contrast, notes that the body of the claim refers to "administering to an individual suffering from an acute attack of asthma a quantity of an optically pure R(-) isomer . . . ." Referring to an individual already suffering from an acute asthma attack, Dey contends that "acute administration" must thus refer to administration after onset of the attack. (See D.I. 302 at 95:16 - 96:2.) Dey further points to the declaration of Dr. Johnson, discussed above, in support of the allowance of the claims of the '755 patent. There, Dr. Johnson explained that in the "acute" "mode" of asthma treatment, "albuterol is administered 'after onset of asthma.'" (See D.I. 265, Exh. 10 at DLEV012281.) In light of this evidence, and because Sepracor points to no evidence in support of its construction, the Court will construe "acute administration" to mean, as Dey contends, treatment after onset of an asthma attack.

18

**D.    "Inducing Bronchodilation Or Providing Relief Of Bronchospasm"**

| Sepracor's Construction | Dey's Construction | Barr's Construction |
|---|---|---|
| Bronchospasm means a contraction of smooth muscle in the walls of the bronchi and bronchioles, causing narrowing of the lumen, which is not limited to bronchospasms associated with asthma. | Treating asthma. | Treating asthma or an asthma attack. |

Defendants contend that this claim term should be limited to the treatment of asthma because the specification refers to "bronchospasm" as merely a symptom associated with asthma.  (D.I. 281 at 10; D.I. 264 at 31.)  For instance, Defendants note that the specification explains that "R(-) albuterol . . . is active in bronchial tissue sufficient to reduce bronchial spasms associated with asthma."  ('755 patent at 1:44-46.)  Defendants further point to a number of statements in the prosecution histories where the applicant explained that the invention was directed to the treatment of asthma.  (See, e.g., D.I. 264, Exh. 20 at DLEV011571 ("The claims of the issued patents 5,844,002; 5,760,090; 5,547,994; and 5,362,755 relate to methods for treating asthma.")).  With Sepracor having characterized the

19

overall invention as pertaining to asthma, Defendants contend that Sepracor should not now be allowed to claim the treatment of other conditions. Along these lines, Barr argues that in the specification Sepracor described no condition other than asthma or an asthma attack and "cannot now claim the benefit of any other conditions." (D.I. 280 at 10.)

Sepracor draws its construction from a medical dictionary definition for the term "bronchospasm." (See D.I. 268 at 19.) In support of this construction, Sepracor notes first that the relevant claims specifically do not include an "asthma" limitation but instead refer to the ostensibly more general terms "inducing bronchodilation" and "bronchospasm." (Id. at 20.) With regard to the specification, Sepracor contends that asthma is described only as an exemplary bronchial disorder, and that the claims should thus not be limited to the treatment of "asthma." (See, e.g., '755 patent at 1:46-51 ("The present invention relates to a method of treating bronchial disorders, such as asthma . . . .").) As for the prosecution histories, Sepracor notes that during prosecution of the '002 patent the applicants specifically explained that claims of the parent application were directed to a "method of treating asthma," whereas new claims were directed to "inducing bronchodilation or providing relief of bronchospasms." (D.I. 269, Exh. 14 at SEP0729190.) Thus, notwithstanding broad statements

20

characterizing the overall invention as pertaining to asthma treatment, Sepracor contends that the prosecution histories confirm that "bronchospasm" and "asthma" are distinct concepts. (D.I. 268 at 21.)   Along these lines, Sepracor further contends that the doctrine of claim differentiation requires this claim term be construed differently from the claim term "asthma." (D.I. 268 at 19-20.)

The Court will begin its analysis with the principle that "the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) (citations omitted).   The Court agrees with Defendants that the specification describes "bronchospasm" as part of the physiology of asthma and the inducement of "bronchodilation" as one manner of treating asthma.   But this does not lead to the conclusion that these terms are exclusively synonymous with asthma treatment, and it certainly does not rise to the level of a "manifest exclusion or restriction" of claim scope.   The same can be said with regard to statements in the prosecution history explaining, for instance, that the "thrust" of the invention is the treatment of asthma or that the claims "relate to" the treatment of asthma.   Indeed, far more compelling is that during prosecution the patentee specifically explained to

21

the examiner that claims including the term "inducing bronchodilation or providing relief of bronchospasms," which issued as part of the '002 patent, were distinct from claims pertaining to a "method for treating asthma," which issued as part of the '755 patent. (D.I. 268, Exh. 14 at SEP0729190.) Based on this, the Court concludes "inducing bronchodilation or providing relief of bronchospasms" should not be construed synonymously with "treating asthma."

Having declined to accept Defendants' proposed construction, the Court is left with the question of whether it is appropriate to, as Sepracor contends, look to a dictionary definition for support in construing this term. Because this claim term is not specifically defined in the internal record, the Court concludes that consultation of a dictionary is appropriate. Furthermore, "[b]ecause dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." Phillips, 415 F.3d at 1318; see also Atofina v. Great Lakes Chem. Corp., 441 F.3d 991, 996 (Fed. Cir. 2006) ("Because there is no suggestion that the intrinsic evidence defines the term 'catalyst,' one may look to technical dictionaries for assistance in determining that

22

term's meaning to a person of ordinary skill in the art.").
Here, Sepracor's dictionary definition defines "bronchospasm" as
"a contraction of smooth muscle in the walls of the bronchi and
bronchioles, causing narrowing of the lumen." (D.I. 268 at 19
(citing Stedman's Medical Dictionary 25th Ed. at 214).) Though
Defendants contend that this definition is not supported in the
specification or file history, see D.I. 281 at 11, they do not
clearly dispute the correctness of it. On the contrary,
Defendant Dey explains in its Opening Claim Construction Brief
that the term "bronchodilation," which is part of the disputed
claim term, refers to "relaxation of the airway smooth muscle."
D.I. 264 at 31. Furthermore, the specification explains that
"[a]lbuterol acts selectively on the beta$_2$-adrenergic receptors
to relax smooth muscle tissue, for example, in the bronchial
system." ('755 patent at 1:18-20.) Thus, construing this
disputed phrase in terms of smooth muscle tissue relaxation
appears to be well aligned with the specification. Accordingly,
the Court will construe "inducing bronchodilation or providing
relief from bronchospasm" to mean "inducing relaxation of smooth
muscle in the walls of the bronchi and bronchioles or providing
relief from contraction of smooth muscle in the walls of the
bronchi and bronchioles."

**E.    "Treating Bronchospasm In A Patient With Reversible Obstructive Airway Disease" And "Preventing Bronchospasm In A Patient With Reversible Obstructive Airway Disease"**

| Sepracor's Construction | Dey's Construction | Barr's Construction |
|---|---|---|
| Reversible obstructive airway disease is a respiratory disorder such as asthma, chronic bronchitis, and emphysema. | The "treating bronchospasm . . ." term refers to treating a patient after the onset of an asthma attack, and the "preventing bronchospasm" term refers to chronically treating a patient for asthma. | Reversible obstructive airway disease refers to asthma or an asthma attack. |

### 1.    Whether These Terms Should Be Limited To Asthma Treatment

As with other terms pertaining to "bronchodilation" and "bronchospasm," the core of the parties' dispute is whether "reversible obstructive airway disease" should be limited to "asthma."  In support of the position that it should be so limited, Dey raises essentially the same arguments it raised for the term "inducing bronchodilation or providing relief from bronchospasm."  See supra Part II.D.  Specifically, Dey contends that during prosecution the patentees characterized the invention as a whole as pertaining to "asthma" and that the specification contains no support for the treatment of conditions other than

24

"asthma." (D.I. 264 at 33-34.) Dey further points to extrinsic evidence that it contends demonstrates that "reversible obstructive airway disease" is synonymous with "asthma." (Id.) Barr, like Dey, also contends that this term should be limited to "asthma or an asthma attack" "[f]or substantially the same reasons" that it argued "inducing bronchodilation or providing relief of bronchospasm" referred only to asthma treatment. (D.I. 281 at 13-14.)

Sepracor's principal position on this term appears to be only that the term should not be limited to asthma treatment. Though Sepracor provides a definition from a journal article for this term, Sepracor does not urge the Court to adopt this definition as its construction. Rather, Sepracor contends that it provided the definition only to demonstrate that those of skill in the art understand "reversible obstructive airway disease" to refer to more than just "asthma." (D.I. 268 at 23 n.14.) Sepracor further contends that the patentees clearly explained during prosecution of the '933 patent that "reversible obstructive airway disease" was distinct from "asthma." Specifically, just like the term "inducing bronchodilation or providing relief from bronchospasm," Sepracor notes that the patentees explained that unlike previous claims, which were directed to "asthma" treatment," new claims were directed to

"reversible obstructive airway disease." (D.I. 269, Exh. 16 at
SEP0729306.)

Again, the Court must consider whether there has been a
clear intention to limit the claim scope of the claims using
"words or expressions of manifest exclusion or restriction."
Liebel-Flarsheim, 358 F.3d at 906. For the same reasons set
forth above, the Court concludes that there has been no such
intention to limit claim scope. Furthermore, the extrinsic
evidence relied upon by Dey does not demonstrate that "reversible
obstructive airway disease" is "synonymous" with "asthma." For
instance, the 1991 Report of the National Heart, Lung and Blood
Institute that Dey relies upon merely confirms that asthma is, in
fact, one type of "reversible obstructive airway disease," not
that it is the only kind. (See D.I. 264, Exh. 22 at SEP0743646.)
With regard to the Physician's Desk Reference that Dey argues
"indicates reversible obstructive airway disease is used
interchangeably with asthma," (D.I. 275 at 34), the Court notes
that Dey does not quote any specific language from this document
demonstrating this to be the case. After reviewing the document,
the Court does not identify any such language either. Finally,
as to the journal article Dey cites, (see D.I. 265, Exh. 24), the
Court concludes that this article actually suggests that
"reversible obstructive airway disease" should not be limited to
"asthma." Indeed, Table 1 of this article characterizes data for

16 patients having "reversible airway obstruction." The "Clinical Diagnosis" listed for such patients includes, in addition to various types of "asthma," "Pulmonary emphysema" and "Chronic Bronchitis," suggesting that those of skill in the art understand "reversible airway obstruction" to refer not just to "asthma." (Id. at 1368.)

Having concluded that this claim term will not be limited to treatment of "asthma," the Court must now consider what additional construction, if any, is required. The Court agrees with Defendants' that the term "reversible obstructive airway disease" is not defined in the specification. (See D.I. 281 at 13; D.I. 264 at 33-34). In these circumstances, it is not inappropriate for the Court to consider extrinsic evidence for assistance in construing this term. See Phillips, 415 F.3d at 1318. As explained above, the article Dey points to suggests that "reversible obstructive airway diseases" can include, at least, asthma, pulmonary bronchitis, and emphysema. Likewise the extrinsic evidence that Sepracor points to explicitly explains that "[r]eversible obstructive airways disease (ROAD) include asthma, chronic bronchitis, and emphysema." (D.I. 269, Exh. 15 at 154, 155.) Thus, the Court will construe "reversible obstructive airway disease" to mean, as Sepracor states in its Answering Claim Construction Brief, "a respiratory disorder such as asthma, chronic bronchitis, and emphysema." (D.I. 283 at 17.)

27

This construction confirms that the term is not limited to "asthma" and, at the same time, illuminates the meaning of the term by setting forth the types of conditions that those of skill in the art understand to be within the scope of "reversible obstructive airway disease."

  2. Whether The "Treating Bronchospasm" Term Must Be Limited To Treatment "After An Asthma Attack"

In addition to contending that this term should be limited to "asthma" treatment, Dey contends that this term includes a temporal component. Specifically, Dey contends that it refers only to treatment "after" onset of an asthma attack. In support of this position, Dey notes that the specification explains that "for example, R(-) albuterol is administered to an individual after onset of asthma." ('755 patent at 2:29-31.) Given the Court's determination that this claim term is not limited to "asthma" treatment, it makes little sense to, in the first instance, require that treatment take place only "after" an "asthma attack." Likewise, the Court sees nothing about the words "treating bronchospasm" that calls for the imposition of a temporal limitation. The specification excerpt Dey cites to, describing one exemplary manner of using R(-) albuterol, does not call for this either. Furthermore, unlike the term "acute administration," see supra Part II.C, the Court finds nothing in the claim language or file history suggesting such a limitation.

Accordingly, the Court will not limit this term to post-asthma attack treatment.

>    3.    Whether The "Preventing Bronchospasm" Term Must Be
>           Construed As "Chronic" Treatment

With their proposed construction, Dey essentially contends that the term "preventing" should be construed to refer to "chronic" treatment. In support of this position, Dey points to the prosecution history of the parent '755 patent. In particular, Dey points to the declaration of Dr. Johnson, who opined that one passage of the application discussed both acute and chronic therapy. (D.I. 265, Exh. 10 at DLEV012881.) The application was referring to chronic therapy, Dr. Johnson explained, when it described the administration of albuterol prior to the onset of bronchospasm in an asthma attack in order to prevent its occurrence. (Id.) But these statements do not establish that a treatment designed to "prevent" bronchospasm must always be defined as "chronic" treatment. Moreover, the Court's construction of "chronic," which Dey advocated for, already encompasses the concept of preventative treatment through its use of the word "phrophylactic." As such, the Court does not understand how defining "preventing" in terms of "chronic" treatment would meaningfully advance the understanding of the claim to one of skill in the art. Accordingly, the Court will not redefine "preventing" to correspond to "chronic" treatment.

## CONCLUSION

For the reasons discussed, the Court has construed the disputed terms and/or phrases of the patents-in-suit as provided herein. An Order consistent with this Memorandum Opinion will be entered setting forth the meanings of the disputed terms and/or phrases in the patents-in-suit.